ROBERT S. BREWER, JR.
United States Attorney
AARON P. ARNZEN, Cal Bar No. 218272
ANDREW J. GALVIN, Cal Bar No. 261925
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-8384 / 9721
Email: Aaron.Arnzen@usdoj.gov; Andrew.Galvin@usdoj.gov

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>ANDREW HACKETT (1),<br>ANNETTA BUDHU (2),<br><br>　　　　　Defendants. | Case No. 18CR3072-WQH<br><br>**UNITED STATES' MOTIONS *IN LIMINE* TO:**<br><br>1. **ADMIT CONSPIRATORS' REFERENCES TO OTHER "DEALS" IN DESCRIBING THE CHARGED SCHEME**<br><br>2. **ADMIT EVIDENCE OF DEFENDANT ANDREW HACKETT'S USE OF BOILER ROOMS TO PROMOTE "DEALS" OTHER THAN IN THE CHARGED SCHEME** |

The United States of America, by and through its counsel, Robert S. Brewer, United States Attorney, and Aaron P. Arnzen and Andrew J. Galvin, Assistant U.S. Attorneys, hereby files its first motions *in limine* relating to the October 28, 2019 trial.

## I.
## INTRODUCTION

Defendants Andrew Hackett and Annetta Budhu ("Defendants") are charged with crimes arising from a pump-and-dump scheme surrounding the stock of Arias Intel Corp., which is known by its ticker symbol, ASNT. Michael Forster, a cooperating witness, has been in the penny stock fraud business for well over a decade. Forster became a source and has been assisting the FBI since August 2017. In late-October 2017, Forster was recruited by defendant Vikram Khanna (now deceased) to promote, or "pump," ASNT stock. Through a series of consensually recorded phone calls, emails, and text messages, Forster gathered information about all significant aspects of an ongoing pump-and-dump scheme surrounding ASNT. Through the scheme, the conspirators planned to generate millions of dollars, and although the scheme did not reach full flower due to stock trading issues, Hackett sold large blocks of ASNT shares and received hundreds of thousands of dollars in fraudulent proceeds.

Through the present motions, the United States seeks to:

1. <u>Admit the conspirators' references to other penny stock "deals" in describing the ASNT scheme.</u> When discussing the contours of the ASNT conspiracy, the conspirators and Forster occasionally spoke about other deals as reference points. These references to other deals are intrinsic evidence of the charged scheme, and exempt from the requirements of Federal Rule of Evidence 404(b). Even if Rule 404(b) applies, the evidence should be admitted because it shows defendants' knowledge, plan, and modus operandi, and meets Rule 403's balancing test.

2. <u>Admit evidence of Hackett's use of boiler rooms to promote "deals" other than ASNT.</u> There is voluminous evidence (including recorded phone calls

and expected witness testimony from a boiler room broker and operator) that Hackett used boiler rooms to pump and dump ASNT as well as other stocks. This evidence should be admitted under Rule 404(b) to prove Defendants' intent and knowledge of the boiler room operations.

## II.
## STATEMENT OF FACTS

**A.   Forster's Discussions with the Conspirators**

Defendants in this case were already working together on a pump-and-dump scheme when, on October 25, 2017, Khanna contacted Forster about promoting ASNT through a stock touting website known as TheMoneyStreet.com.  Forster worked with the individual (Gannon Giguiere charged elsewhere) who controlled TheMoneyStreet.com to identify stocks to promote on the website.  Over the course of the next three months, at the FBI's instruction, Forster recorded calls and captured text and email communications with Defendants and their co-conspirators.  Forster told the conspirators that it was expensive to prepare and deploy TheMoneyStreet.com on a particular stock, with costs rising into the hundreds of thousands of dollars.  Forster therefore had two excuses to talk with the conspirators about virtually all aspects of the ASNT scheme:  (1) to make TheMoneyStreet.com's promotion of ASNT as persuasive and effective as possible, which would benefit everybody involved in the scheme, and (2) to assess whether Forster's investment in TheMoneyStreet.com's ASNT promotion would pay off (*e.g.*, Forster to defendants Budhu, Khanna, Gillespie: "I was hoping that you'd be a little patient with me and my questions, and I just wanted to demonstrate to you, you know, I'm gonna be 300, 400 [thousand dollars] deep before we hit our stride here, and so, that's why I have a couple of questions.").

