Pages 1 - 67

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Barry Ted Moskowitz, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )          NO. 18-CR-03072-DMS
                                   )
ANDREW HACKETT AND ANNETTA         )
BUDHU,                             )
                                   )
          Defendants.              )
_____   )

San Diego, California
Monday, October 21, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    ROBERT S. BREWER, JR.
                    United States Attorney
                    880 Front Street, Suite 6293
                    San Diego, California 92101
            BY: **AARON ARNZEN, ESQ.**
                 **ANDREW J. GALVIN, ESQ.**
                 **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Andrew Hackett:
                    LAW OFFICE OF MARC S. NURIK
                    1551 Manning Avenue, Suite 302
                    Los Angeles, California 90024
            BY: **MARC STEVEN NURIK, ESQ.**
                 **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
               Official Court Reporter

1    **APPEARANCES:   (CONTINUED)**

2    For Defendant Annetta Budhu:
                              FEDERAL DEFENDERS OF SAN DIEGO, INC.
3                             225 Broadway, Suite 900
                              San Diego, California 92101
4                     BY:   **JOSHUA J. JONES, ESQ.**
                            **MICHELLE CYNTHIA ANGELES, ESQ.**
5                           **ATTORNEYS AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Monday - October 21, 2019                          2:57 p.m.

 2                      P R O C E E D I N G S

 3                         ---oOo---

 4        THE COURT:  Good afternoon.

 5     Please have a seat.  I'll be right with you.

 6                   (Pause in proceedings.)

 7        THE CLERK:  Calling Calendar Matter No. 2, 18-CR-3072,

 8   United States of America versus Andrew Hackett and Annetta

 9   Budhu.

10        MR. JONES:  Good morning, Your Honor.  Joshua Jones

11   and Michelle Angeles, Federal Defenders, on behalf of

12   Ms. Budhu.

13        MR. NURIK:  Good afternoon, Your Honor.  Marc Nurik.

14   My client Andrew Hackett is present.

15        THE COURT:  All right.

16        MR. JONES:  I should note Ms. Budhu is present by

17   videoconference.

18        THE COURT:  I see her.

19     Do you also see her?

20        MR. JONES:  Yes, Your Honor.

21        THE COURT:  So what are we going to do about my speech

22   difficulty for her?