The conspirators were eager to have access to TheMoneyStreet.com – the website had been exceptionally successful in promoting other stocks by this time – so they freely divulged information about the scheme to Forster.  The subject of the communications ranged from who was involved in the scheme; the roles they played;

how much stock they collectively controlled; the overseas and domestic accounts at which they did and would hold their ASNT shares; a number of press releases ASNT planned to release in the future; the company's willingness to coordinate press releases with other efforts to pump the stock; previous and ongoing efforts to promote the stock through boiler rooms, email blasts, and internet touts; how high to pump ASNT's stock price before dumping the shares; how proceeds of the fraud would be distributed; and the use of encrypted messaging apps to conceal the conspirators' communications from law enforcement.

B. **The Conspirators' References to Other Deals to Describe the ASNT Scheme**

Forster and Hackett fell into a pattern of relatively consistent contact, and Hackett began to discuss his other, non-ASNT stock deals. Budhu and other conspirators also participated in discussions in which non-ASNT deals were discussed to illustrate various points about the ASNT scheme. The Government intends to introduce evidence surrounding these other deals only to the extent that the conspirators referenced such deals to describe, explain or discuss the contours of the ASNT scheme (except for Hackett's use of boiler rooms for other deals, as discussed below). For example, Hackett, Khanna and Forster discussed the importance of trade execution (being able to make a trade in the public markets quickly and according to specific trade instructions) upon the expected initiation of TheMoneyStreet.com's promotion of ASNT. During this conversation, Forster referenced a deal involving the ticker QBIO. Forster stated, in part, "I'm sure you watched … QBIO. You understand how it goes. I have to tell you, the worst day was when it went to twelve bucks. You want to know why … no one could execute. I'm only 5'7", and I was screaming like I was 6'2". … I can't get there from here on this one [ASNT]. I am not going to be quarter, half a million dollars deep and we can't execute." Mr. Hackett indicated that he remembered this series of events, and suggesting that the group deposit ASNT stock at several different

brokerages to improve trade execution. *See* Ex. 1, 171102_0078.MP3, at 26:26 - 28:37.[1] We expect that Forster would testify, on direct examination, that QBIO was a penny stock deal in which he participated, and that poor trade execution combined with promotions led to large, erratic movements in the stock price.

Similar references to this and other deals, during discussions about ASNT, include the following:

- On an October 25, 2017 call, Khanna stated to Forster that the individuals involved in ASNT, including Hackett, were the same as those involved in "Yuengling" deal. *See* Ex. 2, 171025_0042.MP3 at 0:30 – 1:10, 4:57 – 5:30.

- On an October 30, 2017 call, a deal involving DAVC was referenced during a call about ASNT. *See* Ex. 3, 171030_0057.MP3, at 2:30 – 3:30.

- On an October 31, 2017 call, Khanna stated to Forster that Budhu is involved in HVST, and Khanna knows Budhu because she has been a long-time shell broker. Khanna and Forster also discussed some of the ways in which the ASNT scheme was similar to the QBIO deal. *See* Ex. 4, 171031_0062.MP3, at 3:30 – 5:05, 7:25 – 8:05.

- On an October 31, 2017 call between Khanna and Forster, which Budhu joined after the call initiated, Khanna stated that Hackett and Budhu knew each other, that Hackett had a "Zika" deal for which Budhu got the shell, and that Khanna had known Hackett for some time because Hackett and Budhu were involved in Canadian deals. Khanna also stated that Hackett had shares of QBIO stock, so Hackett understood and valued promotions on TheMoneyStreet.com. Khanna also stated that he knew Hackett from the "ice cream deal," [i.e., the Yuengling deal] and stated that Hackett

---

[1] The MP3 files referenced herein as exhibits will be delivered on a DVD to the Court's chambers at the first available opportunity. Defense counsel has been provided with these files in discovery.

brings a number of high net worth individuals into deals. *See* Ex. 5, 171031_0065.MP3, at 2:00 – 2:30, 5:55 – 7:35.

- On a November 1, 2017 call, Khanna stated to Forster that Budhu knows about the QBIO deal through Hackett and Budhu. *See* Ex. 6, 171101_0068.MP3, at 7:00 – 7:55.

- On a November 6, 2017 call, Forster described the risks of having a limited number of ASNT shares during a promotion. In doing so, Forster referenced share price volatility in QBIO that occurred when it was promoted and Forster's group had a limited number of shares. *See* Ex. 7, 171106_0087, at 15:20 – 17:00.