23        MR. JONES:  She sees a split-screen.  So she can

24   confirm, but I believe she can see the running transcript that

25   we all see here on the screen.
```

1      **THE COURT:**  Is that correct, Ms. Budhu?

2      Mr. Jones, why don't you ask her.

3      **MR. JONES:**  Ms. Budhu, can you confirm for the judge

4  that you can see the --

5      **DEFENDANT BUDHU:**  Yes.  Yes, Your Honor.  Yes,

6  Your Honor.  I can see the transcript, but it's just half of

7  the page.  It's kind of -- I can't see the rest of the page,

8  only half of it.

9      **THE COURT:**  Well, can you see what I'm saying?

10     **DEFENDANT BUDHU:**  Yes, sir.

11     **THE COURT:**  So that page is working?

12     **DEFENDANT BUDHU:**  Your Honor, I can see the

13 transcript, only the highlights.  I can't see the exact text,

14 the entire verbiage.

15     **THE COURT:**  How can we fix that?

16     **THE CLERK:**  Let me -- Ms. Budhu, are you seeing where

17 it says, "Others Speaking"?

18     **DEFENDANT BUDHU:**  Yes.

19     **THE CLERK:**  And do you see the highlighted portion

20 just underneath that and then some text to the right of it?

21     **DEFENDANT BUDHU:**  Yeah, but half of the text is cut

22 out because my -- the video is -- my video screen is covering

23 that.  So I can't read the entire line, just the first part of

24 it.

25     **THE CLERK:**  Okay.

1      **DEFENDANT BUDHU:**  If you expand that screen, I can

2   probably see it all.

3      **THE CLERK:**  Is Bruno still here?  Yeah.

4      **MR. DOBU:**  I don't know what -- what is causing that

5   problem.  I mean --

6      **THE CLERK:**  What I might suggest, Bruno -- you can

7   tell me if this is accurate or not.  We are not likely to have

8   witnesses at the witness stand today; correct?

9      **MR. ARNZEN:**  Correct.

10      **MR. JONES:**  That's correct.

11      **THE CLERK:**  If we went to a three, where we see the

12   judge, the lectern, and the evidence, it may expand the size of

13   that screen.

14      **MR. ARNZEN:**  And in the meantime, Your Honor, Aaron

15   Arnzen and Andrew Galvin for the United States.

16      **THE CLERK:**  Did that help?

17      **DEFENDANT BUDHU:**  Oh, perfect.  I can read it now.

18   Yes, absolutely.  Thank you.

19      **THE CLERK:**  Your Honor, I can switch back and forth

20   from her viewing you and the running transcript if she needs to

21   see her attorney or the other attorney at the lectern camera.

22   I can switch it to where it's the lectern camera and the

23   evidence.

24      This -- that way, she'll be able to see the running

25   transcript in full the entire time.  It's just going to be me

1    switching back and forth as needed and as requested by counsel.

2          **THE COURT:**  All right.  If you don't see what I said

3    in the transcript, will you please let us know.

4          **DEFENDANT BUDHU:**  I can see the entire transcript,

5    Your Honor.  Thank you.

6          **THE COURT:**  But if something happens that you can no

7    longer see it, please let us know.

8          **DEFENDANT BUDHU:**  I sure will.  Thank you.

9          **THE COURT:**  All right.  The first thing is the trial

10   will be presided over by Judge Sabraw, and he will have you

11   before him Wednesday afternoon for a status hearing.  Any

12   requests to continue the trial need to be made before him.

13         **THE CLERK:**  Your Honor, that would be at 10:30 on the

14   23rd.

15         **THE COURT:**  All right.  Now, he asked me to rule on as

16   many of the motions in limine as possible.  So I think we'll

17   have to await the circumstances at the trial, but we will get

18   into that later.  So let's first start with the *Bruton* issue.

19      Did the Government prepare the exact wording of what they

20   might want to offer if they elect to do so under the --

21      (Court reporter requests clarification for the record.)

22         **THE COURT:**  Of what the Government wants to offer if

23   they decide to elect to proceed under the proffer agreement,

24   which would allow them to offer certain statements of

25   Mr. Hackett.

1          **MR. JONES:**  Your Honor, I believe they did that in

2     their response to our original *Bruton* motion unless there was

3     something else that the Court was anticipating.

4          **MR. ARNZEN:**  Yes, Your Honor.

5       Mr. Jones is right.  We have prepared that.  It is set

6     forth in Docket No. 173.  This sets out four statements that

7     were made by Mr. Hackett during his proffer that touch upon

8     Ms. Budhu that we would seek to introduce if the proffer came

9     into evidence.

10      And I think I -- oh, I'm sorry.  Your Honor, I'm sorry.

11    That's Document No. 178 -- or Docket No. 178.  It starts at

12    Page 7 and goes through Page 8.

13         **THE COURT:**  I don't believe I actually ruled on this,

14    and I checked the minute order this afternoon, and it doesn't

15    reflect that --

16      (Court reporter requests clarification for the record.)

17         **THE COURT:**  I checked the minute order this afternoon,

18    and it doesn't indicate that I actually ruled on it.

19         **MR. JONES:**  My understanding was that the Court was

20    denying the motion to sever without prejudice and that the

21    Court was reserving with regard to the admission because it

22    would depend on the nature of any potential representations or

23    testimony on behalf of Mr. Hackett, but --

24         **THE COURT:**  Well, if that is true, the minute order

25    would reflect that the motion to sever was denied, but I don't

1   think I ruled on the actual content of the information that

2   would be elicited.

3        **MR. JONES:**  I think that's correct, Your Honor, but I

4   believe that was intentional because we don't know the

5   circumstances.

6        **THE COURT:**  Well, we don't know what would key the

7   admission of any statement.  It may be partial, it may be the

8   entirety of what the Government wishes to offer.

9        Would you like a specific ruling on the content; in other

10  words, whether the specific offer would contravene *Bruton*?

11       **MR. JONES:**  Your Honor, I did -- I do believe we had

12  some argument last time.  Obviously, our contention is that the

13  replacements that the Government is making are not sufficient

14  to make -- that it would be very clear that we're referring to

15  Ms. Budhu, but I do think that that is going to be much clearer

16  come trial time.

17       My understanding -- or my belief is that Ms. Budhu and

18  Mr. Gillespie will be the only two ASNT representatives who are

19  referenced during the course of the trial, and thus it would be

20  clear, because Mr. Gillespie is a cooperating witness, that the

21  ASNT representative was Ms. Budhu.

22       So I'm happy to address that issue now if the Court would

23  like, but it seems like I definitely would probably be

24  re-raising the issue based on the way the evidence comes out at

25  trial as well.

1          **THE COURT:**  Who is speaking for the Government on

2    this?

3          **MR. ARNZEN:**  I am, Your Honor.

4       And so there is good case law and ample case law in the

5    Ninth Circuit that establishes that if you replace a proper

6    noun -- or proper name -- I'm sorry -- with a pronoun that is

7    neutral, that doesn't specifically identify the other

8    defendant, that that does not spark a *Bruton* concern sufficient

9    to dictate -- or sufficient to mandate severance.

10      And indeed, even other evidence that comes in at trial,

11   even if it's inferential -- inferentially shows that the

12   neutral pronoun actually does identify a defendant, that still

13   is not good enough for severance.

14      What we've done here is apply a phrase -- "ASNT

15   representative" -- that is neutral.  It's not -- it's not

16   gender-specific.  We think we've made it sufficiently anonymous

17   such that the *Bruton* concerns aren't raised.  We certainly

18   don't think that -- that these rise to the level to -- to

19   require severance, and they don't -- they don't constitute a

20   *Bruton* violation.

21          **THE COURT:**  Well, I agree with you as to severance,

22   and I previously denied the motion to sever.  But then we come

23   to what might you be able to use, as shown on Page 7 of your

24   submission on September the 18th, Docket No. 178.  Let's go

25   through them.

1    So the first one is on Line 15 of Page 7.

2         **MR. ARNZEN:**  Yes, Your Honor.

3    Are you asking for argument on this -- on this specific

4    statement?

5         **THE COURT:**  Yes.

6         **MR. ARNZEN:**  Yes.  Okay.

7         **THE COURT:**  There are four of them; right?

8         **MR. ARNZEN:**  There are, Your Honor, exactly right.

9         So with respect to the first one, Mr. Hackett said in his

10   proffer in July of 2018, a statement that was summarized by the

11   FBI in the interview report -- it's set forth on Lines 11

12   through 14 on Page 7, as you just indicated.  This indicates

13   where Mr. Hackett received the shares from.  He received them

14   from Ms. Budhu.

15        There is -- I should be clear, Your Honor -- a very

16   substantial body of evidence that we will seek to introduce

17   that shows exactly where these shares came from, that

18   Mr. Hackett purchased them from Ms. Budhu.  That evidence is

19   separate and apart from this statement.

20        However, Mr. Hackett said so, and we should be able to put

21   it in because instead of indicating that Ms. Budhu was the one

22   that supplied them, in the proffer, we can simply substitute

23   "an ASNT representative," and then all you've got is an

24   inference that this is the same person as Ms. Budhu.  The case

25   law, again, is clear that that inference is permissible, and

1  there's nothing under the law that requires us to go further

2  and totally redact the name.

3      Even if Your Honor told us that the FBI agent should not

4  mention another person, that Mr. Hackett got these 300,000

5  shares from somebody -- I'm sorry.  There's -- she -- Budhu

6  stated -- oh.  This is not with respect to -- so there are a

7  couple bodies of -- a couple blocks of stock.  This one refers

8  to 750,000 shares that -- that were subject to a negotiation

9  between Mr. Hackett and Ms. Budhu.

10      And so, again, this simply uses the phrase "an ASNT

11  representative" so -- so that it is sufficiently anonymous and

12  not specifically identify Ms. Budhu.

13      **THE COURT:**  Well, it says, "An ASNT representative

14  stated," but I thought this was Mr. Hackett's statement.

15      **MR. ARNZEN:**  That is our proposal, to change the name

16  "Budhu," as represented in the 302, so that when an FBI -- FBI

17  agent testifies to it, it will simply -- he will simply say,

18  "An ASNT representative conveyed to Mr. Hackett such-and-such."

19      **THE COURT:**  Well, I think this is confusing because it

20  is Mr. Hackett's statement that you are offering; correct?

21      **MR. ARNZEN:**  It is absolutely Mr. Hackett's statement

22  that we're offering.

23      **THE COURT:**  And so here, you say, "An ASNT

24  representative stated."  It should be "Mr. Hackett said that."

25      **MR. ARNZEN:**  Oh.  I'm sorry.  I think I understand the

1   confusion, Your Honor.

2        During the proffer, here's what Mr. Hackett said:

3   "Annetta Budhu told me that the $300,000 would be used for

4   750,000 shares."  So he was conveying during the interview,

5   during the proffer, a statement that was originally made by

6   Ms. Budhu.

7        It was a back-and-forth conversation/negotiation about how

8   many shares Mr. Hackett would get in exchange for the money

9   that he was giving the people that held the shares.

10       **THE COURT:**  I think it needs to be modified to make it

11  clear that Mr. Hackett is saying that another person told him.

12       **MR. ARNZEN:**  Very well, Your Honor.  I understand the

13  confusion, and we can correct it.

14       Again, it is nice because what we're going to have is not

15  a tape -- a tape recording that we press "Play" on but an FBI

16  agent testifying, and he can certainly work this into his

17  testimony so that it is clear for the jury.

18       **THE COURT:**  So as to that modification, Mr. Jones,

19  what would be your objection?

20       **MR. JONES:**  Your Honor, our objection would be the

21  same.

22       While we understand that there is case law, specifically

23  *Richardson*, indicating that the Government can do these types

24  of redaction and replacement, I think there is support for our

25  position that if it's a completely transparent replacement

1    where immediately the jury is going to know exactly who they're

2    talking about, that that's not sufficient to comply with

3    *Bruton*'s protective rule because the actual criteria that we're

4    looking at is whether or not it clearly implicates Ms. Budhu

5    and would constitute powerful and incriminating evidence.

6        I think both of those requirements are met here with

7    regard to referring to an ASNT representative, and I don't

8    think very much is gained from that particular portion here.

9        The Government, especially given that this is going to be

10   coming out through the summary testimony of an agent, could

11   elicit the fact that he obtained these shares and what he

12   thought was going to happen with the shares without indicating

13   anything about an ASNT representative or any individual other

14   than Mr. Hackett himself.

15       **THE COURT:**  The whole idea is Mr. Hackett obtaining

16   the shares.  I agree with Mr. Jones that it is not necessary to

17   implicate another person, especially given the limited purpose

18   that the statement would come in for under the proffer

19   agreement.

20       So you need to --

21       (Court reporter requests clarification for the record.)

22       **THE COURT:**  Proffer agreement.

23       So I think you need to eliminate "The ASNT representative

24   stated" and modify it to Mr. Hackett stating that he would have

25   the shares.

1        Let's go to Statement No. 2.

2            **MR. JONES:**  Your Honor, presuming that the bracketed

3    "Deleted" is meaning that it wouldn't actually be there, I

4    don't think we would have any objection to this since it would

5    completely omit Ms. Budhu and would not even implicate the

6    existence of a second person.

7            **THE COURT:**  So there is no problem with Statement No.

8    2.

9        Do you agree?

10           **MR. JONES:**  Yes, as redacted.  I would agree with

11   that.

12           **THE COURT:**  All right.  Statement No. 3?

13           **MR. ARNZEN:**  Your Honor, during the proffer,

14   Mr. Hackett stated to us and to the FBI agent that he received

15   press releases about ASNT, the company, from two people,

16   Gillespie and Ms. Budhu.  What we've -- what we've done with

17   this proposed modification is the same thing we did with the

18   first one.

19       We attempted to make anonymous the reference to Ms. Budhu

20   by instead referring to "another ASNT representative."  If

21   Your Honor feels the same way about this one, we can simply say

22   "Mr. Gillespie" so that it eliminates the same concern

23   Your Honor mentioned.

24           **THE COURT:**  Mr. Jones, how would this necessarily

25   implicate Ms. Budhu?

1          **MR. JONES:**  Given the Government's idea to completely

2     remove her without referencing "another ASNT representative," I

3     don't think that it would except, however, at Line 5, there's a

4     specific reference to Ms. Budhu in the absence of Mr. Gillespie

5     indicating Budhu also provided such updates.  So I think that

6     sentence essentially would have to go as well.

7          And all of this is a little bit difficult in the abstract

8     because my understanding is that these statements would only be

9     admissible to the extent that they're contradictory to an

10    assertion that's already been made in trial.  So these aren't

11    being offered as substantive evidence of what people were

12    doing.

13         I think in that context, completely removing Ms. Budhu and

14    the reference to any other person would be appropriate.

15         **THE COURT:**  Well, look at Statement No. 1.  How would

16    the jury conclude presently that the ASNT representative was

17    Ms. Budhu in Statement No. 3?

18         **MR. JONES:**  As -- as I indicated before, there really

19    are only two ASNT representatives that are referenced in the

20    discovery and, I expect, will be referenced in the trial.  So I

21    think Mr. Gillespie and anybody else -- any ASNT representative

22    who's not Mr. Gillespie, who is a cooperating witness for the

23    Government, is going to be transparently Ms. Budhu.

24         **THE COURT:**  Is that correct, that the only two

25    representatives of ASNT that will be mentioned are

1    Mr. Gillespie and Ms. Budhu?

2         **MR. ARNZEN:** I don't think it's totally correct. I

3    mean, they're the two representatives that will receive the

4    most attention at trial because both were defendants here. But

5    there were other people that Mr. Gillespie hired in order to

6    represent in one way or another ASNT, not just Ms. Budhu, not

7    just Mr. Gillespie.

8         **THE COURT:** So the Government is correct about the

9    *Bruton* and *Richardson* standard --

10        (Court reporter requests clarification for the record.)

11        **THE COURT:** The Government is correct about the *Bruton*

12   and the *Richardson* standard for the adjudication of allowing a

13   statement in that implicates the codefendant. But if there is

14   only testimony about two other representatives of ASNT besides

15   Mr. Hackett, I think that it is foolish to think that the jury

16   will not conclude immediately that it refers to Ms. Budhu.

17        So under Rule 403, I'm going to exclude the part that has

18   "An ASNT representative stated." Now, if at trial there is

19   other evidence that there were other ASNT representatives, you

20   can ask Judge Sabraw to allow you to put that in.

21        (Court reporter requests clarification for the record.)

22        **THE COURT:** Judge Sabraw to allow you to put that in.

23        So my ruling is without prejudice to see what actually

24   happens at the trial.

25        **MR. ARNZEN:** Very well, Your Honor. Thank you.

1        **THE COURT:**  All right.  Now, Statement 4.

2        **MR. JONES:**  Your Honor, similarly to Statement 2, I

3  think the redaction that completely removes the reference to

4  Ms. Budhu here will do the trick and would make the statement

5  acceptable, presuming it was otherwise admissible.

6        **THE COURT:**  All right.  I think that concludes the

7  *Bruton* issue.

8    Do you all agree?

9        **MR. JONES:**  Yes, Your Honor.

10       **MR. ARNZEN:**  Yes, Your Honor.

11       **THE COURT:**  Mr. Nurik, do you have any issue with the

12  rulings that the Court has made here on the *Bruton* issue?

13       **MR. NURIK:**  Your Honor, as I understand it, you are

14  limiting your ruling to what the Government could use in the

15  event that Mr. Hackett's proffer statements were admissible.

16    And to that extent, I don't have an issue except I must

17  point out that I do have an issue with the accuracy of what the

18  Government has related in its Exhibit 178 compared to what is

19  in the actual agent's 302 report of my client's statements,

20  which raises another issue.

21    And I've already discussed this with the Government.  We

22  have not been able to reach an agreement, but I am requesting

23  the agent's rough notes of the interview.  The interview was

24  not taped, and I believe when -- if you were to look at the

25  interview notes -- I mean, the interview report, you will see a

1   lot of references that are subject to different interpretation.

2       And rather than create issues that will arise at trial,

3   I'm asking that the Government turn over the agent's rough

4   notes of that interview now.

5       **MR. GALVIN:**  Your Honor, as Mr. Nurik just stated,

6   this -- he just raised this a few hours ago.  So we haven't had

7   a chance to research and brief this issue, but in the limited

8   time I had to research this, it -- the rough notes would not be

9   discoverable under the *Jencks* Act.

10      First of all, I'm not exactly sure what theory Mr. Nurik

11  is asking for the statements, and that would affect the

12  analysis, if it's under the *Jencks* Act, if he's looking for

13  *Brady* or exculpatory evidence.

14      If he's looking for *Brady* or exculpatory evidence, the

15  agent who wrote the notes, who authored the 302, reviewed the

16  handwritten notes today and determined that there was nothing

17  that would even come close to exculpatory in those notes,

18  nothing that differed.  There were no inconsistencies, no

19  deletions, or anything that would rise to the level of *Brady* in

20  those notes.

21      If Mr. Nurik is asking for these under the *Jencks* --

22  *Jencks* Act, there's a case, *Bobadilla-Lopez*, a Ninth Circuit

23  case, 954 F.2d, 519, that says that to be required under the

24  *Jencks* Act, materials should not only reflect the witness's own

25  words but should be a complete recital.  And that's referring

```
 1   to the agent's notes.