- In a group text message, discussions of the Yuengling deal were interspersed in a broader discussion regarding ASNT. At the bottom of a text string about ASNT between Forster and Hackett, Forster stated that he had other deals in the works, including a medical device company; Hackett mentioned an ice cream deal, which the United States assumes refers to the Yuengling deal. *See* Ex. 8, SC14-TEXTS-000041.

- On a December 19, 2017 call, Hackett and Forster discussed the use of a "massive email campaign" to promote ASNT. During the call, Hackett stated that he has sold "400 to a million" [in context, Hackett was likely referring to shares] through email campaigns. Forster and Hackett also discussed using an undercover agent's broker network to dump, or possibly dump, Hackett's ASNT and DAVC stock. *See* Ex. 9, 171219_00209.MP3, at 4:50 - 6:11, 12:30 – 16:25.

- On a December 20, 2017 call, Forster and Hackett discussed using an undercover agent's broker network to dump, or possibly dump, Hackett's ASNT and DAVC stock. *See* Ex. 10, 171220_00217.MP3 at 1:01 – 1:50.

- On a December 21, 2017 call, Forster and Hackett discussed using an undercover agent's purported broker network to dump, or possibly dump,

Hackett's ASNT, DAVC and WRIT stock.  *See* Ex 11, 171221_00218.MP3, at 0:40 – 4:15.

C.   **Hackett's Use of Boiler Rooms on Other Deals**

Hackett participated in recorded calls during which stated that he used boiler rooms to pump other stocks.  When Hackett mentioned the person he typically contacted to engage boiler rooms (the "Boiler Room Broker"), Forster expressed an interest in meeting with the Boiler Room Broker, and Hackett introduced Forster to the Boiler Room Broker.  The Boiler Room Broker (who pleaded guilty earlier this year in another case filed under seal in another district) is expected to testify at trial, and has identified a number of deals that he/she promoted through boiler rooms at Hackett's request.  In addition to ASNT, these include the following tickers: BMXI, CHZP, GVCL, ITMC, LBTD, ODYY, QBIO, TLNUF, and VIVK.  The Boiler Room Broker also identified an individual (the "Boiler Room Operator") that she engaged to pump these stocks.  Hackett usually paid the Boiler Room Broker 50% of the amounts that investors identified through the Boiler Rooms invested in ASNT.

The Boiler Room Operator (who also pleaded guilty earlier this year in another case filed under seal in another district) is also a likely Government witness at trial.  He/she is expected to testify that the boiler room pumped each of the foregoing stocks; his/her boiler room did so through false and misleading statements and omissions to investors; his/her boiler room has had a consistent practice of making such false and misleading statements and omissions to investors since its inception; and based on his experience, his boiler room is very similar to all other boiler rooms of which he is aware.  The Boiler Room Broker usually paid the Boiler Room Operator 35% of the amounts that investors identified through the Boiler Rooms invested in ASNT stock.

# III.

# ARGUMENT

## A. The Court Should Admit the Conspirators' References To Other "Deals" When Describing the ASNT Scheme

### 1. The Evidence is Not Subject to Rule 404(b)

The conspirators' references to other deals to describe aspects of the ASNT deal constitute direct evidence of the conspiracy and securities fraud alleged in the indictment. In the recorded calls with Forster, the conspirators discuss, among other things:

- The Yuengling, Zika and Canadian deals, in order to describe how the conspirators know one another.
- Budhu's role as a long-time shell broker, to describe how Khanna and Buhu met.
- QBIO, to determine which conspirators had knowledge of TheMoneyStreet.com, which was going to be used to pump ASNT stock, to demonstrate how effective TheMoneyStreet.com was at pumping stock, and the risks posed if the conspirators held a limited number of ASNT shares when ASNT was being pumped.
- Hackett's use of specific email and internet promotions, and how successful those promotions could be if engaged on ASNT.
- Dumping shares of ASNT, DAVC, and WRIT into an undercover agent's purported broker network. Hackett and Forster often discussed these stocks collectively in fluid conversation.

Because the conspirators discussed each of these stocks in connection with, and to illuminate, the conspirators' plans and actions with respect to ASNT, they are intrinsic evidence of the crimes for which Defendants are charged. The evidence is therefore not subject to Rule 404(b). As the Ninth Circuit explained:

> Other act evidence that is inextricably intertwined with a charged offense is independently admissible and is exempt from the requirements of Rule 404(b). ... Such intrinsic evidence includes evidence constituting a part of the transaction that serves as the basis for the criminal charge. … Intrinsic evidence, however, also includes evidence that is necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime. ... This is because the jury cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge. … This includes circumstantial evidence explaining the general nature of a defendant's business activity and providing a context in which the transactions at issue took place.