 2        In this case, there's no indication that these handwritten

 3   notes were a, you know, verbatim transcript of the witness's

 4   words, that he was given the chance to correct them such that

 5   they're an adopted statement of the witness.  Therefore, they

 6   wouldn't be discoverable under the Jencks Act or under Brady.

 7            THE COURT:  Well, let me say this.  I'm ordering you

 8   to have them available in court for the trial judge's

 9   inspection and analysis during the testimony of the agent if he

10   testifies on this subject matter of the four statements.  Then

11   Judge Sabraw can take up the issue of whether it is producible

12   under the Jencks Act, J-e-n-c-k-s Act, or otherwise under Brady

13   or any other standard.

14        I would leave that up to him, but you need to have the

15   notes readily available for the Court's inspection.

16            MR. GALVIN:  Very well, Your Honor.  We will have

17   those notes available during trial.

18            THE COURT:  All right.  Even if they were statements

19   of the witness -- that is, the statement of the agent from

20   Mr. Hackett -- they wouldn't be producible as to -- before the

21   agent testifies.  Because they would be the agent's alleged

22   statements, that would be producible, but the act says only

23   after the witness testifies on direct examination.

24        So this issue is not yet ripe for adjudication.

25            MR. GALVIN:  Very well, Your Honor.
```

1    **THE COURT:**  All right.  We have a lot of issues.  What

2    I suggest is that the main issues are two remaining.  That is

3    the alleged 404(b) evidence or intrinsic evidence of other

4    offerings or transactions and the testimony of the expert from

5    the Regulatory Commission.  I would take up the expert's

6    testimony first because I think that it is the shorter one.

7    So I'll hear argument on that.  I read your briefs, and

8    also the Government attached the letter of disclosure on the

9    expert's testimony to their brief.

10   **MR. ARNZEN:**  Thank you, Your Honor.  I won't belabor

11   what is stated in the briefs, then, or the letter.

12   In short, Mr. Carocci is a member of what's called the

13   criminal prosecution's assistance group at FINRA.  This is what

14   he does.  He comes into court all over the country many times a

15   year and testifies to exactly the type of stuff that we're

16   moving to admit at this trial.  He testifies about any number

17   of things that are covered in our letter and that we notified

18   the defense about.

19   He'll give background information about the nature,

20   structure, and regulation of the securities markets, the

21   regulator's rules -- that is the SEC -- as well as FINRA.  This

22   gentleman is from FINRA.  That is what's called a

23   self-regulatory organization under the jurisdiction of the SEC.

24   He's got experience and has testified many times about

25   general securities industry terms.  He knows them well.  He's

1  testified frequently about them.  He knows the disclosure

2  requirements that public companies have to the SEC and to

3  investors.

4       **THE COURT:**  Well, let's cut to the chase.  Why don't

5  we hear from the defendants about what the specific problems

6  are.  I don't think they are seeking to exclude all of it.  So

7  let's go to what they are seeking to exclude.

8       Who would like to argue?

9       **MR. JONES:**  I can, Your Honor.

10      The first portion of his testimony that we seek to exclude

11  is what they refer to as the design and purpose of the

12  securities laws.  Specifically, they indicate that the purpose

13  of these is to protect the investing public (Inaudible).

14      (Court reporter requests clarification for the record.)

15      **MR. JONES:**  Indicating that the purpose of -- of

16  these -- the securities laws is to maintain fair and honest

17  markets and eliminate manipulative practices.

18      There's really -- it's essentially a 403 argument.  It

19  doesn't have any bearing on here.  The statute is clear as to

20  what is prohibited.  Whether or not it violates the purposes of

21  the SEC or FINRA would be irrelevant and unduly prejudicial and

22  invite confusion.

23      The second thing that we indicated was an issue, some of

24  which I think may have been cured by discovery that we've

25  received recently.  The Government said that they intend to

1    introduce testimony summarizing the trading prices and volumes
2    of the stocks at issue.  I think they've turned over some
3    summary exhibits, which will be the basis or the substance of
4    Mr. Carocci's testimony.
5        So as long as that is the extent of the testimony, we
6    would find that that particular objection would be moot.
7            THE COURT:  Let's take it one at a time.
8        Now, your first objection is what?
9            MR. JONES:  Our first objection is to testimony
10   regarding the design and purpose of the securities laws.
11           THE COURT:  All right.
12           MR. ARNZEN:  Your Honor, we don't expect this to be
13   extensive testimony.  I had a securities fraud trial before
14   Judge Sabraw last year, 16-CR-1842.  Mr. Carocci's colleague
15   absolutely testified about the design and structure of the
16   securities laws.
17       It's really short and simple testimony.  It's meant to
18   establish that -- really common things that everybody knows
19   that's not -- or that is in the securities industry that we
20   hope to share with the jury.
21       Sunlight is the best disinfectant.  The stock market
22   should be a level playing field, and the regulations seek to
23   establish one, and the regulations protect the investing public
24   to make sure that everybody has an equal chance of success.
25   It's that simple, and that's what came in before Judge Sabraw

1    last year, Your Honor.

2         **THE COURT:**  But why is that really relevant here?

3    What does that do?  I'm concerned that it would unduly

4    prejudice the defendants by giving essentially a statement by

5    the Government employee as to the need for enforcement of the

6    law, and I don't see the probative value.

7         **MR. ARNZEN:**  He's not a Government employee.  He works

8    for a not-for-profit self-regulatory organization.  He does not

9    work for the Government for one, Your Honor.

10        I think it's especially probative because if we've heard

11   it once, we've heard it a thousand times as it concerns the

12   federal securities laws and regulations, that there are a lot

13   of them.  There are little Piccadilly rules that don't mean

14   much, and so what if there's an underlying violation of some

15   small rule that's very esoteric?  No harm, no foul.

16        And Mr. Carocci's testimony will establish that these are

17   important because they go to a single purpose, which is to

18   establish a level playing field.

19        **THE COURT:**  What is the violation that the Government

20   is prosecuting here?

21        **MR. ARNZEN:**  A violation of the antifraud provisions

22   of the Securities Exchange Act, Section 10(b).

23        **THE COURT:**  All right.  That is not some little

24   regulation.  You're talking about fraud, and the jury will

25   understand that.

1    I'm sorry I mistook FINRA for a Government agency --

2    (Court reporter requests clarification for the record.)

3         **THE COURT:**   I'm sorry that I mistook FINRA, F-I-N-R-A,

4    for a Government agency.   But the concern I have is still the

5    same, and that is someone telling the jury the importance of

6    enforcing the securities law, and that is prejudicial to the

7    defendants.   You have a basic fraud case here, and I don't

8    think there is a specific esoteric regulation.

9         As to whether Judge Sabraw allowed it in in another case,

10   I don't know whether the defense objected to it there.   I think

11   the probative value here is really nominal, and the prejudicial

12   ability of the evidence would substantially outweigh it.

13        So without prejudice -- all these rulings are without

14   prejudice because the trial judge will have a different record

15   as the trial proceeds.   So anything can happen from the

16   openings to the -- telling him that you want to offer the

17   evidence in.   My rulings are without prejudice to you seeking

18   reconsideration based on the actual record at trial.

19        **MR. ARNZEN:**   Thank you, Your Honor.

20        **THE COURT:**   So I'm going to exclude that.

21   Next one, Mr. Jones?

22        **MR. JONES:**   This is the one that I believe may be moot

23   based on summaries disclosed by the Government.   If the

24   Government could just confirm that there is not going to be

25   additional testimony regarding this -- the trading prices and

1  volumes of the stocks at issue other than what we have received

2  in discovery, I think that would be moot.

3       MR. ARNZEN:  I can confirm that that is the nature of

4  the summary exhibit, Your Honor.  We have turned over some

5  summary exhibits of the tradings so far.  We are still digging

6  into other trades and hope to represent those on some summary

7  charts that are forth -- that will be forthcoming shortly.

8       MR. JONES:  Then I think that's probably -- at this

9  point, I'd ask the Court to reserve on that until we see what

10  the other summaries are, and we can address that with Judge

11  Sabraw with regard to the trial date.

12       THE COURT:  All right.  Next one?

13       MR. JONES:  The next issue is that the Government

14  indicates that they're going to have their expert testify about

15  the common aspects of a pump-and-dump market manipulation

16  scheme.

17       With regard to this, I think that the disclosure here is

18  not sufficient because we don't have an indication as to

19  exactly what his testimony is in terms of what that means, what

20  are the common aspects of a pump-and-dump scheme.  Moreover,

21  the charge here is not that there was a pump-and-dump scheme

22  but instead that there was a scheme to defraud under 10(b)(5).

23       The Government -- you know, there's case law saying the

24  Government doesn't have to prove that there was, in fact, a

25  pump-and-dump scheme.  They simply have to prove that there was

1    a scheme to defraud, even if that's what they alleged the

2    general nature is.

3        So if there's going to be specific testimony from their

4    experts saying, "These are the hallmarks, and those hallmarks

5    are present here in this case" or that they're going to have

6    them say, "These are the hallmarks" and then in closing they're

7    going to get up and take those off, I want to know exactly what

8    those are going to be, and I think I'm entitled to that under

9    Rule 16.

10        **MR. ARNZEN:**  We don't differ with Mr. Jones,

11    Your Honor.  We will not elicit testimony from Mr. Carocci

12    about the hallmarks of a pump-and-dump scheme.

13        **THE COURT:**  I will grant that without prejudice to

14    exclude the common aspects of a pump-and-dump scheme.

15        All right.  Your motion to allow it into evidence as to

16    the --

17        (Court reporter requests clarification for the record.)

18        **THE COURT:**  The Government's motion to allow that into

19    evidence as to the common aspects or attributes of a

20    pump-and-dump scheme --

21        (Court reporter requests clarification for the record.)

22        **THE COURT:**  Attributes of a pump-and-dump scheme is

23    denied without prejudice.  It should be excluded at this stage.

24        All right.  Next?

25        **MR. JONES:**  Your Honor, the next thing deals with the

Government's representation that it will have testimony that it
is outside of business norms for public companies to disclose
material nonpublic information to persons and entities outside
the company without a compelling reason to do so and that
selectively making such disclosures could violate Reg FD in
addition to other securities laws.

We would object to this both on insufficient notice or
insufficient disclosure as well as Rule 403.  Again, we have a
specific statute with which the defendants are charged of
violating.  But this reference to a regulation that could
possibly be violated and then other miscellaneous securities
laws, I think, is unduly prejudicial and indicates that the
jury might be looking for some additional wrongdoing out there
other than what the defendants are charged with.

Here, there is going to be -- I think the Government is
going to raise the issue of the disclosure of material
nonpublic information.  If the Government's alleging that that
violates a specific regulation, then I think that needs to be a
specific assertion, and we need to know what they're alleging
violates that regulation.

And if there are other securities laws they're claiming
are violated, we're certainly entitled to notification as to
what the other securities laws are.

MR. ARNZEN:  Your Honor, I'll describe first what the
evidence will show.

 1        The evidence will show that Mr. Gillespie was the CEO of

 2   ASNT.  He and Ms. Budhu knew inside information, forthcoming

 3   press releases, for example, about the company, and they

 4   provided that inside information to people outside of the

 5   company.

 6        If people outside the company trade based on that inside

 7   information, it's fraud.  It's securities fraud under the same

 8   statute that the defendants are charged under, 10(b) of the

 9   Exchange Act.  So that's what the evidence will show, and what

10   we expect to draw out from Mr. Carocci is giving that

11   information out to people outside of the company is

12   exceptionally unusual.

13        He testifies, for example, in insider trading cases all

14   the time, and every time, the company has a policy that forbids

15   providing nonpub- -- material nonpublic information to people

16   outside of the company.  It's highly abnormal unless there's,

17   like, a contractual relationship.  A service provider needs to

18   know specific information in order to provide those services.

19        And so that -- that gives -- that provides an impact to

20   the testimony later on that we expect to present.  Mr. Carocci

21   will -- will not say this particular evidence shows a very

22   unusual pattern.  He will just state the generality that it's