*United States v. Anderson*, 741 F.3d 938, 949-50 (2013) (internal citation, quotations omitted).

The conspirators' references to other deals when describing the ASNT scheme falls squarely into these categories. The conspirators discussed the contours of their agreement – the same agreement that forms the basis for the conspiracy alleged in count 1 of the Indictment – by referring to these deals. Their discussion of these deals is therefore inextricably intertwined with the ASNT scheme. Introduction of these conspiratorial discussions will provide the jury with "knowledge of the time, place, and circumstances" surrounding the ASNT scheme, and allow for a "coherent and comprehensible story regarding the commission of the crime."

### 2. The Evidence Would be Admissible under Rule 404(b)

In the alternative, the same evidence would also admissible under Rule 404(b). "In making admissibility decisions, the court will admit Rule 404(b) evidence if (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *United States v. Verduzco*, 373 F.3d 1022, 1027 (9th Cir. 2004) (citing *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994)). Evidence of other acts is particularly helpful to the jury in a criminal case where, as here, the defendant's intent is the relevant issue. *United States v. Huddleston*, 485 U.S. 681, 685 (1988)

("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.").

The evidence undoubtedly proves several material points – Defendants' intent, knowledge of, and plan to perpetrate the ASNT scheme, the scope of their conspiratorial agreement, and their modus operandi surrounding pump-and-dump schemes. *See, e.g.*, *United States v. Williams*, 900 F.2d 823, 826 (9th Cir. 1990) (reversing District Court order precluding Rule 404(b) evidence in a drug distribution case because, *inter alia*, even though the subject packages did not contain cocaine, "they may still be relevant to show modus operandi").

Second, the discussions were not remote in time. In fact, the discussions were contemporaneous with the conspiratorial discussions about ASNT. This is exactly why the United States seeks to introduce this evidence; the references to other deals were made to articulate, explain, and illuminate the ASNT scheme. As for the deals themselves, recorded calls make clear that Hackett was working on the Yuengling, DAVC and WRIT deals during the same period he was engaged in active discussions regarding the ASNT scheme, *i.e.*, October 2017 through at least January 2018. As for QBIO, regulatory records indicate that scheme began in 2015 and continued until at least April 2017. For context, Budhu received the 200,000 shares that were dumped in the ASNT scheme pursuant to a February 10, 2017 advisory agreement, and sold those shares to Hackett under an August 8, 2017 share purchase agreement. The life cycle of the respective deals therefore overlap, and are not too remote in time. *See United States v. Lozano*, 623 F.3d 1055, 1059-60 (9th Cir. 2010) (concluding that three years was not too remote).

Third, the recordings are clear that Hackett was "working" the other deals. Khanna stated that Hackett had shares in QBIO, Hackett introduced Forster and the Boiler Room Broker to each other by reminding them they both promoted QBIO, and when Forster recounted how angry he was about poor execution in the QBIO deal,

Hackett responded: "I remember." Hackett tried to recruit Forster and TheMoneyStreet.com into the WRIT deal, talked shop with Forster about the Yuengling deal, and tried to dump DAVC shares through the undercover agent's broker network. The evidence is therefore sufficient to support a finding that Hackett participated in other deals for which he was seeking promotion and to dump shares.

The recordings also demonstrate that the other deals are similar to the ASNT deal. In brief, the calls show that Hackett had obtained inexpensive blocks of stock in the subject companies, sought to pump the stocks' prices through TheMoneyStreet.com, boiler rooms, and/or internet and email campaigns. This is exactly what the indictment alleges Hackett and Budhu conspired to do, and did, with ASNT stock.

Finally, the evidence should not be excluded under Rule 403. As discussed above, the evidence is highly relevant to Defendants' intent, knowledge of, and plan to perpetrate the ASNT scheme, the scope of their conspiratorial agreement, and their modus operandi surrounding pump-and-dump schemes. The evidence is also relevant to show Defendants' respective roles in the scheme. Any prejudice would not be so great that it would meet Rule 403's "unfair" standard. The evidence is not voluminous and would not take an undue amount of time to present, the impact of engaging in other deals is quite unlikely to prompt an emotional response in the jurors, and a limiting instruction during and at the conclusion of the trial would be sufficient to ensure the jury considers it for only prescribed purposes. *See United States v. DeDinces*, 808 F.3d 785, 791-92 (9th Cir. 2015) (reversing District Court's *in limine* ruling that precluded 404(b) evidence in securities fraud trial: "the admission of any evidence will necessarily lengthen the trial, but we cannot conclude that it would result in 'undue delay' or 'wasting time,' in light of the significant probative value of this evidence").