23   very unusual and usually breaks the law -- in other words,

24   specifically Reg FD and 10(b) of the Exchange Act -- when

25   people inside the company such as Mr. Gillespie and Ms. Budhu

1    share inside information with outsiders.

2         **MR. JONES:**   Your Honor, we would still object to the

3    testimony as characterized by the Government.  Here, again, I

4    think there's a significant risk of the jury -- of having

5    testimony about whether or not they're defying what constitute

6    regular business norms.  That is not what they're charged with

7    doing.

8         If, as the Government contends, that providing this

9    information to outside parties, people who are not part of the

10   corporation, constitutes a violation of the statute, then

11   certainly that's something for the jury to decide and consider.

12        I don't know what information -- what having their expert

13   witness offer that testimony or opinion would add except to

14   invade the province of the jury and suggest that they should

15   defer to his conclusion that this usually violates Reg FD or

16   other unnamed securities laws.

17        **THE COURT:**   If I were trying the case, I would take

18   Mr. Carocci's testimony on this narrow point first outside the

19   presence of the jury to see what his basis is for saying that

20   and to see what perhaps would need to be done to eliminate

21   undue prejudice or craft a limiting instruction, but I'm not

22   trying the case.

23        So I'm deferring this issue to Judge Sabraw so he can deal

24   with this in the practice he is most comfortable with.

25        **MR. ARNZEN:**   Thank you, Your Honor.

1        **THE COURT:**  All right.  I can see a basis for its

2   admission, but I'm concerned with the prejudicial effect.  So

3   rather than spring this on the jury and face it once they

4   have -- once it is out of the box, I would hear it first and

5   then decide how to treat it as to its admission --

6       (Court reporter requests clarification for the record.)

7        **THE COURT:**  And decide how to treat it as to its

8   admission in whole or in part.

9       All right.  Next?

10       **MR. JONES:**  Your Honor, I think that -- with regard to

11  the expert, I think that's all of it.  The final subsection

12  that I had kind of relates to all of them and is not an

13  individual -- it would mostly relate to this last issue that

14  was raised.

15      So I don't believe there's any further issues to

16  address -- address with regard to the expert.

17       **THE COURT:**  You have no problem with the experts

18  testifying as to the terms and definitions that the Government

19  has listed?

20       **MR. JONES:**  Give me one moment.

21      Your Honor, other than the issues that we've specifically

22  raised, presuming that there's a proper foundation at trial, we

23  don't have an objection to the definitions that were listed in

24  the Government's notice other than the ones that have been

25  discussed so far.

1    **THE COURT:**  Mr. Nurik, you requested in a filing to

2  join in the responsive motions of Mr. Jones.  So I grant your

3  request to join.

4    Do you have anything you would like to add?

5    **MR. NURIK:**  No, Your Honor.  I think Mr. Jones has

6  ably set forth our position.  Thank you.

7    **THE COURT:**  So would it be fair to say that I'm

8  granting in part and denying in part the Government's motion to

9  admit the expert's testimony and exclude -- excluding the

10  specific items that I expressly mentioned?

11    **MR. ARNZEN:**  It would be fair for the Government,

12  Your Honor.

13    **MR. JONES:**  Yes, I think that's accurate.

14    **THE COURT:**  All right.

15    **MR. NURIK:**  Yes.

16    **THE COURT:**  Anything else you would like to argue on

17  the expert Mr. Carocci?

18    **MR. JONES:**  No.  I think that's it for that expert.

19    **THE COURT:**  All right.  You have a supplemental

20  response that has the basis for his testimony?

21    **MR. JONES:**  I have -- we've received -- if the Court's

22  referring to the summaries that I mentioned earlier, the

23  Government has provided summaries of some of the trading

24  volumes, and that addressed one of the motions.

25    **THE COURT:**  Right, but you're okay with the

1   admissibility of the things I mentioned in the Government's

2   motion except for the arguments you made on the record here

3   this afternoon?

4           **MR. JONES:**  That's correct, Your Honor.

5           **THE COURT:**  All right.

6           **MR. NURIK:**  Your Honor, may I just say assuming that

7   the proper foundation is laid for the expert testimony and the

8   admission of that particular portion of the testimony?

9           **THE COURT:**  That goes without saying.  I think you are

10  correct, Mr. Nurik.

11      All right.  So now let's go to the -- what is the larger

12  issue.  That is the other deals mentioned, and the Government

13  in Document 187 outlines the theory of what they are seeking to

14  do.  That was filed on October the 4th.

15      All right.  Let's take that up, and we'll rule on each one

16  separately -- I believe there are four references -- and then

17  the issue of the boiler room broker and the boiler room

18  operator.

19          **MR. ARNZEN:**  Yes, Your Honor.

20      Would you like to hear argument from the Government on

21  that?

22          **THE COURT:**  Yes.  Let's take it up one at a time.

23          **MR. ARNZEN:**  Yes, sir.

24      Shall I go through the exhibits that were attached to

25  Document 187, then?

1      **THE COURT:**  Yes.  I've perused them, but I would like

2  to focus on them anew -- that is, the transcript you

3  attached -- once I hear the argument.

4      **MR. ARNZEN:**  Great, Your Honor.  I'll start with the

5  first one, if that's okay.

6      Exhibit 1 is a transcript of a call between Mr. Forster

7  and an indicted codefendant whose name is Vikram Khanna.  It

8  should be clear Mr. Khanna has since passed away.  So he won't

9  be at trial obviously, but this is a conversation in which Mr.

10  Khanna is in the process of recruiting Mr. Forster to pump the

11  stock that the conspirators own.  That is ASNT.

12      And this is a portion of the transcript where Mr. Khanna

13  is identifying other people that are in the deal.  "The deal"

14  is a term they use all the time to mean a scheme like this.  So

15  Mr. Khanna mentions knowing Mr. Hackett through another deal

16  known as Yuengling.  Yuengling is an ice cream company, as I

17  understand it.

18      And there was a scheme that concerned Yuengling that Mr.

19  Khanna had knowledge of and through which he knew Mr. Hackett.

20  It's important for conspiracies like this and people that play

21  the role that Mr. Forster was pretending to play.  It's

22  important for them to know that everybody is in line.

23      In other words, there are people there in place to do the

24  different aspects and play the different roles within the

25  context of the conspiracy.  It's a -- it's a very --

1    Mr. Forster will testify that it's a very typical exercise to

2    figure out who else is involved and what their bona fides are.

3        And so Mr. Khanna knew this and was describing who Hackett

4    was, how Mr. Khanna knew Mr. Hackett, and other deals that they

5    had in common such that he had some familiarity and comfort

6    with Mr. Hackett.

7        So this, we think, would fall into evidence as

8    inextricably intertwined or intrinsic evidence of the fraud

9    because it simply identifies Mr. Hackett in terms that

10   Mr. Forster would understand.

11           **THE COURT:**  Who wants to go first?

12           **MR. NURIK:**  Your Honor, I just want to make sure that

13   we're clear that what the Government is simply seeking to do is

14   to allow this portion of the transcript to be played to the

15   jury because if they are asking Mr. Forster or anyone else to

16   comment on the -- what is referred to here as the Yuengling

17   deal, which is what I thought from the get-go -- was what the

18   Government was seeking to do because they're terming this as

19   404(b) evidence.

20       Other than the fact that it is spoken between the parties

21   and it is, as Mr. Arnzen is attempting to characterize, a way

22   of familiarizing with who is -- who these people are and where

23   they come from -- anything beyond that, I would submit, would

24   be impermissible.

25       So I want to make sure, since there is reference in their

1    supplemental motion that Mr. Forster is going to be testifying,

2    that the Government is not permitted to have Mr. Forster or

3    anyone else testify about the Yuengling deal at this point.

4    And I think this will go for all these other matters and all

5    these others references.  So I can frame my responses going

6    forward.

7         I don't think that there's any indication from any of this

8    as to any specific illegality about these other deals.  Now, if

9    the Government's sole argument is that this is just

10   inextricably intertwined with the conversations between the

11   alleged coconspirators and allows people to know who people

12   are, that's one thing.

13        But if they're going to be allowed now to elicit testimony

14   about these other deals, which is what I thought their original

15   intent was under Rule 404(b) -- otherwise, why would it be

16   characterized as 404(b) evidence? -- then I must clearly object

17   for the reasons I've identified in my -- in my pleadings,

18   including the fact that they've never articulated what those

19   illegalities are since July, when you've asked them to.

20        And secondly, there's no indication of specific connection

21   between my client and any illegality in any other deal, which

22   would be a prerequisite under Rule 404(b).

23             **THE COURT:**  Do you want to add anything, Mr. Jones?

24             **MR. JONES:**  Your Honor, just briefly.

25        I would concur with Mr. Nurik's comments.  The concern

that I have is that the Government seems to intend to go beyond

simply naming these things based on a couple of comments that

have been made.

One, the fact that they continuously use scare quotes

around the word "deals" and Mr. Arnzen's representation just

now that when he -- that he believes that they use "deal" to

refer to an illegal pump-and-dump scheme.

So my concern is Mr. Forster is going to get on the stand,

he's going to say, "I engaged in a bunch of pump-and-dump

schemes" -- and I think that's going to bear out on his

cross-examination -- "and typically, this is how they go, and

that's how it was going here."

The Government represents that Mr. Forster would testify

that he typically wanted to know and sought who -- sought to

know who else was participating in a deal.  But that overlooks

the fact that in this case he's operating as a Government

informant, and his goal is not to engage in an actual

pump-and-dump scheme but to gather information for the purposes

of prosecution.

So I don't think having him testify that he was doing

these things and that that's how pump-and-dump schemes

typically work -- I think that would be severely problematic

under 404(b) and also would be -- constitute improper expert

testimony in addition to what was already laid out.

            **THE COURT:**  What do you want to offer as the evidence?

1          **MR. ARNZEN:**  The evidence that we'd intend to offer is

2     simply stated in our briefs, Your Honor.  We would elicit, we

3     hope, testimony from Mr. Forster that would establish that

4     Yuengling was a deal that he heard Mr. Khanna talk to him about

5     outside of the context and prior to his cooperation here,

6     outside of the context of the discussions and the recordings

7     that we have at this trial.

8          And he would testify that they typically wanted to and

9     sought to know who else was participating in a deal.  This is

10    just background information about Mr. Hackett that Mr. Khanna

11    brings to bear so as to consummate the deal, to find somebody

12    to pump this stock.

13         It's not 404(b).  It would -- it would certainly come in

14    as 404(b) if we got there, but it's our position that this does

15    not fall under the strictures of 404(b).  This is intrinsic

16    evidence of the fraud.

17         **THE COURT:**  Well, it depends what you are offering.

18    If what you are offering is the mere words in a transcript or

19    testimony that Mr. Hackett was also in the Yuengling deal --

20    would you spell that for the court reporter?

21         **MR. ARNZEN:**  Sure.  I'm sorry, Your Honor.

22    Y-u-e-n-g-l-i-n-g.

23         **THE COURT:**  If you are only offering the statement of

24    the witness -- the statement, that is -- to Mr. Forster by Mr.

25    Khanna, who is deceased but was a --

1      (Court reporter requests clarification for the record.)

2      **THE COURT:**  By Mr. Khanna, who is deceased but was a

3  coconspirator, I have no problem with that.  But if you want to

4  offer independent proof about Yuengling being a fraudulent

5  deal, that would get us into the issue, and it depends on

6  exactly what you are offering.

7      **MR. ARNZEN:**  I understand.

8      And first of all, I want to make real clear, Your Honor.

9  All of the deals listed here -- we're not going to have

10  Mr. Forster testify that it was a fraudulent deal, that it was

11  a pump-and-dump scheme.  We're going to simply say they were

12  engaged in transactions or discussions about another company;

13  right?

14      So first of all, we're not going to elicit that as 404(b)

15  evidence and dump in front of the jury evidence that

16  Mr. Hackett or Ms. Budhu participated in fraudulent deals as

17  such.  We're not going to do that.  We would like, though, to

18  elicit testimony from Mr. Forster that this was another deal

19  that he talked to Mr. Khanna about because so much of this case

20  depends on the recordings, and the recordings are spoken by

21  people that are very experienced in this area.

22      It's like if we had a violent crime here that was being

23  tried and someone -- some witness comes in and says, "I heard

24  the defendant say, you know, 'Please go Rambo' or 'Go Rambo on

25  the victim if he says no.'"  I mean, the jury has to know what