**B.  The Court Should Admit Evidence of Defendant Hackett's Use Of Boiler Rooms to Promote "Deals" other than ASNT**

Evidence surrounding Hackett's use of the Boiler Room Broker and Boiler Room Operator to pump and dump non-ASNT stock should be admitted under Rule 404(b).

First, the evidence is relevant. The United States expects Hackett and Budhu to argue that they are not guilty because, *inter alia*, they lacked the requisite *mens rea*. For example, we expect the evidence to show that Hackett only communicated with the Boiler Room Broker, and not with the Boiler Room Operator. This would allow Hackett to argue that he had no idea that the Boiler Room Operator made false and misleading statements / omissions in pushing victims to purchase ASNT stock. The United States should have the opportunity to refute this defense. *See United States v. Curtin*, 489 F.3d 935, 940 (9th Cir. 2007) ("Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense."). To do so, the United States would present evidence that (1) Hackett engaged the Boiler Room Broker for a number of stocks, (2) the Boiler Room Broker, in turn, engaged the Boiler Room Operator to pump these stocks, (3) the Boiler Room Operator and his/her employees consistently misled investors, and (4) other boiler rooms were very similar to the Boiler Room Operator's. The United States would argue that, given the number of times Hackett used the Boiler Room Broker, and the fact that the Boiler Room Operator was typical of his/her shady corner of the securities industry, Hackett was in an excellent position to know that the Boiler Room Operator defrauded investors when he/she pumped ASNT on behalf of Hackett. Indeed, standard commissions in the securities brokerage industry rarely exceed 5% – the only plausible explanation for paying the Boiler Room Broker 50% of Hackett's proceeds from selling ASNT stock is that the Boiler Rooms were engaged in fraud. Simply put, Hackett's repeated use of boiler rooms for other deals is highly relevant to his knowledge and intent in pumping ASNT stock.

Second, the boiler room promotions were not too remote in time. In fact, Hackett paid the Boiler Room Operator to pump BMXI, CHZP, GVCL, ITMC, LBTD, ODYY, QBIO, TLNUF, and VIVK in 2016, 2017, and/or 2018. And Hackett paid for ASNT to be pumped through the Boiler Room Broker in 2017 and 2018. His use of the boiler

rooms on others deals is therefore not too remote in time. *See Lozano*, 623 F.3d at 1059-60 (three years not too remote).

Third, the evidence is certainly sufficient to show that Hackett paid boiler rooms to pump the non-ASNT stocks. The Boiler Room Broker will testify that Hackett paid him/her to do so, and the Boiler Room Operator will testify that the Broker did the same. In addition, the Boiler Room Operator contemporaneously emailed weekly invoices to the Boiler Room Broker detailing the amounts that he "earned" by pumping these stocks. The United States intends to introduce these invoices at trial to corroborate the expected testimony described above. *See*, *e.g.*, Ex. 12, SC14_15 Reports-030421.

Fourth, Hackett's use of boiler rooms to pump these other stocks is virtually identical to his use of the rooms to pump ASNT. The Boiler Room Operator is expected to testify that his methods did not change over time or from one stock introduced by the Boiler Room Broker to the next.

Finally, the evidence should not be excluded under Rule 403. The evidence is highly relevant to Defendants' intent and knowledge of the boiler rooms that pumped and dumped ASNT stock. And, once again, any prejudice would be insufficient to meet Rule 403's "unfair" standard. The evidence is not voluminous and would not take an undue amount of time to present, the impact of using boiler rooms to pump other stock is unlikely to prompt an emotional response in the jurors, and a limiting instruction during and at the conclusion of the trial would be sufficient to ensure the jury considers it for only prescribed purposes. *See DeDinces*, 808 F.3d at 791-92.

## IV

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court grant its motions *in limine*.

DATED: September 4, 2019.

                                      Respectfully submitted,

                                      ROBERT S. BREWER, JR.
                                      United States Attorney

                                      */s/ Aaron P. Arnzen*
                                      AARON P. ARNZEN
                                      ANDREW J. GALVIN
                                      Assistant U.S. Attorneys