```
 1    "Rambo" means.  If the jury has no idea what "Rambo" means,
 2    it's meaningless.
 3        We can't go on the cold transcript without somebody that
 4    can actually describe a little bit about what the underlying
 5    terminology means and what the purpose of the conversation is.
 6        THE COURT:  Well, the problem is in the details.  That
 7    is, how much are you describing?  If it is only that it was
 8    another deal that Mr. Hackett was involved with, I don't see
 9    any problem, and even Mr. Nurik seems to think that is okay.
10        MR. ARNZEN:  Thank you, Your Honor.
11        We spelled out exactly what we expect Mr. Forster to
12    testify.  It's right here on the page.  I mean, I can read it
13    into the record, but he would testify that he typically wanted
14    to and sought to know who else was participating in a deal -- I
15    think that's okay -- and their background before he committed
16    to a deal.
17        He will testify that Mr. Khanna knew this and Mr. Khanna
18    had previously mentioned Yuengling to Forster and Khanna had
19    possibly invited Forster to participate in that deal.  That's
20    the size of it, no words about another fraudulent deal or "This
21    is another scheme."
22        THE COURT:  Any problem with that, Mr. Nurik and Mr.
23    Jones?
24        MR. NURIK:  Your Honor, to the extent that the
25    testimony is limited to what is in the tape -- and I do -- do
```

1  reluctantly admit that it probably is so inextricably

2  intertwined that it would be almost impossible to remove the

3  name of the other matter.  But any testimony about it in any

4  shape or form, I would submit, is impermissible.

5      The actual transcript references that you have before you

6  that the Government has provided in its exhibits are so

7  self-explanatory that they speak for themselves.  They don't

8  need further illumination by the witness.

9      And -- and to the extent that the Government seeks to have

10  any conversation between Mr. Forster and Mr. Khan [sic], who is

11  deceased, brought before the jury, again, at that point in

12  time, I believe those conversations were before there was a

13  conspiracy that were not made during the course of or in

14  furtherance of any alleged conspiracy.

15      So I don't know how the Government can do that.  That was

16  before even Mr. Hackett was supposedly involved with these

17  individuals.  So in that regard, I would submit it should not

18  be admissible.

19          MR. ARNZEN:  Just to -- just to the last point, we

20  believe the conspiracy started much earlier than the

21  conversations in which Mr. Forster engaged in began.

22          MR. NURIK:  I guess that's going to be a matter for

23  preliminary proof.

24          THE COURT:  Well, you first have to prove that this

25  was a statement in furtherance of a conspiracy that was in

existence.  As to the 404(b) objection and the 403 concern, I

believe what the Government represented here is permissible.

It is intrinsically involved in the scheme and soliciting

Mr. Ford -- Forster's participation.

So as long as it is limited to what Mr. Arnzen said, I

think it is permissible, and it is not limited to the tape.

Mr. Forster can also testify to the other conversations, but

what would be of concern is if the Government were to seek to

put on the other Yuengling transaction was a fraudulent scheme.

They are not going to do that.

And so we cannot even get into the 404(b) analysis because

the Government is not using the prior acts for one of the

exceptions such as intent or plan or modus operandi.

Agreed, Mr. Arnzen?

**MR. ARNZEN:**  Agreed, Your Honor.

**THE COURT:**  So what you have read and stated, in my

opinion, is fine as long as you first prove that the conspiracy

was enlisting Mr. Khanna with the statements in furtherance of

the conspiracy.

**MR. ARNZEN:**  Completely understood.

**THE COURT:**  All right.  Let's go to Number 2.

**MR. JONES:**  Your Honor, if I can just -- if I can just

make -- I just want to make sure we're really clear about one

point because Mr. Arnzen started off the argument by saying

that when these people refer to deals, they're referring to

1    pump-and-dump schemes, and that's not part of what the Court is

2    approving.

3        It's only the last summary where he was reading and said

4    what he was -- what Mr. Forster would say about those

5    statements; correct?

6            THE COURT:  You are correct.

7        Do we have a similar situation with the others?

8            MR. ARNZEN:  I think that tracks for -- the same logic

9    and the same argument tracks for a number of these, Your Honor.

10       If you simply substitute "Yuengling" for two other what we

11   call ticker symbols -- they're QBIO and QBAK -- because --

12   especially with respect to Q-B-I-O or QBIO, there was a lot of

13   discussion in which Mr. Forster and Ms. Hackett -- Mr. --

14   Mr. Hackett and Ms. Budhu and the other conspirators talked

15   about QBIO as they were discussing the nuances in detail

16   surrounding ASNT.

17       So if, for example, they were concerned that an issue or a

18   problem might arise with respect to the ASNT scheme, they would

19   refer to the QBIO's -- the QBIO transaction and -- and refer to

20   what happened with respect to QBIO as to kind of further

21   discussion about what they should do on the ASNT deal.

22       So I think those are -- those should be admissible, again,

23   as intrinsic evidence of the fraud.  I can identify the

24   specific exhibits that that refers to, Your Honor.  They are --

25   just give me two seconds.  I'm sorry.  Exhibits 4 and 6 through

1   11 fall into that category.

2          THE COURT:  Well, let's take them in order so we have

3   a specific record.

4          MR. ARNZEN:  Very well, Your Honor.

5      Shall I take them in numeric order, or shall I start

6   with -- should I go with 2, or can I go with 4?

7          THE COURT:  I think by taking them in numerical order,

8   we will not forget any.

9          MR. ARNZEN:  Very well, Your Honor.

10      Number 2 also concerns the Yuengling deal.  It would

11   involve the transcripts set forth in Exhibit 2, and it would be

12   supported by the exact same testimony from Mr. Forster that I

13   just described.

14          THE COURT:  Any further concerns about Number 2?

15          MR. JONES:  I think 2 is identical to 1, Your Honor.

16          MR. NURIK:  I agree, Your Honor.

17          THE COURT:  All right.  The same ruling on Number 2 as

18   to Number 1.  If the foundation for coconspirator testimony is

19   laid, then 2 would be admissible.

20      (Court reporter requests clarification for the record.)

21          THE COURT:  If the foundation for coconspirator

22   testimony is laid, 2 would be admissible.  All right?

23          MR. ARNZEN:  Shall I go to Number 3, Your Honor?

24          THE COURT:  Please.

25          MR. ARNZEN:  So this concerns a different company.

1    The ticker for this is DAVC, and it is a little bit different

2    than the Yuengling deal.  It is not so much about Mr. Khanna

3    speaking to Mr. Forster about who -- actually, it's very

4    similar.  I apologize.

5         It's Mr. Khanna filling Mr. Forster in on the -- in on

6    Mr. Hackett's background; in other words, how he knew

7    Mr. Hackett.  Not only was -- did Mr. Khanna and Mr. Hackett

8    have the Yuengling deal in common in some way, shape, or form,

9    they also had in common the DAVC deal.

10        The United States would expect that Forster would testify

11   that he typically wanted to and sought to know who else was

12   participating in a deal before he committed and that Mr. Khanna

13   knew this.  So it would largely be very similar logic that

14   would allow its admission and very similar testimony, just a

15   different ticker.

16        **MR. NURIK:**  Your Honor, I would submit that in light

17   of exactly what was represented, which is that it was necessary

18   for Mr. Forster to know who he was dealing with -- that by this

19   point, this becomes unnecessary.  We have Exhibits 1 and

20   Exhibits 2 talking about the Yuengling deal.  Now we have

21   something else.

22        There's no mention really in this transcript that's being

23   offered in about the actual -- the actual ticker or the actual

24   deal, as the Government refers to it, in question.  This is

25   simply now talking about something else.  And if the purpose of

1  this is to, again, identify that -- that there's some

2  background to this guy and that would make Mr. Forster more

3  comfortable in doing business, we've already had that

4  established.

5       There comes a point in which this becomes frankly

6  duplicative -- duplicative and unnecessary, and I would submit

7  this becomes confusing to the jury because now we're talking

8  about a deal that has nothing to do with the matter in

9  question.  And, again, as the Government has represented,

10 they're not going to offer any evidence that something about

11 this was fraudulent.

12      So why even bother to have the jury hear about it?  It's

13 just going to confuse the jury.  This -- this case, I would

14 submit, is going to be very detailed-oriented and concerning a

15 subject that I would surmise most of the jurors, if not all of

16 them, are going to be unfamiliar with.  It's going to be

17 confusing enough.

18      So I don't see how this aids in any way and serves any

19 purpose, and I would submit its prejudicial value outweighs its

20 limited, nominal relevancy.

21      **MR. ARNZEN:**  If I may add just a point, Your Honor, it

22 concerns the transcript itself.

23      The transcript evidences a pretty fluid conversation

24 between Mr. Khanna and Mr. Forster, and they bounce back and

25 forth between discussion about ASNT and discussion of DAVC.  It

1   would be somewhat difficult to excise the DAVC portion.

2           THE COURT:  Well, what is the context of the

3   statement?

4           MR. ARNZEN:  The context of the statements made in the

5   transcript, Your Honor?

6           THE COURT:  Yes.

7           MR. ARNZEN:  This is a point where Mr. Khanna and

8   Mr. Forster are still talking about whether Mr. Forster is

9   going to get involved in the terms on which he would get

10  involved.  It's still a process in which Mr. Forster is

11  figuring out who else is involved with this deal, and he's not

12  familiar at that point with Mr. Hackett, and so he asks more

13  details about Mr. Hackett.

14      He's also talking about other deals with Mr. Khanna, and

15  so Mr. Khanna talks about deals that he's involved with at the

16  same time.  This one happens to overlap with Mr. -- with

17  Mr. Hackett.

18          THE COURT:  Anything else on this?

19          MR. ARNZEN:  Not from the Government.

20          MR. NURIK:  No, Your Honor.

21          THE COURT:  Mr. Jones?

22          MR. JONES:  I have nothing to add, Your Honor.

23          THE COURT:  I'm going to allow it, and then I'll give

24  you my reasons, and then we'll take a break for the court

25  reporters.

1     It is part of the conversation where Mr. Khanna is trying

2  to get Mr. Forster involved, and I think that all the talk is

3  important to understand how they are proceeding, and the

4  context is important.  So I think it has probative value that

5  is not substantially outweighed by any prejudicial factor.

6     And, again, you are not seeking to prove that DAVC was

7  fraud; right?

8          **MR. ARNZEN:**  That's correct, Your Honor.

9          **THE COURT:**  All right.  4 is admissible as long as the

10  foundation is established.

11     So we'll take a break.

12          **MR. JONES:**  Your Honor, I just wanted to note I do

13  have -- I either need to get my wife the key to our car or

14  leave by 5:00 to pick up my son.  So --

15          **THE COURT:**  We are going to close at 5:00.  We perhaps

16  will not get it all done, but we'll break at 5:00.  Let me give

17  the court reporters a break.

18                    (Recess taken at 4:31 p.m.)

19                (Proceedings resumed at 4:42 p.m.)

20          **MR. JONES:**  Ms. Budhu, I think we're going to get

21  ready to start again here in a second.

22          **THE COURT REPORTER:**  Ready, Judge.

23          **THE COURT:**  Can you get Ms. Budhu there?

24          **THE CLERK:**  Ms. Budhu, we're about to start again.

25          **THE COURT:**  We're ready, Ms. Budhu.

```
 1              MR. JONES:  Ms. Budhu?

 2              THE CLERK:  Ms. Budhu, we are ready for you.

 3              MR. JONES:  I'm going to try to call her phone.

 4        Oh, there she is.  Oh, there she goes.

 5              MS. ANGELES:  Oh.  But she can't see you.

 6              MR. JONES:  It's going to voicemail.

 7              THE CLERK:  Ms. Budhu?

 8              MS. ANGELES:  She's looking at the transcript.

 9              DEFENDANT HACKETT:  Maybe put something in the

10        transcript --

11              MR. NURIK:  The transcript, yes.

12              DEFENDANT HACKETT:  -- because she keeps reading.

13              THE CLERK:  Amanda, can you put something to let her

14        know?

15              THE C.A.R.T. REPORTER:  Okay.  Yeah.

16              THE CLERK:  "We are ready."

17              MR. JONES:  The -- Jesus Christ.

18              THE COURT:  All right.  Ms. Budhu is back.

19              DEFENDANT BUDHU:  Yes.  Yes, Your Honor.  I'm here.

20              THE COURT:  Now, we're on Number 4.

21              MR. NURIK:  Your Honor, if the Court please, given

22        that we have limited time and in light of the Government's

23        announcement as to limitations they're going to put on the

24        items that we've been dealing with, perhaps those could be

25        dealt with at another time because I think the more pressing
```

```
 1    issue for our preparation is the -- what they call the other

 2    boiler room matters.

 3         And I would ask if the Court would indulge me and allow us

 4    to deal with that right now.

 5              THE COURT:  All right.

 6         MR. NURIK:  Okay.  I can -- I can summarize our

 7    position very, very simply.

 8         The Government seeks to introduce evidence through two

 9    witnesses of my client's use of what they call other boiler

10    rooms, which are call rooms on other deals.  Their position is

11    that the two individuals who will testify, the -- the

12    operator -- who they call the boiler room operator,

13    Ms. Millhouse, and the -- I'm sorry.  The broker,

14    Ms. Millhouse, and the operator, Mr. Wolf, will both testify

15    that deceptive practices or deceptive sales practices were used

16    in these particular deals.

17         The problem is that the Government does not have any

18    evidence -- and this is what they've told me unless they've

19    represented it incorrectly -- from either of these two

20    individuals that Mr. Hackett was aware of the sales practices.

21         There will be no evidence that Mr. Hackett saw any of the

22    sales scripts, heard any of the sales pitches, was consulted by

23    any -- by any of these individuals on how to sell these

24    particular tickers, and that, in fact, he was not even aware of

25    the identity of Mr. Wolf, who was the person who actually was
```

1  hired by the broker to market these particular items.  So there

2  would be no evidence that Mr. Hackett was actually aware of the

3  deceptive sales practices.

4      Now, what the Government argues is that you can infer that

5  based upon the fact that Mr. Hackett paid a 50-percent

6  commission to the broker, Ms. Millhouse, and I -- I will assume

7  that they will introduce evidence that that is a high

8  commission.

9      But based on that and that alone, they are now asking the

10  Court to allow them to introduce evidence of all these other

11  particular deals.  There are one, two, three, four, five, six,

12  seven, eight, nine that they will have individuals testify used

13  deceptive sales practices, and yet they will have no one

14  testify that Mr. Hackett was specifically aware of that.

15      And I would submit that violates a basic prerequisite of

16  Rule 404(b), which is that there is actual evidence of a

17  defendant's commission of the other bad acts.  And as such, I

18  would submit that this should not be allowed.

19      And as a further argument, I would -- would posit before

20  the Court that given the number of other items involved, this

21  would create an enormous diversion for the jury.  We would

22  unduly lengthen the trial.  We would have to literally litigate

23  the sales techniques and practices in these other matters.  It

24  would confuse the jury and mislead the jury and, as such,

25  should be excludable under Rule 403.

1          **MR. ARNZEN:**  Your Honor, first and foremost, we would

2     expect that this evidence would come in in less than five

3     minutes.  That's through both witnesses.

4          The broker would testify that Mr. Hackett hired her to

5     promote his companies, the companies that he was invested in,

6     through boiler rooms, and did so on a number of occasions.  He

7     knew also -- and we have text messages to prove it -- that the

8     broker then went on to engage operators, the boiler room

9     operators, to actually make the sales calls.

10         There's very good evidence that Mr. Hackett knew that the

11    broker was not the final person who made calls.  We fully

12    expect Mr. Nurik and Mr. Hackett to make the argument just made

13    that "Hey, we didn't know anything about what the operator was

14    doing, and whatever representations were made weren't

15    necessarily illegal."  That's why we need this 404(b) evidence,

16    to show state of mind.

17         He used the same two, the same broker and the same boiler

18    room -- boiler room operator, on -- on numerous occasions in

19    the past, all of which demonstrates not a propensity to commit

20    the crime but rather a knowledge of what the boiler room

21    operator and broker brought to bear, a knowledge of what kind

22    of increase and pump in the price and the demand for the stock

23    was created by -- by virtue of using the broker and the

24    operator.

25         So it goes to state of mind only insofar as Mr. Hackett

knew what the boiler room operator was all about because he had
used them so many -- him so many times in the past through the
broker.  So that's -- that's the basis of our -- our argument.

Again, we would expect to show the documents that are set
out at Exhibit 20.  In other words, 187-1 has a number of
exhibits attached to it.  Exhibit No. 20 show the invoices that
the boiler room operator sent to the broker and that the broker
in turn shared with Mr. Hackett.

There aren't many of these.  The description and testimony
surrounding these will be exactly the same.  These are other
deals -- the broker will testify, "These are other deals that
Mr. Hackett brought to me and that I sent to the boiler room
operator."

The boiler room [sic] will in turn testify, "Yeah, these
are other deals that I got from the broker.  I've never heard
Hackett's name, but the broker sent me these deals.  I did them
all the exact same way that I did the ASNT deal."

**MR. NURIK:**  Your Honor, if I might point out that in
none of the transcripts or, for that matter, I believe, in any
of the testimony that will be elicited from Ms. Millhouse, the
broker, so to speak, is the word "boiler room" utilized.  These
are call rooms.  Call rooms are a very common aspect of sales
practices in many industries, including this industry.

And I would submit that that should be taken into account
in understanding that Mr. Hackett employs Ms. Millhouse for the

1   purpose of marketing these things, but Ms. Millhouse is not

2   going to testify that Mr. Hackett was aware of how she marketed

3   these things.  This isn't a case about negligence.  This is a

4   case about intentional conduct and fraud.

5        There is absolutely no evidence that Ms. Millhouse was

6   giving Mr. Hackett any specific information about how these

7   things were marketed.  Nor will Mr. Wolf, who is the so-called

8   operator, testify that he ever met my client, ever spoke with

9   my client, ever gave any information to my client.

10        So the one thing that's missing from all this is any

11   knowledge on my client's part of what the Government is going

12   to use these witnesses for to testify that in each of these

13   other deals, there were deceptive sales practices.

14        And I might also point out that the Government's not going

15   to have any evidence of Mr. Hackett having notice from any

16   investor or anyone else saying, "Hey, I was just deceived.

17   They sold me this way" or "They sold me that way."  So there's

18   no notice on his part, there's no knowledge on his part, and

19   yet they're seeking to introduce this.

20        This will be very, very damaging testimony without the

21   necessary core component, and I would submit it's highly

22   prejudicial, Your Honor.

23             **THE COURT:**  I don't think what the Government is

24   relying on is an exception to Rule 404(b).

25        (Court reporter requests clarification for the record.)

1        **THE COURT:**  I don't see what the Government is relying

2    on is an exception to 404(b).

3        In other words, what are you offering the evidence to

4    show?  And that is what I need to focus on.  What is the

5    element involved?  You say state of mind, but that is too

6    broad.  The state of mind must be a mens rea that is relevant

7    to the specific case.

8        I think to start with, you should not refer to these as

9    boiler rooms.  That is pejorative and prejudicial.

10        **MR. ARNZEN:**  Your Honor, some sales rooms are boiler

11    rooms.  I understand the Court's feeling on this, but it's

12    absolutely the truth.  They're boiler rooms.  They're hard-core

13    sales practices that will get investors to invest in stock

14    without knowing the whole story.

15        They're as much a boiler room as any boiler room you see

16    in a movie or heard tell in a book about.  I think we should be

17    able to call them boiler rooms because they were boiler rooms.

18    If Your Honor says, "Hey, I'm making a different decision," I

19    understand that --

20        **THE COURT:**  Well --

21        **MR. ARNZEN:**  -- but I disagree with it.

22        **THE COURT:**  -- you have to have evidence -- that is,

23    testimony -- of what a boiler room is and how this was a boiler

24    room to use the phrase.  You'll have to have a foundation to

25    use the term "boiler room."

1          **MR. ARNZEN:**  Understood, Your Honor.

2          **THE COURT:**  If you have testimony about that, then you

3    can use the term, but to use the term without testimony is

4    confusing and prejudicial.

5          **MR. ARNZEN:**  Very well, Your Honor.  I fully expect

6    that the boiler room operator will call it a boiler room.

7          **THE COURT:**  Maybe, and then you are in the clear.

8      But now what does this prove under 404(b)?  In other

9    words, you say that it would only take five minutes.  Give me

10   the five-minute version of what you will elicit and tell me how

11   this proves something that is admissible under Rule 404(b).

12         **MR. ARNZEN:**  Sure.

13     So first off, let -- I hope I can describe what we intend

14   to prove through this, and that is that Mr. Hackett knew that

15   the boiler room was a boiler room that made high sale --

16   high-pressure sales through misleading representations and

17   omissions on the phone.  We intend to prove that he knew that

18   the boiler rooms were using misrepresentations.

19     We would elicit that because -- through evidence that he

20   had used boiler rooms, this same boiler room, not just with

21   respect to ASNT but with respect to nine other tickers.

22   They're all very close in time.

23     The evidence would also include testimony that Mr. Hackett

24   paid 50 percent of the proceeds that he got from selling his

25   stock, take 50 percent of that and to give it to the broker.

1  The broker would then take a 35-percent cut of that and pass it

2  on to the boiler room operator.

3      These boiler rooms, the evidence will show, caused a

4  dramatic increase in the volume of the stock being sold in

5  these particular companies and an increase in the price of the

6  stock of those companies.  If -- so we will argue that that

7  evidence shows that Mr. Hackett did not -- was not oblivious

8  and completely ignorant of what was happening in the boiler

9  rooms.  Rather, he actually knew what was going on.

10      There's one more key bit of evidence, too, Your Honor.

11  The boiler room operator will testify that he knew others in

12  the industry, other boiler room operators.  And based on his

13  discussion with all of those other people, his boiler room

14  operated in all significant respects the same as all boiler

15  rooms that he knew about doing these types of deals.

16      That's our evidence.

17          THE COURT:  All right.  The last part is still

18  unclear.

19          MR. ARNZEN:  The last part about why it shows

20  Mr. Hackett's knowledge?

21          THE COURT:  No.

22          MR. ARNZEN:  Okay.

23          THE COURT:  The last part of what you said the

24  evidence will show as to other deals.

25          MR. ARNZEN:  As to other deals?  Okay.

1          **THE COURT:**  I understand what you are saying as to the

2     use by Mr. Hackett of the same sales room --

3          (Court reporter requests clarification for the record.)

4          **THE COURT:**  I under- -- I understand what you are

5     saying as to the use by Mr. Hackett of the same broker and same

6     sales or boiler room.  That I understand, but you added

7     something at the end that I didn't quite catch.

8          **MR. ARNZEN:**  Oh.  Understood.

9          So the boiler room operator, Your Honor, will testify that

10    his boiler room is the same as all other boiler rooms he knows

11    about in all significant respects.  It's not like these boiler

12    rooms come in different varieties.  They all do basically the

13    same thing in basically the same way.

14         So I don't think it's plausible to believe that

15    Mr. Hackett thought, "Oh, this one's special.  It's not making

16    misrepresentations and omissions to the investors that they're

17    calling."  The commonality increases the chances that

18    Mr. Hackett knows exactly what he's hiring the call room broker

19    to do.

20         Mr. Hackett reaches out and hires the broker to sell

21    stock.  It seems obvious to us that we should be able to prove

22    how he is selling that stock, and if he -- if they're going to

23    fight on that, we should be able to bring in these other deals

24    simply to show his knowledge about how they work and that they

25    make misrepresentations and omissions to investors.

1          **MR. NURIK:**   The one thing missing in all of this is

2    Mr. Hackett's knowledge of the sales practices.   The fact that

3    Mr. Hackett was aware of -- let me rephrase that.

4          The Government is seeking to introduce evidence that there

5    are other boiler rooms out there without tying them in to

6    Mr. Hackett that the operator knows about and they all do it

7    the same way.   Well, that's the operator's testimony.   Where is

8    the connection between that and Mr. Hackett?   How does that

9    prove Mr. Hackett's intent, lack of mistake, common scheme or

10   plan, or any other aspect of Rule 404(b)?

11         We're getting so far afield here.   The boiler room

12   operator is now being allowed to testify how the rest of the

13   marketplace operates in his opinion or his experience and that

14   now Mr. Hackett is supposed to be responsible for that without

15   any connection to Mr. Hackett knowing about any of those other

16   rooms, any of those other deals, participating them -- in them

17   at all.

18         In this particular case, the Government's reasoning is

19   circular.   They're saying, "Let's bring in the nine other rooms

20   to prove this one."   But in the nine other rooms, there's no

21   testimony that Mr. Hackett had any knowledge about how they

22   sold the securities; or in this one, there's no testimony about

23   how Mr. Hackett had any knowledge how they sold the securities.

24         The fact is Mr. Hackett, according to the proof the

25   Government's going to have, hired one person, Ms. Millhouse,

1    and that's the only person he dealt with.  He never dealt with

2    Mr. Wolf.  He never dealt with anyone else.  Ms. Millhouse will

3    not say that she told Mr. Hackett that she was misrepresenting

4    or had anyone under her misrepresenting the sales.

5        So in light of that, how can the Government introduce all

6    these other deals when Mr. Hackett had no knowledge, again, of

7    how they were sold by simply saying he must have known?  That's

8    not a standard for Rule 404(b), Your Honor.

9             MR. ARNZEN:  One more point, Your Honor.  During the

10   proffer, Mr. Hackett stated as follows:

11       Quote, "Hackett had no idea what Millhouse," who is the

12   broker, "told these buyers to convince them to buy the stock,"

13   period.  He guessed that obviously she wasn't telling them the

14   truth about what was going on, but he didn't know her pitch.

15            THE COURT:  But you cannot use that necessarily in

16   your case-in-chief.

17            MR. ARNZEN:  Agreed, Your Honor.  I'm just providing

18   it as background information for the Court because what I'm

19   hearing from Mr. Nurik is Mr. Hackett had no idea except that

20   he told the FBI that he did.

21            THE COURT:  No.  What Mr. Nurik is saying is that you

22   have no proof that Mr. Hackett knew what they were doing, but

23   besides that, we'll come back to that in a moment.

24       Mr. Jones, I'm concerned with your childcare requirement.

25   Do you have another five minutes?

1    **MR. JONES:**  Your Honor, when you said we were going to

2    5:00, I made some alternate arrangements because I thought we

3    might go over.  So I'm okay.

4         **THE COURT:**  All right.  So I will not allow in the

5    testimony that the specific sales or boiler rooms Mr. Hackett

6    used were similar to other fraudulent boiler rooms.  That seems

7    to me a stretch, and there is no evidence that Mr. Hackett knew

8    about other boiler rooms.  However, let's focus on the one that

9    he had an arrangement in.

10        What do you suggest is proof under 404(b)?  How many times

11   did he use the services of the broker?

12        **MR. ARNZEN:**  He did so with respect to at least ten

13   tickers, Your Honor, including ASNT, so nine others.

14        **THE COURT:**  I thought so.

15        Now, what do the nine others prove as to ASNT?

16        **MR. ARNZEN:**  They give him the results of the call

17   room, the boiler rooms, and specifically the dramatic increase

18   in price and volume in the stock, that he knew what the boiler

19   room was doing, making misrepresentations and omissions to

20   investors.

21        **THE COURT:**  I think I understand your position.

22        Does anyone want to be heard any further on it?

23        **MR. JONES:**  Your Honor, I just wanted to make one note

24   that one of the ticker symbols that the Government's

25   referencing is QBIO.  That was the subject of the earlier call

1  that we were discussing.

2      If that were introduced into evidence, I think it would be

3  in violation of what the Court indicated earlier, that the

4  Government would not be presenting evidence that those specific

5  deals that are referenced in the transcript were fraudulent.

6      If they offer that evidence with regard to the -- these

7  supposed boiler rooms, that would be clear evidence indicating

8  that it was fraudulent, and thus it would become 404(b) in the

9  context of the earlier calls as well, which relates to

10  Ms. Budhu.

11      **MR. NURIK:**  I just want to point out that in light of

12  what Mr. Arnzen just said, apparently there would be, if this

13  were allowed, testimony that -- with respect to these other

14  deals, that the prices increased as a result of the sales

15  technique, which would open Pandora's box into testimony and a

16  mini-trial as to each of these others as to what the cause and

17  effect was.  We'd literally be litigating nine other or ten

18  other deals.

19      **THE COURT:**  What is the evidence that you will present

20  on this?  I understand your theory, and it would be a

21  permissible theory under Rule 404(b), but what is the evidence

22  that those other nine transactions resulted in higher sales and

23  stock prices that were likely involving pressure tactics and

24  false statements?

25      **MR. ARNZEN:**  I think it falls into three categories,

1   Your Honor.  The first category is Exhibit 20 in Docket

2   No. 187-1.  So those are the invoices that correspond with

3   HVST.  This does not include invoices for the nine tickers, but

4   we have invoices like that for the nine other tickers.

5        The second category that it includes is testimony by the

6   call room -- the boiler room broker --

7            THE COURT:  As to the first category, the invoice, I

8   don't see how that shows that.  I have it here -- right here,

9   but I don't see from the face of it how it proves that.

10           MR. ARNZEN:  This is in stages, Your Honor.  First, it

11  proves that Mr. Hackett -- it's part of the evidence that

12  proves that Mr. Hackett actually hired the boiler rooms and

13  that in turn the boiler rooms sold stock because that's what

14  entitles them to that 50-percent or 35-percent compensation

15  figure; right?

16       So it shows liquidity in the stock.  It shows sales that

17  were made to investors and what Hackett is supposed to pay back

18  to the boiler room broker and the operator.  So the invoices

19  absolutely show those things.

20       The second category are communications between Mr. Hackett

21  and the boiler room broker.  We have text messages from her

22  phone that we've turned over in discovery of -- they're

23  communications, text messages, between Hackett and

24  Ms. Millhouse that corroborates this evidence.  It's not a

25  large volume, but there is some -- there are some text messages

1    that corroborates the expected testimony.

2         **THE COURT:**  Well, I need -- in order to find that you

3    have satisfied 404(b), I need to see the evidence to make sure

4    that you have a strong connection.

5         (Court reporter requests clarification for the record.)

6         **THE COURT:**  To make sure that you have a strong

7    connection.  So I have to see the evidence.  Your conclusory

8    statement, while I have the utmost respect for you and rely on

9    what you say, is not enough to create a record that would

10   result in a ruling in your favor.  You need to establish the

11   evidence.

12        So you would have to proffer exactly what the testimony

13   will be.

14        **MR. ARNZEN:**  Understood, Your Honor.  I apologize.  We

15   do not have the specific evidence of that type with us in court

16   today.

17        **THE COURT:**  Well, look, I think that you have somewhat

18   of a case by the fact that the high commissions were being

19   paid, but I need to see the other evidence, and we are not

20   going to complete this.

21        I think if you have the evidence to show that

22   Mr. Hackett -- either the direct evidence or circumstantial

23   evidence that supports that Mr. Hackett knew what the --

24   rather, knew what the nine other deals involved with the call

25   centers or boiler rooms, then this would go to his fraudulent

1    intent and plan and modus operandi to choose the same boiler

2    room in this case.

3         So it would establish the foundation under Rule 404(b).

4    The time involved in the relevant period is not remote, and the

5    probative value is exceedingly high and not outweighed by any

6    substantial prejudice or undue delay, but the Court must be

7    satisfied that you have the actual connection.

8         I'll give you that the high commissions lean in your

9    direction, but you are arguing more evidence, and I would like

10   the record to be complete.

11        **MR. ARNZEN:**  I understand, Your Honor.

12        **THE COURT:**  So if you can establish what you say, I

13   would agree that you are entitled to the admission of this

14   evidence but not the fact that the boiler room operator's the

15   same as all other fraudulent boiler rooms.

16        All right.  So we have 4 through 20 to complete and some

17   other --

18        (Court reporter requests clarification for the record.)

19        **THE COURT:**  We have Numbers 4 through 20 of the

20   exhibits in your most recent submission, Docket No. 187, and

21   also some miscellaneous motions in limine.  So we will have to

22   get together, but you will have to speak to Judge Sabraw on

23   Wednesday to submit his trial schedule.  All right?

24        **MR. ARNZEN:**  Understood, Your Honor.

25        **THE COURT:**  So why don't we come back here and finish

1    this up on Monday.

2         Do we have time on Monday, Rick?

3         **THE CLERK:**  Yes, Your Honor.  We have the trial

4    originally scheduled for Monday, and the last I was speaking

5    with Judge Sabraw's CRD, they were willing to proceed with the

6    trial on Monday.

7                          (Laughter)

8         **MR. ARNZEN:**  Your Honor, I've been in discussions with

9    defense counsel.  We can take it up with Judge Sabraw.  I think

10   there are good reasons to -- to put the trial off a bit,

11   especially in light of the evidence that we're still figuring

12   out what will and won't come in, but I know that's Judge

13   Sabraw's issue at this point.

14        **THE COURT:**  Well, I don't have enough time on

15   Wednesday to complete it, and I'm not here on Friday, and I

16   have a full calendar on Thursday.  So Monday would be the next

17   day.  Also, we have a pretty full calendar tomorrow.

18        Well, you'll proceed before Judge Sabraw on Wednesday and

19   take up the trial date, and I think we can wrap the rest up

20   pretty quickly.  You have a template for how I'm likely to

21   rule.

22        **MR. ARNZEN:**  Yes, I do, Your Honor.

23        Is there a date by which we should submit to the Court our

24   additional evidence concerning this other boiler room issue?

25        **THE COURT:**  The nine others?

1          **MR. ARNZEN:**  Yes, sir.

2          **THE COURT:**  You can do so orally on Monday.

3          **MR. ARNZEN:**  Very well, Your Honor.

4          **THE COURT:**  All right.

5          **THE CLERK:**  What time do you want --

6          **MR. NURIK:**  May we have notice of it, though, before

7   of what their evidence is going to be?

8          **THE COURT:**  All right.  How about file a description

9   of all the evidence you're relying on for the 404(b) issue on

10  the nine other boiler rooms by noon on Friday.

11         **MR. ARNZEN:**  Yes, Your Honor.

12         **THE COURT:**  All right.  We'll see you at 10:30 on

13  Monday, and you can tell Judge Sabraw that we will wrap up the

14  motions in limine on Monday.  So if he wants to start on

15  Tuesday, he can.

16         **MR. ARNZEN:**  Yes, Your Honor.

17         **THE COURT:**  All right.

18         **MR. ARNZEN:**  Thank you, Your Honor.

19         **MR. JONES:**  Thank you, Ms. Budhu.  I think we're all

20  done.

21         **DEFENDANT BUDHU:**  Oh.  Thank you, Your Honor.  Thank

22  you.

23         **THE COURT:**  She has to be here on Monday unless Judge

24  Sabraw excuses her.  Then we can proceed on Monday by the same

25  technology.

1           **MR. JONES:**  Understood, Your Honor.  Thank you.

2               (Proceedings adjourned at 5:22 p.m.)

1

2

3                     **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Wednesday, December 11, 2019

8

9

10

11                    /S/ James C. Pence-Aviles

12         James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25