Pages 1 - 93

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Barry Ted Moskowitz, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   VS.                             )          NO. 18-CR-03072-DMS
                                   )
ANDREW HACKETT AND ANNETTA         )
BUDHU,                             )
                                   )
            Defendants.            )
_____   )

San Diego, California
Monday, October 28, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    ROBERT S. BREWER, JR.
                    United States Attorney
                    880 Front Street, Suite 6293
                    San Diego, California 92101
            BY:  **AARON ARNZEN, ESQ.**
                 **ANDREW J. GALVIN, ESQ.**
                 **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Andrew Hackett:
                    LAW OFFICE OF MARC S. NURIK
                    1551 Manning Avenue, Suite 302
                    Los Angeles, California 90024
            BY:  **MARC STEVEN NURIK, ESQ.**
                 **ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
               Official Court Reporter

1   **APPEARANCES**:   **(CONTINUED)**

2   For Defendant Annetta Budhu:
                              FEDERAL DEFENDERS OF SAN DIEGO, INC.
3                             225 Broadway, Suite 900
                              San Diego, California 92101
4                    **BY:   JOSHUA J. JONES, ESQ.**
                         **MICHELLE CYNTHIA ANGELES, ESQ.**
5                         **ATTORNEYS AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Monday - October 28, 2019**</u>                    <u>**10:50 a.m.**</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | **THE COURT:**  Good morning. |
| 5 | Please have a seat.  I'll be right with you. |
| 6 | (Pause in proceedings.) |
| 7 | **THE CLERK:**  Calling Calendar Matter No. 2, 18-CR-3072, |
| 8 | United States of America versus Andrew Hackett and Annetta |
| 9 | Budhu. |
| 10 | **MR. ARNZEN:**  Good morning, Your Honor.  Aaron Arnzen |
| 11 | and Andrew Galvin for the United States. |
| 12 | **MR. NURIK:**  Good morning, Your Honor.  Marc Nurik on |
| 13 | behalf of Andrew Hackett, who is present in the courtroom. |
| 14 | **MR. JONES:**  Good morning, Your Honor.  Joshua Jones |
| 15 | and Michelle Angeles, Federal Defenders, on behalf of |
| 16 | Ms. Budhu, who is present via videoconference. |
| 17 | **THE COURT:**  All right. |
| 18 | **DEFENDANT BUDHU:**  Good morning, Your Honor.  I'm here. |
| 19 | Nice to see you. |
| 20 | **THE COURT:**  Good morning.  I can see you clearly. |
| 21 | How is the screen working? |
| 22 | **DEFENDANT BUDHU:**  Thank you. |
| 23 | **THE COURT:**  How is the screen working transcribing for |
| 24 | you what I am saying? |
| 25 | **DEFENDANT BUDHU:**  It's working perfectly fine.  I can |

1    read what you're saying.

2           **THE COURT:**  Thank you, and good morning, although it

3    is probably afternoon in New York.

4           **DEFENDANT BUDHU:**  Yes, it is, sir.  It is in the

5    afternoon.

6           **THE COURT:**  Rick, do you have a printout of what the

7    Government filed on Friday?  It's about 77 pages.  I read the

8    brief that the Government filed online, but I don't have a

9    printout of the exhibits.

10       Did the defendants receive a copy of the Government's

11   argument?

12          **MR. NURIK:**  Yes, Your Honor, we did, and the exhibits

13   as well.

14          **MR. JONES:**  And Ms. Budhu as well.

15          **THE COURT:**  All right.  The first thing I want to take

16   up is the assignment to Judge Sabraw and then take up whether

17   we should exclude time under the Speedy Trial Act.

18       There's a local rule that would provide that the -- one

19   judge can transfer a case to another judge if the receiving

20   judge is consenting.  I asked the --

21       (Court reporter requests clarification for the record.)

22          **THE COURT:**  If the receiving judge is consenting.  I

23   asked all the judges who can take this case, and Judge Sabraw

24   volunteered.

25       Does anyone have an issue or an objection to the

1   reassignment of the case to Judge Sabraw?  I believe one of the

2   parties notified the court clerk that they were requesting the

3   reassignment due to my speech impairment.

4       So does anyone have any objection to the reassignment of

5   the case to Judge Sabraw after the motions in limine are

6   resolved?

7           MR. ARNZEN:  Not from the Government, Your Honor.

8           MR. NURIK:  Not (Inaudible).

9       (Court reporter requests clarification for the record.)

10          MR. NURIK:  I'm sorry.

11      Not on our part, Your Honor.

12          MR. JONES:  No objection on behalf of Ms. Budhu.

13          THE COURT:  All right.  So you met with Judge Sabraw,

14  and you got a new trial date; correct?

15          MR. ARNZEN:  That's correct, Your Honor.

16  February 18th is when we will begin trial before Judge Sabraw

17  if that schedule sticks.

18          THE COURT:  So why the continuance?  Why is there a

19  need to go beyond the present date, and should the time be

20  excluded under the Speedy Trial Act?

21          MR. NURIK:  Your Honor, the defense takes the position

22  that the volume of information that has been provided to

23  date -- and there's still been a significant amount of

24  discovery that has been provided to the defense just within the

25  last month -- and the prospect of additional investigation

1    required based on some of your rulings and anticipated rulings

2    on the 404(b) would require an extension of time in order to

3    properly defend the case.

4         We explained that to Judge Sabraw.  He seemed to agree,

5    and that was the date that we set, and it's our position that

6    it should be excludable time and that we are willing to consent

7    to that on behalf of Mr. Hackett.

8         **THE COURT:**  Why do you need all the way until February

9    the 18th?

10        **MR. NURIK:**  I -- I believe the issue was his

11   availability, Your Honor, and that's why we set it for

12   February.

13        Clearly, we did not feel that we could properly defend

14   this case within this year, and that -- I believe that was the

15   date that he was first available for, and that was a date that

16   matched the schedules of all the parties.

17        **THE COURT:**  Well --

18        **MR. JONES:**  Your Honor --

19        **THE COURT:**  -- you cannot exclude time based on the

20   unavailability of the judge.

21        **MR. JONES:**  That's correct, Your Honor.

22        It's the parties' position and agreement that because of

23   the complex nature of the case, the quantity of discovery,

24   including discovery that's been disclosed in the last month, as

25   well as additional investigation and perhaps consultation that

1  we would need to do with regard to these several other deals

2  that are under discussion with regard to the 404(b), that we

3  would need -- to be adequately prepared for trial, that we

4  would need until the trial -- the currently set trial date of

5  February 18th.

6          THE COURT:  So you're saying that you cannot be ready

7  before the 18th, given the need to investigate the other

8  transactions?

9          MR. JONES:  That's correct, Your Honor.

10         THE COURT:  Do you agree with that, Mr. Nurik?

11         MR. NURIK:  Yes, Your Honor.

12         THE COURT:  What does the Government have to add on

13  this issue?

14         MR. ARNZEN:  We don't have anything to add.  We think

15  Mr. Jones has accurately described the situation as they

16  described it to Judge Sabraw, Your Honor.

17         THE COURT:  All right.  So the reason for the

18  continuance is the need for further investigation and perhaps

19  analyzing the discovery between now and February 18th, and to

20  deny the continuance would be denying effective assistance of

21  counsel.

22     Do you both agree with this?

23         MR. JONES:  Yes, Your Honor.

24         MR. NURIK:  Yes, Your Honor.

25         THE COURT:  And have you discussed this with your

```
 1  clients?
 2          MR. JONES:  Yes, Your Honor.  We've discussed the new
 3  trial date.
 4          MR. NURIK:  Yes, Your Honor.
 5          THE COURT:  And you have discussed their speedy trial
 6  rights?
 7          MR. NURIK:  Yes, Your Honor.
 8          MR. JONES:  Yes, Your Honor.
 9          THE COURT:  Mr. Jones?
10          MR. JONES:  Yes, Your Honor.
11          THE COURT:  All right.  Does Mr. Hackett agree to the
12  trial date on February the 18th, 2020?
13          DEFENDANT HACKETT:  Yes, Your Honor.
14          THE COURT:  And, Ms. Budhu, do you agree to that trial
15  date?
16          DEFENDANT BUDHU:  Yes, Your Honor.
17          THE COURT:  The time between today and February 18th
18  will be excluded under the Speedy Trial Act to give the
19  defendants sufficient time to investigate and prepare for the
20  trial.  The need for the continuance outweighs the
21  Government's, the defendants', and the public's interest in a
22  speedier trial, and the time will be excluded under the Speedy
23  Trial Act.
24      All right.  Let's pick up where we left off.  I think we
25  dealt with Exhibit 3.  We're on to Exhibit 4.
```

1        Who's arguing for the Government?

2             **MR. ARNZEN:**  I am, Your Honor.

3             **THE COURT:**  All right.  Ready?

4             **MR. ARNZEN:**  Yes, sir.

5        Your Honor, with respect to a couple of the first -- I --

6   I think it was 1, 2, and 3.  If not, it was two of those.  The

7   basis that we described for the admission of those applies

8   here, too.

9        In other words, when the cooperator, Michael Forster, was

10  pitched on this deal, recruited to participate in this deal by

11  Vikram Khanna, among others, he sought to, as he usually did,

12  understand who else was involved with the deal, who else was

13  playing what role in the deal, and how it was going to work; in

14  particular, how the stock was obtained by the group, held by

15  the group, and how they were planning on trading it.

16       So this is Number 4.  Exhibit 4 in Docket 187-1 is just

17  such a case.  During the call, Mr. Khanna described to Forster

18  his background and experience with the defendant Annetta Budhu,

19  and Khanna stated that she had done sales for him for quite

20  some time and that she was safe and secure.

21       Mr. Khanna and Mr. Forster, Mr. Forster will testify, had

22  an experience -- had a long history of experience and

23  participation together in these deals, and so Mr. Khanna knew

24  that Forster wanted and collected this type of information in

25  analyzing whether to get involved or not.

1      And so this provides the background that he collected with

2 respect to -- to Ms. Budhu.  We think it should be admitted

3 because it's intrinsic evidence of the fraud.

4      **THE COURT:**  The defense position?

5      **MR. JONES:**  Your Honor, with regard to this, again, I

6 think we're in a similar situation where, if we're limiting

7 ourselves to the literal words on the page, there won't be a

8 problem.

9      However, if there's going to be any discussion by Mr.

10 Forster about a belief that any of this prior activity by

11 Ms. Budhu was improper or fraudulent in any way, that -- that

12 there would be a problem.  But my understanding is that that's

13 not going to happen.

14      **MR. ARNZEN:**  Our intent is not to have Mr. Forster

15 describe Ms. Budhu's past, just to -- he would simply say,

16 "Here's why we're having" -- "I was having the conversation

17 with Mr. Khanna, and what he said in response to my queries and

18 my usual interest in who's in the deal is exactly what's on the

19 table."

20      **THE COURT:**  Well, you -- in the transcript, there is

21 mention about other deals, including QBIO.  Are you getting

22 into them?

23      **MR. JONES:**  This is the issue that I had flagged with

24 relate -- relating to the boiler room testimony.  If that

25 evidence is going to be admitted, then they are going to be

1    admitting evidence that the QBIO deal was a fraudulent

2    pump-and-dump deal that used these boiler rooms.

3        If that evidence is going to come in, then that would be,

4    in my -- from Ms. Budhu's position, evidence indicating that

5    this was a prior fraud and thus would constitute improper

6    404(b) as it relates to Ms. Budhu.

7        **THE COURT:**  Well, if I find that it is proper and

8    admissible 404(b), that would cover it.

9        **MR. JONES:**  I don't believe it would as regards to

10   Ms. Budhu, Your Honor, because I don't believe the Government

11   is intending to introduce those other boiler rooms against

12   Ms. Budhu at all.  That evidence is only going as it relates to

13   Mr. Hackett.  There's no evidence that Ms. Budhu was aware of

14   or involved in anything to do with the boiler room operator or

15   the boiler room broker that is anticipated to testify.

16       So my concern is that this is going to be admitted as part

17   of the transcript with the reference to QBIO, and then in

18   another portion of the trial, the Government's going to

19   introduce evidence saying, "Oh, and by the way, QBIO is another

20   fraudulent pump-and-dump scheme," permitting the jury to draw

21   the inference that this is something that Ms. Budhu has done

22   before.

23       I don't think there's any proper purpose under 404(b) as

24   it relates to Ms. Budhu, and that would be improper propensity

25   evidence.

1          **MR. NURIK:**  Your Honor, if I might address also on

2     behalf of my client, I don't believe that the testimony in the

3     case, even if you were allowed -- to allow all the Government's

4     proposed evidence on QBIO, would show that Mr. Hackett engaged

5     the call rooms in order to sell QBIO.  And if you look actually

6     on Page 8 of Document 190, Lines 8 through 4 -- 13, where they

7     refer to QBIO, it is not in that context.

8          So to the extent that Mr. Jones is making the argument, we

9     would similarly make the same argument that the QBIO deal is

10    not one that Mr. Hackett could be under any circumstances held

11    responsible for.  He was not involved in that deal.

12         The only thing -- the only references in the transcripts

13    are that he had knowledge about the stock and about the deal in

14    general, but as we know, mere knowledge alone is not sufficient

15    to show being part of a conspiracy.  He was not actually

16    involved in having the call room sell it -- or pitch it because

17    they actually don't sell.  They just pitch.

18         So it's not the same as these other transactions that the

19    Government is referring to.

20          **THE COURT:**  Do you want to address that?

21          **MR. ARNZEN:**  I do, Your Honor.  There are a couple of

22    points that I'd like to make.

23         First, the 404(b) evidence with respect to QBIO -- if

24    we're going to jump to that other subject, which is the -- the

25    call -- the boiler room operator's selling of QBIO, this is not

1    intended to reflect upon Ms. Budhu's knowledge.  It is intended

2    to show Mr. Hackett's knowledge.

3        And so the Court could easily give a limiting instruction

4    as to the purpose for which that evidence is presented to the

5    jury.  It happens all the time, and that's what limiting

6    instructions are for.  So I think we can address Mr. Jones's

7    concern through a limiting instruction.

8        With respect to QBIO, I would just urge the Court to look

9    at Exhibit 37 that was submitted on Friday.  That's Docket

10   18 -- 190-1, Page 63.  This is an invoice that the call room --

11   the boiler room operator sent to the boiler room broker, and

12   the boiler room broker will testify that these were sales of

13   QBIO made through that mechanism on behalf of Mr. Hackett.

14       So indeed, Mr. Hackett was involved with the QBIO deal.

15   This is proof positive of that, as is the expected testimony of

16   the boiler room broker and boiler room operator.

17           **THE COURT:**  Well, the way I see it is Exhibit 4 is a

18   transcript of a conversation by Mr. Khanna with Mr. Forster;

19   correct?

20           **MR. JONES:**  That's correct, Your Honor.

21           **THE COURT:**  So --

22           **MR. ARNZEN:**  It is, Your Honor, yes.

23           **THE COURT:**  -- the only basis it would be admissible

24   is that if it is a statement of a coconspirator in furtherance

25   of the conspiracy; in other words, Mr. Khanna getting Mr.

```
 1   Forster involved.

 2        Would you spell Mr. Forster's name for the court reporter?

 3            MR. JONES:  You got it?

 4            MR. ARNZEN:  It's spelled correctly on the screen,

 5   Your Honor, F-o-r-s-t-e-r.

 6            THE COURT:  All right.  So the statement about QBIO in

 7   Exhibit 4 would be admissible on that basis if the Government

 8   establishes the foundation for the admissibility of a

 9   coconspirator's statement.  If they do not establish that, it

10   is not admissible, and that is a matter that will have to

11   weigh -- await trial.

12        But if they establish that, I think that this would be

13   intrinsic evidence and not 404(b) at this point.  We'll take up

14   whether it becomes 404(b) later.

15        And I would agree that if it becomes 404(b), then as to

16   QBIO, there can be a limiting instruction including wording

17   that says Ms. Budhu was not involved in it.  It would have to

18   be really strongly worded, but I'm leaving that up to the

19   parties to suggest a limiting instruction and up to the trial

20   judge to exercise his discretion as to the wording.

21        So I think Exhibit 4 does not at this point constitute

22   Rule 404(b) evidence.  It is certainly relevant as to the case,

23   and it is not sufficiently prejudicial to keep it out under

24   403.

25        But I would ask you to look at Page 4, the fourth
```

statement from the bottom.  Is that really necessary, and can

that be prejudicial in part?  It starts with Mr. Khanna saying,

"She is one of those kinda funny Indians."

(Court reporter requests clarification for the record.)

**THE COURT:**  "She is one of those kinda," k-i-n-d-a,

"funny Indians."  This is what Mr. Khanna is saying to Mr.

Forster, and then it goes on.  It first talks about Ms. Budhu

being Fijian, F-i-j-i-a-n, Indian descent, and then it goes on

to talk about her sexuality.

**MR. ARNZEN:**  Agreed, Your Honor.  There are two

sentences, I think, that are -- or two statements that I think

we can strike.

Mr. Khanna says, "Annette" -- "Annetta Budhu."

And then Mr. Forster says, "Is she Indian?"

Vikram Khanna starts at two sentences with "She's one of

those funny kinda Indians."

We can strike both the CHS statements and Mr. Khanna's

entire statement from there if that's acceptable to the

defense.  We don't have any interest in putting that in, no

reason.

**MR. JONES:**  May I have one moment, Your Honor?

I think that would make sense, Your Honor.

**THE COURT:**  I know the defendant did not raise it, but

it caught my eye, and I wondered whether it is sufficiently

probative to counteract -- to counteract any prejudice that

1  might be attributable to it, and you don't know what the

2  individual jurors may have in terms of prejudice.

3      So I thought it was worthy of bringing it up.  It was

4  worthy, w-o-r-t-h-y, of bringing it up.

5          MR. JONES:  And we appreciate that, Your Honor.  We're

6  in agreement that I don't think there's any probative value to

7  those specific portions.

8          THE COURT:  Is there any other similar comments in the

9  transcript --

10     (Court reporter requests clarification for the record.)

11         THE COURT:  Are there any other similar comments in

12  the transcript that should be likewise eliminated?

13     MR. ARNZEN:  I can say, Your Honor, that there are no

14  similar references that track these in any way.

15     And I should make clear that if Mr. Jones or Mr. Nurik see

16  some -- something to the contrary of what I just said, they're

17  free to raise it with us, and we'll strike it.  We don't think

18  there's any probative value there.

19         THE COURT:  All right.  So you have my ruling on

20  Exhibit 4.

21     Let's go on to the next one.

22     MR. ARNZEN:  Yes, sir.

23     Exhibit 5 is very similar, Your Honor.  This one is a

24  conversation between Ms. Budhu, Mr. Khanna, and Mr. Forster.

25  It's a consensually recorded conversation, and in it, Mr.

1    Khanna is heard to describe to Forster how Mr. Sidhu knows

2    Mr. Hackett.

3        So this is part of the same process by which Mr. Forster

4    is figuring out who is who, who do they know, and what roles do

5    they play.  We think it's admissible for the same reason as 4.

6            **THE COURT:**  Any objection?

7            **MR. NURIK:**  Your Honor, if you would note by now,

8    we've had four other conversations, previous conversations, in

9    which Mr. Forster has become familiar with who Mr. Hackett is.

10       So the contention on the part of the Government that this

11   is necessary because Mr. Forster would typically want to know

12   who else was participating in the deal and about that person --

13   i.e., Mr. Hackett -- that would no longer have any real

14   relevance.  It has minimal relevance at best.

15       Contrast that with what we contend would be the

16   prejudicial value of Mr. Khanna saying that "Kip knows Hackett

17   for years now.  They've made money, and they've lost money, and

18   they've made money, you know, in deals back and forth."  We

19   would submit that the prejudicial value of that -- that becomes

20   in effect 404(b), and under the test of 404(b), we don't

21   believe the Government has sufficiently met the criteria.

22       There's no reasonable need for this testimony at this

23   point.  As I said, four prior dates of discussing who

24   Mr. Hackett is, who he knows -- now it's clear Mr. Forster

25   doesn't need to know this anymore.  And keep in mind that Mr.

```
 1    Forster is a Government informant, was in an active

 2    participation role, creating the conversations on purpose.

 3        So we would submit that this should not be allowed.  It's

 4    a one-page reference --

 5            THE COURT:  Who -- who is Kip, K-i-p?

 6        MR. NURIK:  Kip Sidhu is another charged alleged

 7    coconspirator who we understand has pled guilty and will

 8    testify, I believe, at trial.

 9            THE COURT:  Mr. Jones?

10        MR. JONES:  I would just join in the comments made on

11    behalf of Mr. Hackett since this conversation doesn't

12    specifically involve Ms. Budhu.

13            THE COURT:  All right.  Anything further?

14        MR. ARNZEN:  Just briefly, Your Honor.

15        These are statements in further [sic] of the conspiracy

16    because -- not because Mr. Forster is a conspirator obviously,

17    but Mr. Khanna has already entered into a -- into a conspiracy

18    with others, including the defendants, and he's furthering the

19    conspiracy by trying to recruit Mr. Forster.

20        Mr. Forster and Mr. Khanna are express in these tapes that

21    peeling back the onion -- and that's a phrase used in the

22    conversations themselves -- is part of the process.  Mr.

23    Forster and Mr. Khanna himself are gaining more and more

24    information about who else is in the deal and what roles they

25    play.
```

1    So it's an iterative process.  We don't think it's

2    prejudicial.  It is part of the background so as to give

3    context and meaning to the jury as they analyze the facts

4    presented here against -- about Mr. Hackett.  Again, we think

5    it's admissible for the same reasons as 4.

6         **THE COURT:**  I agree with you 100 percent.  It is not a

7    404(b) issue, and there is not substantial prejudice from the

8    statement of Kip that he engaged in other transactions with

9    Mr. Hackett and they made money and lost money.  That is the

10   nature of --

11        (Court reporter requests clarification for the record.)

12        **THE COURT:**  And that they made money and lost money.

13   That is the simple nature of investing.  There's nothing to

14   indicate that they made money by fraud.  So I will allow it in

15   if you satisfy the foundation for coconspirator statements.

16        Number 6?

17        **MR. ARNZEN:**  Okay.  Thank you, Your Honor.

18        The reason that we raise this is it was a conversation

19   that we would have thought would have been admitted as long as

20   we established the foundation.  There is some -- some talk

21   about a person named Ollie, who we understand to represent a

22   person named Oliver Lindsay.  He was charged in another case

23   that was presided over by Judge Hayes until recent guilty

24   pleas.

25        And there's some overlap.  In other words, Mr. Khanna and

1    Mr. Forster know who Mr. Lindsay is, and apparently so does

2    Mr. Hackett.  The reason it's relevant is because Mr. Forster

3    is asking Mr. Khanna about this ASNT deal, and he says to Mr.

4    Khanna, "Who is our Ollie in this deal?  We had Ollie on QBIO.

5    Who is playing that role with respect to ASNT?"

6         That's what makes it relevant and admissible here as an

7    intrinsic evidence of the fraud.  They're not just out there

8    talking about some other conduct by Mr. Hackett just to talk

9    about it.  They're trying to contextualize and put into -- into

10   relief exactly who's doing what, again, with the ASNT deal.

11         **MR. NURIK:**  Your Honor, I'd like to -- I'd like to

12   refer the Court to the middle of Page 4 of this particular

13   transcript --

14         **THE COURT:**  Hold on.

15         **MR. NURIK:**  -- where CHS, which is Mr. Forster, makes

16   the statement.  This is not made by one of the coconspirators.

17         **THE COURT:**  Hold on.

18         **MR. NURIK:**  Specifically, "He watched QB, he knows

19   Ollie, he knows the drill, blah, blah, blah," and then the

20   comment again "Okay now.  All roads are leading to home.

21   That's how he got in the deal."

22         But in particular, "He watched QB, he knows Ollie, he

23   knows the drill, blah, blah, blah."  I would submit that that

24   is a self-serving statement, should not be allowed.  It has no

25   relevancy for the reasons that the Government had argued

1   previously about trying to learn who was in the deal.

2       It is, as I said, a self-serving statement by a Government

3   witness whose intent is to create in the transcript that he

4   knows is being made of these statements that would be

5   prejudicial to the defendants in order to aid him in his

6   dealing with his cases, which the Court will learn is one of

7   the reasons why he's cooperating.

8       And I would submit that that's improper 404(b).

9           **THE COURT:**  Do you want to add anything, Mr. Jones?

10          **MR. JONES:**  Yes, Your Honor.

11      I think the problem that I have with this portion of the

12  testimony is I understand the Government's explanation of them

13  using this other deal as a way to define terms, roles in the --

14  in the charged conspiracy, but that's not what plays out in the

15  transcript.  What -- there's going to need to be some sort of

16  significant amount of testimony from Mr. Forster to explain

17  what the Government just proffered to the Court.

18      Right now, it's particularly vague with regard to who

19  Ollie is.  Is Mr. Forster going to get on the stand and say,

20  "Ollie is a person that was involved in this other

21  pump-and-dump scheme, and his role was this, and thus it was

22  relevant when we said that this person is our Ollie in this

23  case?" to draw some sort of conclusion?

24      Because I think that's what's going to be problematic.

25  That's going to be both a problem under 404(b) and 403 because

1    we're essentially going to be then litigating the details of a

2    case that's already resolved in front of Judge Hayes with

3    regard to what a particular person's role was in that case.

4         So it seems to me -- and the Government can correct me if

5    I'm wrong, but that they would need some significant testimony

6    from Mr. Forster beyond what's here on the plain page to

7    establish what they've just alleged, which is that they were

8    using this other deal, this Zika deal, as some sort of, you

9    know, definitional tool about the roles of people in ASNT.

10        **MR. ARNZEN:**  Your Honor, Mr. Jones is right.  This is

11   the exception.  QBIO is not like the other deals that we seek

12   to introduce before the jury.  Mr. Forster and the

13   conspirators -- Mr. Hackett was on the phone.  Ms. Budhu was on

14   the phone with Mr. Forster.  Everybody was on the phone with

15   Mr. Forster comparing ASNT with QBIO.

16        And indeed, there's a portion on Page 2 of the same

17   transcript.  It's on the bottom 30 percent of the page, and

18   CHS:  "Um, was Hackett involved in QBIO?"

19        Khanna responds, "No, just as an investor.  He had some --

20   he had some shares."

21        And here's the point that I've been trying to make,

22   Your Honor.  CHS then says, "I only ask because, you know, does

23   he value the program or not?  Does he already know about it?

24   Does he already..."

25        And then Khanna describes, "He (Unintelligible) the

1    program."  I imagine that says, "He knows the program.  He

2    knows the QBIO program very well."

3        And so, again, this is Mr. Forster trying to understand

4    what others know about QBIO.  We are going to have to present

5    some aspects of the QBIO deal in brief to the jury so that they

6    can understand the nature of the conversation as it concerns

7    ASNT.

8        The part that Mr. Nurik complains of is simply Mr. Forster

9    summarizing statements that had been previously made by Mr.

10   Khanna to him in the tapes -- in this tape and the prior tapes.

11       **MR. JONES:**  And I just want to make one factual

12   clarification.

13       I think Mr. Arnzen indicated that this was a conversation

14   with Ms. Budhu.  I don't -- I think this is one of the calls

15   where she comes in and out.  She's certainly not present at the

16   beginning of this call where he says, "So I got off the phone

17   with Annetta."

18       **MR. ARNZEN:**  Mr. Jones is right.  She is not present

19   for this part of the conversation.

20       **THE COURT:**  Let me reread it.  R-e-r-e-a-d, reread it.

21       Mr. Arnzen, what about the concern that Mr. Nurik had on

22   Page --

23       (Court reporter requests clarification for the record.)

24       **THE COURT:**  Mr. Arnzen, what about the concern that

25   Mr. Nurik had in the middle of Page 4?

1          **MR. ARNZEN:**  Your Honor, that is simply Mr. Forster

2     restating what had already been told to him by Mr. Khanna

3     during this conversation and prior conversations.  He's not

4     making up facts and having Mr. Khanna simply say, "Yes."  He's

5     restating what Mr. Khanna, a coconspirator, had already

6     reported to Mr. Forster.

7          **THE COURT:**  That is the way I see it also.  I don't

8     think there is a concern here as to 404(b).  This is the

9     conversation of a coconspirator, and they are trying to get Mr.

10    Forster to contribute, I think, about 300,000; is that correct?

11         **MR. ARNZEN:**  Close, Your Honor.  Mr. Forster was going

12    to contribute services, a promotional tool, that he said that

13    he was going to have to spend a lot of money on.  The 300,000

14    is the amount that Mr. Hackett paid to Ms. -- Mrs. Budhu for

15    the shares that they were going to then pump and dump.

16         **THE COURT:**  All right.  I think it is necessarily a

17    part of the conversation about Mr. Forster being involved and

18    his comfort level, c-o-m-f- --

19         (Court reporter requests clarification for the record.)

20         **THE COURT:**  And his c-o-m-f-o-r-t level about being

21    involved.  He's trying to figure out who's involved and what

22    their level of competency is.  So I think this is intrinsic to

23    the conspiracy, and under Rule 403, I don't think there's

24    sufficient prejudice to disallow it into evidence.

25         So if the Government lays the proper foundation for

```
 1   coconspirator --

 2        (Court reporter requests clarification for the record.)

 3        THE COURT:  If the Government lays the proper

 4   foundation for the coconspirator admissions, I think this would

 5   come in, and I so hold.

 6        MR. ARNZEN:  Your Honor, I wonder if I can make one --

 7   one correction quickly.  I did not describe the deal perfectly.

 8   I think the -- the logic still applies.

 9        300,000 was an amount that Mr. Hackett paid, invested in

10   the company so that the company itself would issue shares

11   directly to Mr. Hackett.  This was not part of the Annetta

12   Budhu -- this was not part of the Annetta Budhu part of the

13   deal.  She had another part that involved 300,000 -- 200,000

14   shares?  200 -- 200,000 shares that she exchanged for $5,000.

15        THE COURT:  That would not change my analysis.

16        MR. JONES:  Your Honor, can I inquire as to the scope

17   of your ruling?

18        THE COURT:  Yes.

19        MR. JONES:  I know that the Court has ruled that the

20   specific transcript would come in, but the Government at this

21   point has acknowledged that they would also be introducing some

22   additional testimony from Mr. Forster, not what's laid out in

23   their explanation of testimony -- of Exhibit 5 here but instead

24   an explanation of the QBIO deal and what happened in it.

25        I think -- is your ruling meant to encompass that
```

1  additional testimony?  If so, I think that a more concrete

2  proffer as to what Mr. Forster is going to testify to would be

3  appropriate.

4      **THE COURT:**  Well, I cannot rule on the admissibility

5  on something that I have not yet heard.  I'm only ruling on the

6  transcript, which is Exhibit 6, but what are you going to

7  offer?

8      **MR. ARNZEN:**  With respect to the QBIO deal,

9  Your Honor, Mr. Forster will say that that was a pump-and-dump.

10  It was a stock that he helped promote on a promotion -- an

11  Internet promotion tool called The Money Streets.

12      He will also testify that there were a number of people

13  involved with that deal, including Mr. Khanna and Mr. Lindsay,

14  Ollie, Oliver Lindsay.

15      He will also say that it was spectacularly successful, the

16  price of the stock rose dramatically, and a lot of people made

17  a lot of money on that deal.  So it garnered a lot of attention

18  from folks who watch penny stocks.

19      He'll also say it was a crooked deal.  There were out --

20  there were elements of misleading representations and

21  omissions, and I think that's the size and scope of what he

22  would testify to with respect to QBIO.

23      **THE COURT:**  That would certainly be 404(b) evidence.

24      **MR. ARNZEN:**  Your Honor, under the case law -- well, I

25  don't know how it's 404(b).  I can't -- I can't see how it's

 1   not intrinsic evidence of the fraud.

 2        I used an example last week.  Maybe it wasn't a great one,

 3   but if somebody says, "Go Rambo on the victim" and then whoever

 4   heard that did a violent act upon the victim, I think the

 5   Government should be able to present to the jury that *Rambo* is

 6   a violent film.

 7        In other words, they're talking about ASNT.  They're

 8   simply using QBIO to talk about what happens in ASNT.  So

 9   everybody has got a reference point.  That reference point is

10   not evidence in and of itself that a bunch of other people did

11   other things on the QBIO stock that were illegal except for the

12   boiler room broker part of it.

13        It is, rather, a reference -- it's a way to talk about

14   ASNT in a manner that everybody who's participating in the

15   discussion understands because they either watched it or were

16   told about it or participated in it.

17        **THE COURT:**  I would agree with you to a certain point,

18   but once you get into bringing up false representations and

19   describing a fraudulent scheme, that is where I think it

20   crosses over to 404(b).

21        With your Rambo example, that is not what the defendants

22   were engaged in.  Here, there is at least one of the

23   conspirators, Mr. Khanna, who is alleged to be involved with

24   QBIO.  Your Rambo example just uses what people would

25   understand, that it would be neutral and does not involve

```
 1   the --
 2          (Court reporter requests clarification for the record.)
 3          THE COURT:   It would be neutral and does not involve
 4   the specific defendants in that case.  If, for example, he
 5   said, "Go Adam," A-d-a-m, "4 on him" and you wanted to --
 6          (Court reporter requests clarification for the record.)
 7          THE COURT:   If he said, "Go A-d-a-m 4," the Number 4,
 8   "on him" and you then wanted to bring up what Adam 4 was -- it
 9   was a series of violent acts -- and the very same parties were
10   involved, I think that would be more similar to this situation.
11          So the trouble I'm having and perhaps Mr. Nurik and Mr.
12   Jones are having is that I don't know what you are specifically
13   trying to offer on the testimony of Mr. Forster.  I don't have
14   it in black and white before me.  I would need a specific
15   proffer.
16          I was spending much of yesterday thinking about this case,
17   and frankly that is the problem I have.  I don't have specific,
18   finite proffers to rule on, and that makes the motions in
19   limine quite dangerous, especially since I'm ruling on a case
20   that I'm not going to try.
21          So I'm only ruling on the transcript as to what you would
22   like to elicit from Mr. Forster.  I would need a specific,
23   finite proffer.
24          MR. ARNZEN:   Understood, Your Honor.
25          The -- may I inquire?  Are you asking for a specific,
```

finite proffer, or are you telling the parties that you're
simply ruling on the transcripts and that's --

     **THE COURT:**  Right now, I'm saying I'm only ruling on
the transcripts.  The fact that they mention QBIO is not a
concern at this point.  The question is:  How much can you put
in about QBIO, and who is involved in it?  I would need a
specific proffer.  I would need to know exactly what you are
going to offer.

    If I were trying the case, I might have Mr. Forster
testify outside the presence of the jury so I can --

    (Court reporter requests clarification for the record.)

     **THE COURT:**  If I were trying the case, I might have
Mr. Forster testify outside the presence of the jury so I would
have exactly what he's going to say, and I can make the Rule
404(b) and Rule 403 analysis.  Here, I don't have it, and words
are important, and the exact words he would use are --

    (Court reporter requests clarification for the record.)

     **THE COURT:**  Words are important, and the exact words
he would use are crucial for the analysis.

     **MR. ARNZEN:**  And, Your Honor, I think I probably led
to some of the confusion because I'm trying to balance
attention.

    On the one hand, I don't think Mr. Forster has to say much
about QBIO.  Indeed, we said that in our original brief, that
he would simply testify that QBIO was a penny stock deal in

```
 1   which he participated.  He would comment on poor trade
 2   execution and erratic movements in the stock prices.
 3       So we started with that position, but we've also got
 4   Mr. Hackett's engagement of the boiler room broker or the
 5   boiler room operator for purposes of promoting QBIO right
 6   before Mr. Forster got involved with that deal a couple years
 7   back.
 8       So I apologize.  I think I'm leading to some of this
 9   confusion.
10       THE COURT:  All right.  Again, I think it is important
11   to know exactly what he'd be testifying to in several regards
12   because:
13       1.  The trial judge has to craft a limiting instruction,
14   and that would depend on who was involved with QBIO and who was
15   not involved.  And the judge may want to instruct the jury, for
16   example, who was not involved and that they cannot consider
17   this as evidence against that defendant.
18       Ms. Budhu was not involved in QBIO; is that correct?
19       MR. ARNZEN:  Does not -- not from the evidence that we
20   have, Your Honor.  There is reference to QB -- QBIO in the
21   calls vis-a-vis Ms. Budhu, and it sounds like Ms. Budhu knew
22   about it or was told about it but did not participate in it.
23       THE COURT:  So I'm going to leave that to the trial
24   judge.  You would have to make a further motion in limine with
25   an -- an express proffer as to exactly what was --
```

1          (Court reporter requests clarification for the record.)

2          **THE COURT:**  With an express, e-x-p-r-e-s-s, proffer as

3    to what Mr. Forster would testify to in that regard, but I'm

4    ruling that the transcript -- I believe it's Number 6 -- is

5    admissible if you satisfy the foundation for coconspirator

6    statements.

7          All right.  Number 7?

8          **MR. ARNZEN:**  Yes, Your Honor.

9          Your Honor, with respect to Number 7, we teed up this

10   transcript because of the -- the bottom of Page 2 of the

11   transcript.  There's a statement by Vikram Khanna about QBIO

12   and a deal that was very similar to that and had very similar

13   participants known as QBAK.

14         So same analysis.  It's just with respect to QBIO and an

15   additional stock here.

16         **THE COURT:**  All right.  Go ahead.

17         **MR. JONES:**  Your Honor, I don't have a lot to add to

18   the arguments previously.  This is very similar in the sense

19   that there's a reference to QBIO and supposedly Ms. Budhu being

20   aware of QBIO.  Just to the extent that it matters, this

21   involves a little bit more than pure speculation on Mr.

22   Khanna's part with regard to what she understood with regard to

23   these other deals.

24         The main problem that we've identified with this is that

25   in relation with other evidence, the evidence that the

1    Government has indicated they're going to introduce, and the

2    testimony that we just discussed, I do think this would cross

3    the line over into 404(b) to the extent that they go beyond

4    what's here on the page.

5            **MR. NURIK:**  I would just note, Your Honor, that it

6    seems that if we are dealing strictly with the issue of the

7    admissibility of the transcript, that's one thing, and that

8    seems to be what you've been ruling on.

9        Our great concern -- and it's unfair to the Court right

10   now to make a ruling absent specific information -- is what Mr.

11   Forster, the Government's witness, will testify to at trial.

12   So it seems that that's going to get teed up in front of the

13   trial judge at the time, and we're just going to have to deal

14   with that then.  It would be unfair to ask the Court absent a

15   specific proffer on that.

16       So I don't have anything else to add, and I think frankly

17   that's the case with all of these.  The biggest issue that we

18   raised from the very beginning in this case when we objected to

19   the Government's motions in limine is what is going to be

20   testified to by the witness, not what's in the transcript as

21   much as what is the witness going to say concerning references

22   to people or to particular deals with stock tickers.

23       And that's what we still haven't been able to resolve, and

24   I don't think we're going to be able to resolve that today.

25           **THE COURT:**  I will allow Exhibit 7 based on the same

1   analysis that I gave you for the other transcripts -- other

2   transcripts.

3       Let's move on to Exhibit 8.

4       MR. ARNZEN:  Your Honor, this is a somewhat longer

5   portion of a conversation that we hope to introduce into

6   evidence.

7       The only reason that we raised it in this context was on

8   Page 1 of the transcript, Page 47 of 120 of the filing, it's in

9   the middle where Mr. Hackett himself references QBIO.  And what

10  they're talking about is another person that was involved with

11  the QBIO deal, and Mr. Hackett is telling Mr. Khanna and Mr.

12  Forster about that.

13      So same analysis on the QBIO deal.

14      THE COURT:  Your response?

15      MR. NURIK:  Your Honor, I have nothing further to add

16  other than what we've argued previously.

17      MR. JONES:  Your Honor, I would just note that in this

18  particular transcript, it seems like it would be

19  extraordinarily easy to remove the reference to QBIO and that

20  the reference to QBIO in this case does not appear to be a

21  reference to anybody who was actually involved or alleged to be

22  involved in this case.

23      It's saying that some other -- this person, Ray, was

24  somehow -- originally started off with QBIO, but the entire

25  transcript makes sense regardless of the QBIO -- the invocation

1    of QBIO here.

2         MR. ARNZEN:  I can proffer that there's a direct

3    connection between this conversation and ASNT because the

4    person referenced above that, Market -- Market Wise and Ray --

5    they were engaged by Mr. Hackett on ASNT.  It was simply a

6    reference back to who else has been engaged or -- or another

7    deal on which those two were engaged as well.

8         So --

9         THE COURT:  All right.

10        MR. ARNZEN:  -- there's a direct connection.

11        THE COURT:  Base upon the same analysis I mentioned

12   for the other transcripts, Exhibit 8 would be admissible.  I

13   don't think you can take out part of it without it not making

14   sufficient sense.

15        These are conversations by alleged coconspirators.

16   Mr. Hackett is involved in this conversation with Mr. Khanna,

17   and this is allegedly in furtherance of the conspiracy in

18   having these discussions with Mr. Forster.  So I would find

19   Exhibit 8 admissible for the same reasons.

20        Exhibit 9?

21        MR. ARNZEN:  Your Honor, exact same analysis here.

22   This is a discussion between Mr. Forster, Mr. Hackett, and Mr.

23   Khanna, and it's a discussion about QBIO and what happened in

24   that deal and how some of the same -- same dynamics might occur

25   in ASNT.  And Mr. Hackett had some suggestions on how to remedy

1    the problems that might come up in ASNT.

2            **THE COURT:**  Anything by the defense on Exhibit 9?

3            **MR. NURIK:**  I would simply adopt my previous arguments

4    and comments, Your Honor.

5            **THE COURT:**  Mr. Jones?

6            **MR. JONES:**  The same, Your Honor.

7            **THE COURT:**  The same for me.  I will find it

8    admissible based on the analysis I had previously given as long

9    as the Government establishes the foundation for coconspirator

10   statements.

11       All right.  Number 10?

12           **MR. ARNZEN:**  Number 10 is yet another one, Your Honor.

13   This time, Mr. Hackett is preparing to introduce Mr. Forster to

14   the boiler room broker, and it's the same boiler room broker

15   that Mr. Hackett has told Mr. Forster has been engaged on the

16   ASNT deal, the charged deal.

17       And in this case, Mr. Hackett mentions right before the

18   introduction that the call -- the boiler room broker was also

19   engaged on the QBIO deal before Mr. Forster got involved with

20   it.

21           **THE COURT:**  Anything by the defendants?

22           **MR. NURIK:**  Same arguments and comments, Your Honor.

23           **MR. JONES:**  Nothing to add on behalf of Ms. Budhu.

24           **THE COURT:**  All right.  I would agree as to its

25   admissibility with the caveat --

1      (Court reporter requests clarification for the record.)

2           **THE COURT:**  I would agree to its admissibility with

3      the caveat that the Government establish the foundation for the

4      admission of coconspirator statements as to Rule of Evidence

5      801.

6           Number 11?

7           **MR. ARNZEN:**  Yes, sir.

8           Number 11 is just like Number 9 except that it has another

9      participant on the phone call.  This time, the call involves

10     Mr. Khanna, Ms. Budhu, Mr. Forster, but it also now includes

11     Kevin Gillespie, who is the CEO of Arias Intel Corp, the

12     company.  He's also an indicted coconspirator and has pled

13     guilty.

14          So this is a conversation about how ASNT might have some

15     of the same characteristics as the QBIO deal, but this time,

16     Mr. Forster is telling Mr. Gillespie about it as well.  And

17     collectively, they're working through what the problems might

18     be in hopes of addressing those problems with ASNT.

19          **THE COURT:**  The defense?

20          **MR. NURIK:**  We don't have anything further to add,

21     Your Honor.

22          **MR. JONES:**  Same for Ms. Budhu, Your Honor.

23          **THE COURT:**  All right.  I would agree with the

24     Government as to the admissibility of Exhibit 11 with the

25     caveat I previously mentioned.

1    Number 12?

2         **MR. ARNZEN:**  One moment, Your Honor.

3    Okay.  So, Your Honor, this is a conversation between Mr.

4    Forster and Mr. Hackett.  Something has gone wrong with the

5    ASNT deal, and Mr. Hackett starts coming up with ideas on the

6    phone about what he might do with the stock that he still

7    holds.

8         He says on Page 1 at the bottom -- I don't know --

9    80 percent of the way down, "Yeah.  I'll just do a massive

10   e-mail campaign, if I can, in one or two days and then be done

11   with it."

12        Mr. Forster and Mr. Hackett then discuss what that

13   campaign -- e-mail campaign might look like, and -- and when

14   doing so, Mr. Hackett starts discussing his success in using

15   that -- that promotional tool, that pump tool, in recent

16   history.

17        So they're sizing up the chances of success in dumping the

18   shares through the same tool on the ASNT deal.

19        **THE COURT:**  The defense position?

20        **MR. NURIK:**  Your Honor, just presuming that we're

21   limiting the ruling to the admissibility of the transcript

22   itself, we have nothing further to add.

23        **MR. JONES:**  Nothing to add on behalf of Ms. Budhu.

24        **THE COURT:**  All right.  I will find the transcript

25   admissible subject to the Government laying the proper

```
 1    foundation for coconspirator statements.

 2        Number 13?

 3        MR. ARNZEN:  Your Honor, Number 13 is a slightly

 4    different topic, but it's on the same subject of getting rid of

 5    the shares that Mr. Hackett already has.  They're looking for

 6    what -- Mr. Hackett is looking for ways to unload the shares to

 7    victims in the market.  One of the ways that he does so is

 8    through the boiler room broker.  Another way is a way that

 9    Mr. Forster talked about.

10        Mr. Forster represented that he had a contact who could

11    take in shares on behalf of clients.  That contact would not

12    tell the clients themselves what was going on with the stock,

13    why they were taking it in, but rather the contact would just

14    get a kickback for putting away stock.  It's a way to sell

15    stock to victims without the victims really even analyzing or

16    knowing about it.

17        So Mr. Forster raises this with -- with Mr. Hackett.

18    Mr. Hackett has a couple of stocks that he's interested in

19    using this tool for.  One of them is ASNT, and another is a --

20    is a ticker by the -- by the name DAVC.  The reason -- and so

21    there's conversation and mention of the second ticker in this

22    transcript.

23        The reason that it's important, though, Your Honor, is

24    simply because this is the transcript in which Mr. Forster

25    describes this tool in some details in the way in which it
```

misrepresents and misleads investors.  Mr. Hackett's first
response is "Can you do it on DAVC?"  And then they come back
later and talk about ASNT.

    So we're fronting this for the Court because there's
mention of this other ticker, but the whole conversation,
again, provides the framework for describing to the jury
through the taped evidence what this tool represents.

            **THE COURT:**  All right.  The defense argument?

            **MR. NURIK:**  As before, Your Honor, nothing further to
add.

            **MR. JONES:**  Nothing to add on behalf of Ms. Budhu.

            **THE COURT:**  All right.  I think it would be admissible
if the Government establishes the foundation for the
co-conspiracy admission.

    Number 14?

            **MR. ARNZEN:**  Yes, Your Honor.  Just one moment,
please.

    Your Honor, this is about the same exact subject as the --
as what was discussed in Exhibit 13.  And I apologize.  I'm
trying to figure out why we included it here because I don't
see mention of another ticker symbol.

    So we think it's admissible because it's intrinsic
evidence of the fraud.  I can't figure out for the life of me
right now why I included it here again because I don't think I
see reference to any other -- oh.  I'm sorry.  I did.

1      So the -- on Page 2, the -- the top third, CHS says,

2  "ASNT, I haven't showed it to him.  If you want me to show him

3  both symbols, I'll show him both symbols."  In context, Mr.

4  Forster was -- was telling Mr. Hackett that he would show ASNT

5  and the other ticker, DAVC, to the contact to -- to analyze for

6  purposes of using this tool.

7      So that's why we put it in.  It's the exact same tool that

8  I just described.  It's the exact same two tickers, ASNT and

9  DAVC.

10          **THE COURT:**  The defense position?

11          **MR. JONES:**  Nothing to add on behalf of Ms. Budhu.

12          **MR. NURIK:**  Your Honor, without -- without the Court

13  ruling on any additional testimony by Mr. Forster, we have

14  nothing further to add.

15          **THE COURT:**  I will allow it into evidence so long as

16  the Government satisfies the foundation for coconspirator

17  statement admissibility.

18      Number 15?

19          **MR. ARNZEN:**  And, Your Honor, I apologize.  So I'm a

20  little bit confused about the requirement for -- for a

21  foundation on coconspirator admissibility.

22      This is a direct conversation between Mr. Hackett and Mr.

23  Forster.  We think it should come in simply because Mr. Hackett

24  was talking about -- talking about both of these tickers,

25  including the subject ticker, ASNT, at the same time.

1          **MR. JONES:**  As it relates to Ms. Budhu, they would

2    still need to meet the requirements of 801(d)(2)(E).

3          **THE COURT:**  Right.  Exactly.

4          **MR. ARNZEN:**  Fair enough.  Sorry.  I got my wires

5    crossed.  I agree with Mr. Jones.  We certainly would, and we

6    would -- we would establish, I think, that there is -- that

7    these were statements in furtherance of.

8       So we understand the Court's condition on -- on

9    admissibility.

10         **THE COURT:**  It would be an admission as to

11   Mr. Hackett, but it would not be an admission as to Ms. Budhu

12   unless you satisfy the foundation for the coconspirator rule.

13         **MR. ARNZEN:**  Understood.  Thank you, Your Honor.

14         **THE COURT:**  All right.  15?

15         **MR. ARNZEN:**  Yes, Your Honor.

16      I think we're on 15.

17         **THE COURT:**  Yes.

18         **MR. ARNZEN:**  It is -- it's the exact same topic that

19   is being discussed between Mr. Hackett and Mr. Forster.  And,

20   again, the ticker DAVC comes up because as they are discussing

21   this tool, it's being discussed in the context of these two

22   tickers, ASNT and DAVC.

23      So the same analysis, we would argue, applies to Exhibit

24   15.

25         **THE COURT:**  Anything further from the defense?

1        **MR. JONES:**  Nothing to add for Ms. Budhu.

2        **MR. NURIK:**  Not for Mr. Hackett.

3        **THE COURT:**  I would find the transcript admissible

4 based on the rulings that I have made as to the other ones.

5     We'll take our lunch break now and pick up at

6 2:00 o'clock.

7        **MR. ARNZEN:**  Thank you, Your Honor.

8        **THE COURT:**  So what else do we have to cover?  We have

9 the remaining transcripts and then the call room or boiler room

10 testimony.

11       **MR. ARNZEN:**  I think those are the two -- two most

12 significant motions that are still on the table, Your Honor.

13       **THE COURT:**  Well, what else is still out there?

14       **MR. ARNZEN:**  Your Honor, I was looking at my notes

15 about what we actually got a ruling on -- from the Court on.

16 So -- sorry.  One moment.

17       **MR. JONES:**  I believe the only other one that was done

18 is the expert testimony; is that right?

19       **MR. ARNZEN:**  Thank you, Mr. Jones.  I believe that's

20 true.

21     So in our filing, Docket 176, there are a number of

22 motions that I do not think have been either discussed -- some

23 of them maybe have been discussed briefly but not ruled upon,

24 the Motions in Limine Nos. 1, 3, 4, 5, 6, 7, 8, 9, and 10 --

25 oh, wait.  10 is done.  So 1 and 3 through 9, I think,

1    Your Honor.

2         And then I believe that Mr. Jones filed some motions as

3    well.  I think Your Honor has addressed the *Bruton* motions as

4    it respects -- as it concerns the motion for severance.

5         **MR. JONES:**  Yes, and the other motion is -- overlaps

6    with the same issues as the Government's Motion No. 1 relating

7    to the coconspirator statements.

8         **THE COURT:**  I thought we dealt with most of In Limine

9    No. 1.

10        **MR. JONES:**  I -- I think we have to the extent that

11   the Court has indicated that it's deferring the coconspirator

12   ruling until the Government lays the foundation at trial.  So I

13   don't think there's anything for the Court to actually decide

14   there.

15        **MR. ARNZEN:**  Sounds right to me.

16        **THE COURT:**  All right.  I'm prepared to rule on them

17   all.  We'll pick them up, but what we don't finish today, we'll

18   have to --

19        (Court reporter requests clarification for the record.)

20        **THE COURT:**  What we don't finish today, we'll have to

21   come back at another time.

22        So, Ms. Budhu, can you be back online at 5:00 o'clock your

23   time, 2:00 o'clock here?

24        **DEFENDANT BUDHU:**  Yes, Your Honor, I can.

25        **THE COURT:**  Thank you.

1          **DEFENDANT BUDHU:**  Thank you.

2          **THE COURT:**  All right.  We'll see you at 2:00 o'clock

3    here.

4          **MR. ARNZEN:**  Thank you, Your Honor.

5          **MR. NURIK:**  Thank you.

6          (Luncheon recess was taken at 12:38 p.m.)

7    **AFTERNOON SESSION**                              **2:22 p.m.**

8          **THE COURT:**  Ms. Budhu, can you hear us and see the

9    screen?

10         **DEFENDANT BUDHU:**  Yes, Your Honor, I can.

11         **THE COURT:**  Okay.  Thank you.

12    All right.  We're on --

13         **DEFENDANT BUDHU:**  Yes, I can.

14         **THE COURT:**  Thank you.

15    We're on to Exhibit 16.

16         **MR. ARNZEN:**  I think that's true, Your Honor.

17    With respect to 13, 14, and 15, I was describing a tool by

18    which Mr. Forest -- that Mr. Forster was making available so

19    that Mr. Hackett could dispose of the stock.  That's

20    colloquially termed the broker network.

21    So 13, 14, and 15 were about the broker network and

22    discussions between Mr. Hackett and Mr. Forster about it.  They

23    discussed three deals in -- while discussing the broker

24    network:  ASNT, I described the deal DAVC, and there was one

25    more, too, WRIT.

1      So, Your Honor, Number 16 concerns all three of those

2  deals:  ASNT, DAVC, and WRIT.  It is about the same tool

3  described earlier and so should be admissible on the same logic

4  that 13, 14, and 15 were.

5              THE COURT:  What is the tool?

6          MR. ARNZEN:  The tool, Your Honor, is this.  As I

7  described or attempted to describe earlier, Mr. Hackett was

8  interested in getting rid of the stock of ASNT that he had

9  because there was a problem with part of the deal, and so he

10  talked to Mr. Forster and asked him about ways to unload the

11  stock.

12      Forster had a specific tool to unload the stock that

13  consisted of using a contact that Forster had.  Forster

14  represented that that contact could purchase from Mr. Hackett

15  the shares for a certain price and then put it into brokerage

16  accounts that the clients wouldn't review, analyze, or see.

17      So the contact was a securities professional who had

18  control over discretionary accounts, would take the stock in

19  and put it away such that Mr. Hackett could sell the stock.

20  The contact could take it in and take a kickback of between 30

21  and 50 percent over time.

22      And so that was the tool presented by Forster to

23  Mr. Hackett, and this discussion concerns Mr. Hackett's

24  reaction to that offer.  And three -- three stocks were

25  discussed during that conversation, as I said, ASNT, DAVC, and

the charged stock ASNT [sic].

        **THE COURT:**  Where is that in the transcript?

        **MR. ARNZEN:**  Your Honor, it may be in one of these transcripts.  If it is, it's either in the first or the second one.

        **THE COURT:**  Well --

        **MR. ARNZEN:**  It may not be because if it -- if it was discussed -- if it was discussed by itself and not in a deal or just with respect to ASNT, we didn't put it in the 404(b) stack, if you will.  I think it's at Number 13, though.

        **THE COURT:**  Well, we're talking about Number 16.

        **MR. ARNZEN:**  You're right.

    Okay.  So just speaking about Transcript No. 16, Your Honor, the first line -- so this is a follow-on conversation to the first time that Mr. Forster discussed with Mr. Hackett this tool.  And indeed, this is just part of that call.  It is a -- it is a portion of the transcript.

    So this is a follow-on to a previous conversation, and when the CHS, Mr. Forster, says, "It's not that he won't do A. It's just that he'll have to do both because A is just not big enough," he is the contact with this tool.  The entire conversation, Your Honor, is about using that tool.

    Mr. Hackett -- I'm sorry.  So Mr. Forster is presented by Mr. Hackett with a means to compensate Forster for access to the tool, and Mr. Forster declines to an extent.  He says,

1    "Well, you're going to set me up with some offshore brokerages

2    where I can hide my money, and you're going to do a couple

3    other things for me, and that's going to be my compensation for

4    my ability -- my -- Hackett's ability to use this tool."

5              **THE COURT:**  Where are you in the transcript?

6         (Court reporter requests clarification for the record.)

7              **THE COURT:**  Where are you in the transcript?

8         **MR. ARNZEN:**  Okay.  Bottom of Page 2, Your Honor.

9    Actually, about 70 percent of the way down, AH says, "Does he

10   really want White Sands, or does he -- would he rather have

11   Seton?"  Those are the names of two offshore brokerage accounts

12   at money-laundering havens.  That will be established by other

13   evidence, Your Honor.

14        And so that's the compensation that's -- that's part of

15   the compensation that Mr. Hackett -- Mr. Forster is telling

16   Mr. Hackett that he would be satisfied with, is an introduction

17   to White Sands and Seton.

18        The rather longer phrase above that, CHS -- his -- it

19   begins with, "And which means that his take is nothing."

20   Again, "his" is the contact.  This is the person who's going to

21   make access to the tool available.  So the whole first page is

22   about the tool and possible compensation for use of the tool.

23        The discussion about Seton and White Sands extends all the

24   way up until at least -- and possible compensation continues

25   all the way to the -- almost the bottom of Page 3, when

1    Mr. Hackett reports that he's going to go see Oliver in

2    Vancouver.  Oliver is Oliver Lindsay, the same individual we

3    discussed earlier.

4         It continues again, a portion about the compensation.

5    There's some discussion about Oliver Lindsay at the top of

6    Page 4.  Then they drop back into Mr. Forster's compensation

7    from Mr. Hackett for the referral to this contact for use of

8    the tool that I've described.

9         Then Mr. Hackett discusses his use of an Internet and

10   e-mail promotional campaign that is not associated with Mr.

11   Forster.  It's called Nando or Nando's List.  Nando's List puts

12   out penny stock newsletters and has a -- as far as I know, a

13   penny stock website that recommends stocks if it gets payments

14   from somebody hoping to -- to promote the stock.

15        **THE COURT:**  Where is the part about Mr. Hackett

16   wanting to use this --

17        (Court reporter requests clarification for the record.)

18        **THE COURT:**  Where is the part about Mr. Hackett

19   wanting to use this tool?

20        **MR. ARNZEN:**  This is a discussion after 13,

21   Your Honor.  So these are in chronological order.  You'd have

22   to go back to 13 to understand contextually that this is about

23   Mr. Hackett wanting to use the tool.  That's why he's seeking a

24   way to compensate Mr. Forster.  Mr. -- he's compensating Mr.

25   Forster for exactly that, use of the tool, and I --

```
 1              THE COURT:  I just don't see it.  The problem is you

 2     have a good grasp, g-r-a-s-p, on the case, but I only have bits

 3     and pieces.

 4              MR. ARNZEN:  Now, I know you're in a difficult

 5     position, Your Honor.  I wonder if I can specifically refer to

 6     the transcript at Exhibit 13.

 7              THE COURT:  Please.

 8              MR. ARNZEN:  Great.

 9          It's Page 5 of that.

10              THE COURT:  What page of your submission?

11              MR. ARNZEN:  Let me see.

12          I'm sorry, Your Honor.  I started too late.  It starts on

13     Page 2.  Right in the middle of the page, there's a statement

14     by CHS.

15              THE COURT:  What page?  Give me a way to find it.

16              MR. ARNZEN:  Yeah.  I'm sorry, Your Honor.  Page 2 of

17     the transcript at Exhibit 13.  It's Page 70 of 120 at the upper

18     right-hand corner.

19              THE COURT:  Hold on.  All right.

20              MR. ARNZEN:  Okay.  And Mr. Forster says to

21     Mr. Hackett, "So I don't want this going around to anybody,

22     please."

23          Hackett says, "Fair enough."

24          Then -- then CHS, Mr. Forster, begins a description of the

25     tool.  "There's a guy I use sometimes.  Like, if I just had a
```

position" -- "just a position that I just wanted to get rid of, I use a liquidity guy."  And then that's where a two-page -- at least a two-page description of this tool -- and they revisit the description on a couple of occasions.

So if one reads Page 2 and Page 3 of that transcript, Your Honor, that's a very bare-bones outline of the tool that was further detailed later on.

**THE COURT:**  Where -- what is the exact language?

**MR. ARNZEN:**  It's on -- it starts at Page 3, Your Honor.  About 30 percent of the way down, there's a CHS quote that starts with "No, no, no, no."  That's part of it.

So Mr. Forster says, "This is" -- "this is my guy who's got a lot of friends who are brokers and family office, and they basically go with" -- "in discretionary accounts with..."

And then Mr. Hackett says, "Fair enough.  You don't even have to go into it."

Mr. Forster follows up, "Yeah, pretty high-net-worth people.  And they put it away, and we never see it again."  Mr. Forster -- Mr. Forster would testify that "it" is stock.  "So if ever you need something like that, because I am going to tap you for Liana, I'm gonna tap you for e-mail stuff.  And if you ever need..."

And then they go back and forth about kind of trading favors with each other.  And then Mr. Forster says almost at the bottom of the page, "They need, like, there to have been --

 1   had news out.  The company does its filings because they build

 2   a little file to cover their ass."

 3        Then Hackett says, "So there's -- there's been a company

 4   that hasn't traded.  I think I told you the symbol already.

 5   It's DAVC."  Mr. Hackett's already agreeing to -- to

 6   consider -- to use this tool for purposes of the ticker DAVC.

 7        It starts back up a little bit -- if Your Honor is

 8   interested more in the description, it's at Page 5 of the

 9   transcript.

10             **THE COURT:**  Where?  Where on Page --

11             **MR. ARNZEN:**  Where -- where on Page 5?

12        There's a -- there's a sentence right there in the

13   middle -- or a statement by Mr. Hackett beginning with a

14   "Chuckles" bracket, and so he describes there that the company

15   DAVC is going to put out a press release.  And Mr. Forster

16   responds, "That's exactly what these guys need.  They need to

17   build a little file."

18        And then he says later on, "So if you can get my guy to

19   put liquidity away, to bury it with all these brokers and for

20   less than 50 percent, you're money ahead."

21        And so that was -- that's the first call during which this

22   tool was discussed.  That's a very broad -- like, the

23   framework -- a broad framework description of the tool, and it

24   gets more detailed in later calls, Your Honor.

25        And the reason that we teed this up for 404(b) purposes or

1    non-404(b), as -- whatever the case may be, is because there's

2    mention of that same ticker symbol, DAVC, in here, which

3    obviously is not the charged deal.

4              **THE COURT:**  Coming back to Exhibit 16.

5              **MR. ARNZEN:**  Thank you, Your Honor.

6         So Exhibit 16 contains discussion of DAVC, which is why we

7    teed this up just like Exhibit 13.  There's talking about the

8    exact same tool, and DAVC -- DAVC comes up because they're

9    concurrently talking about both deals.  I'll try to pinpoint

10   where that is, Your Honor.

11        So, Your Honor, you can kind of tell that the discussion

12   is about both the deals, DAVC and ASNT, by virtue of -- I mean,

13   just for example, the very first line on Page 2 of Exhibit 16.

14   Mr. Forster says, "So it's not that he" -- the contact -- "he

15   won't do A.  It's just that he'll have to do both because A is

16   just not big enough."

17        And so the discussion is about this tool, and it's in the

18   context of both of the deals, ASNT and DAVC.

19             **THE COURT:**  The defense position?

20             **MR. NURIK:**  Your Honor, I believe that the Government

21   would represent -- and I hope I'm not mistaken -- that despite

22   these conversations on what they're proposing to be 404(b),

23   there's no actual evidence of my client participating in using

24   DAVC with this so-called tool.

25        I'd like to know the Government's position on it because I

believe that they would represent that it was not used, that

this is just talk from the informant.  It was a lot of yep and

yeahs and -- but no actual action.  And I would submit under

Rule 404(b), this would not qualify as an other similar bad

act.

**MR. ARNZEN:**  And that may be the case, Your Honor, but

irrespective, it's inextricably intertwined with the evidence

on ASNT because they talk about both of these deals when

they're speaking about using this tool and what the tool

represents.

It's just a contextual problem that we have with

presenting the evidence because when they talk about both deals

like the sentence that I just pointed out, it's -- it's -- it

is very difficult and would subtract a lot of information and

context unless we can -- we can play that whole sentence for

the jury.

It's just -- the discussion of DAVC is so baked in that it

would be very hard to strip out.

**THE COURT:**  Where is that in Exhibit 16?

**MR. ARNZEN:**  Well, it's not even exceptionally overt.

Most of this conversation is just about what the tool is,

Your Honor, and how compensation for the tool will work.

So when it's -- the first line on Page 2 is a good

example.  It's oblique, but we wanted to be very forthcoming

with the Court and the defendants that this is in there.  In

1    other words, there is certainly reference to DAVC.  It's just

2    not by name.

3        The first sentence, Page 2, Exhibit 16:  "It's not that

4    he" -- the contact -- "won't do A.  It's just that he'll have

5    to do both because A is just not big enough."  So they're

6    obviously talking about two deals.  The rest of the call makes

7    clear that it's DAVC that they're discussing.

8            **THE COURT:**  All right.  Anything else?

9        **MR. NURIK:**  I just would submit, Your Honor, that this

10   is very confusing.  It has --

11           **THE COURT:**  You think?

12           **MR. NURIK:**  Excuse me?

13           **THE COURT:**  You think?

14                        (Laughter)

15       **MR. NURIK:**  And -- and due to that confusion, I think

16   that it would be confusing to the jury, even more confusing

17   than it is to us, who are schooled and experienced in dealing

18   with these matters, and I would submit it should not be

19   allowed.

20           **THE COURT:**  All right.  The problem is we're taking

21   this out of context, and what would Mr. Forster testify as to

22   this conversation?  What is it about?

23       This is why I have so much difficulty with the whole

24   process here.  It is really out of context.

25           **MR. ARNZEN:**  We can give you a proffer on the finite

1  and definite testimony we expect from Mr. Forster on this

2  issue, Your Honor.

3      I don't think it's going to be much more than the

4  transcript, though.  There's not much to add.  It's there.  I

5  know you're getting bits and pieces.  And, Your Honor, this is

6  just the stuff that carries 404(b) or potential 404(b) import.

7  So it's confusing, I think, in partial [sic] because Your Honor

8  has not seen the rest of the evidence yet.

9      Mr. Forster is not going to comment a bunch on -- a bunch

10  on this potential tool.  We will during the case itself and in

11  closing point to the words and point to the recording of the

12  call itself.

13      It will -- I should -- I should make really clear, though,

14  Your Honor, that the contact who is going to put away this

15  stock, bury the stock, was actually an undercover FBI agent who

16  then Mr. Hackett corresponded with by text message later on.

17      **THE COURT:**  I don't have a sufficient basis to rule on

18  Exhibit 16.  So I'm denying the motion without prejudice to

19  the -- deferring it until trial.  It requires a foundation that

20  I don't see --

21      (Court reporter requests clarification for the record.)

22      **THE COURT:**  It requires a foundation that I frankly

23  don't see clearly here.  Perhaps Judge Sabraw will see it once

24  the evidence is presented with Mr. Forster on the direct.

25      So I'm denying it without prejudice, really deferring it

1  to the trial.  I'm not saying that it is inadmissible.  I just

2  cannot say comfortably that it is admissible at this point.

3       **MR. ARNZEN:**  Your Honor, I wonder if I can inquire if

4  your discomfort is both with the tool that I've described as

5  well as the mention of this other ticker, or is it just with

6  respect to the other ticker?

7       **THE COURT:**  It is neither.  It is unclear that this is

8  mentioning the other tool or that it is clearly part of the

9  conspiracy.  I just need the context.

10      **MR. ARNZEN:**  Okay.  Thank you, Your Honor.

11      **THE COURT:**  I think that in the progression of how you

12 develop it in your testimony may be --

13     (Court reporter requests clarification for the record.)

14      **THE COURT:**  In the progression of how you are

15 developing the testimony, it may be abundantly clear, but I

16 just am not comfortable ruling that it is clearly admissible.

17 It requires a connection.

18     So indeed, the problem is not the 404(b) issue.  If it is

19 what you say it is, it is inextricably tied up with the

20 evidence of what Mr. Hackett was trying to do with the subject

21 stock.  But it is not clear from what I have been presented

22 with as opposed to the other transcripts, which are pretty

23 clear.

24     All right.  So that is essentially deferred to trial.

25     Number 17?

1          MR. ARNZEN:  Your Honor, 17 and 18 are exactly the

2    same.  I should be forthcoming with the Court.

3          THE COURT:  Well, aren't you always?

4          MR. ARNZEN:  That's just preamble to say this.  Yes,

5    Your Honor, absolutely.  13, 14, and 15 -- if you have a

6    problem with -- with 17 -- or 16, Your Honor, the same problem

7    will apply to 13, 14, and 15.  So if there's a consistent

8    analysis --

9          THE COURT:  Well, I didn't have a problem with 13, 14,

10   or 15.

11         MR. ARNZEN:  Oh.  You just couldn't tell that 17

12   was -- I'm sorry -- 16 was discussing the same thing?

13         THE COURT:  Right.

14         MR. ARNZEN:  Oh.  I see.

15     Okay.  Thank you, Your Honor.  That clears things up for

16   me.  Thank you.

17     Your Honor, 17 is -- is a further discussion of exactly

18   the same subject.  This is the same tool that we've just

19   described or attempted to describe, and it has a mention of --

20   just a second, Your Honor.

21     On Page 1 of the transcript in the middle of the page,

22   CHS, Mr. Forster, says, "Okay.  So on the WR you got, I'm gonna

23   call him back."  The "him" is the contact.  Now that I kind of

24   understand the Court's problem with 16, I can offer this:

25         Beginning at a certain point -- because there were

1    problems with the deal, Your Honor, they start a conversation

2    about this tool I've described.  In virtually the rest of the

3    conversations all the way through the end of the tapes --

4    right? -- all of those conversations concern Mr. Hackett's

5    interest or noninterest in using the tool.

6         So all of these tapes, 13 through 18, are about exactly

7    that.  They are use of this tool.  This one happens to concern

8    WR, which in its full -- its full ticker is WRIT.  "WR" appears

9    again halfway down Page 1 of the transcript in Exhibit 17.

10             **THE COURT:**  What are you going to offer as to Exhibit

11   17?

12             **MR. ARNZEN:**  That it should be admitted for the same

13   reasons that 13, 14, and 15 were, Your Honor.  In other words,

14   this is discussion about the tool to dump stock.  It is wrapped

15   up -- it's a discussion that concerns both ASNT and WRIT.  It's

16   inextricably intertwined.  It's so baked into the discussion --

17   they go from one to the other -- that to strip out WRIT would

18   leave the jury without sufficient context to analyze this call.

19             **THE COURT:**  All right.  I agree with Mr. Nurik that

20   the problem is not the transcript but where you -- what you are

21   going to offer to explain what WR or WRIT is.

22             **MR. ARNZEN:**  Mr. Forster would simply say WRIT is

23   another stock that was first mentioned to him by Mr. Hackett,

24   period.

25             **THE COURT:**  If that is the extent of it, I really

1    don't see a problem.

2         Mr. Nurik and Mr. Jones?

3         **MR. NURIK:**  Well, we should only hope that that's what

4    the witness would be confined to, and if that's the case, it

5    would not create any additional problem.  I guess we'd just

6    have to wait and see.  I've been -- been around long enough to

7    know these things don't always go quite that way.

8         **THE COURT:**  Mr. Jones?

9         **MR. JONES:**  I don't -- I don't have anything to add.

10   This is kind of separate and apart from Ms. Budhu.  So --

11        **THE COURT:**  I think that there is no 404(b) problem

12   with the use of WR, and as long as Mr. Forster does not go

13   beyond what the Government just suggested, I don't see it as a

14   404(b) problem.  It is inextricably part of the discussion.

15   And if it is found that the discussion was in furtherance of

16   the conspiracy, which the Government has a credible theory for,

17   as alleged here, I would think it would be admissible.

18        So for the reasons I have stated on the other ones, this

19   is admissible notwithstanding an alleged 404(b) issue.

20        All right.  Number 18?

21        **MR. ARNZEN:**  Your Honor, this is very similar in terms

22   of the discussion both of ASNT and DAVC.

23        So DAVC, I think, comes up for the first time on this --

24   on Page 2 of the transcript near the very top, Mr. Hackett's

25   first statement as transcribed on Page 2.

1          And throughout this discussion, Your Honor, Mr. Forster

2    and Mr. Hackett are discussing two things to get rid of the

3    stock that Mr. Hackett has, one, the tool that we've just

4    mentioned and comparing and contrasting that tool with using

5    the boiler room broker to get rid of the stock.

6          Our theory for admissibility is exactly the same.  It's

7    not important to us that DAVC is discussed here.  It's just

8    literally -- they go back and forth, back and forth, and often

9    in the same sentence discussing both tickers.  So it's

10   inextricably intertwined, and to tear it out would rob context

11   from the transcript.

12         **THE COURT:**  Anything by the defense?

13         **MR. NURIK:**  So may I take it that the Government's

14   position on what Mr. Forster would say about DAVC will be

15   similar to WOR -- WR, that it is just simply another stock or

16   ticker?

17         **MR. ARNZEN:**  That's exactly right, Your Honor.  Yes,

18   sir.

19         **MR. NURIK:**  Limited to that, then I would just rest on

20   whatever prior arguments were made.

21         **THE COURT:**  All right.  Mr. Jones?

22         **MR. JONES:**  I have nothing to add, Your Honor.

23         **THE COURT:**  I would find it admissible as long as they

24   show that it was a conversation in furtherance of the --

25      (Court reporter requests clarification for the record.)

1              **THE COURT:**  As long as they show that it was a

2    conversation in furtherance of the conspiracy.

3         All right.  In other words, the foundation under Rule of

4    Evidence 801 for conspirator statements if they are going to

5    use it against Ms. Budhu.

6         Number 19?

7              **MR. ARNZEN:**  Number 19, Your Honor, is a discussion

8    about -- pardon me -- a third type of tool that I talked about

9    earlier.  It's an Internet and e-mail promotional tool that one

10   can use to pump a stock in order to create a market to dump it

11   into.  This is between Forster and Mr. Hackett again.

12        The reason that we put -- we included this in here,

13   Your Honor, was because at the very end on the last page -- I

14   mean, to the extent that there's any risk that it's 404(b),

15   it's on the last page.  Mr. Hackett indicates that he knows

16   what deal the -- this promotional tool is doing that day.  He

17   says, "They're doing a medical deal today.  Hold on."  And then

18   he names the -- the tool.  It's called Fernando's List.

19        I don't see a real risk that this is 404(b), but just to

20   be careful, Your Honor, we fronted it to the defendants and the

21   Court.

22             **MR. NURIK:**  Taken at face value, the transcript itself

23   I don't believe is anything more than somewhat innocuous, but I

24   just heard counsel for the Government say that Nando's List or

25   Fernando's List is another tool to pump.

```
 1        So my concern is that there would be witness testimony to

 2   that extent, and then that takes it into the 404(b) category as

 3   opposed to inextricably intertwined.

 4        MR. ARNZEN:  I have no idea how that's true,

 5   Your Honor.  I mean, Mr. Hackett intends to use a tool to get

 6   rid of his ASNT stock, and he named the tool.  And

 7   Mr. Hackett -- Mr. Forster is familiar with the tool.  He would

 8   say in a couple sentences that he knows about that tool, but

 9   that doesn't bring it within the confines of 404(b), I don't

10   think.

11        MR. NURIK:  I thought I heard him say "used to pump or

12   dump."  And so to that extent, I would object to any testimony

13   concerning that.

14        MR. ARNZEN:  That's what it is.  It's a pump-and-dump

15   tool, Your Honor.  Mr. Forster is familiar with it.

16   Mr. Hackett told Mr. Forster -- Forster he intended to use it.

17        MR. NURIK:  Well, that's an argument that the

18   Government can make, but whether a witness can testify to that

19   is a different thing.

20        THE COURT:  Well, what would you be offering about

21   Fernando's website?

22        MR. ARNZEN:  Sure.

23     "Question:  Mr. Forster, are you familiar with Nando's

24   List?"

25        "Yes."
```

1       "What is it?"

2       "It's a tool to promote stock on the Internet and through

3  e-mails.  I've used it before, and it's been used on deals that

4  I've participated on before."

5       "Are you somewhat familiar with it?"

6       "Yes."

7       "How long has it been around?"

8       "For several years now."

9       "Very well.  Turning to the transcript..."

10      **THE COURT:**  I really don't see any problem with that.

11  Mr. Hackett used the expression, and the witness would just be

12  talking about what he understood him to be saying.  I don't

13  think there's a 404(b) problem.

14      But the Government should be careful not to use pejorative

15  language.  In other words, Mr. Nurik was correct about being

16  concerned about using the "pump" language.  Using the language

17  of "a website" from both sides infers nothing improper.

18      So, Mr. Jones, do you have anything to add?

19      **MR. JONES:**  No, Your Honor.

20      **THE COURT:**  All right.  I would find that if the

21  foundation under Rule 801 is established, that this would be

22  admissible and not be a 404(b) issue.

23      All right.  I think that concludes the transcript issues.

24      **MR. ARNZEN:**  I think you're right, Your Honor.

25      **MR. NURIK:**  Your Honor, while they're getting set up,

1    is it possible I could run very quickly to the men's room?

2            **THE COURT:**  You can walk.

3            **MR. NURIK:**  Thank you.

4        (Court reporter requests clarification for the record.)

5            **THE COURT:**  You can walk, w-a-l-k.

6                        (Pause in the proceedings.)

7            **THE COURT:**  Okay.  Let's take a look at the

8    Government's motions in limine, Document 176.

9        Have we covered the others that you are asking for in

10   Motion No. 1?

11           **MR. ARNZEN:**  Catching up, Your Honor.

12       I'm embarrassed to say I'm not sure exactly what 176 is.

13           **THE COURT:**  It's the omnibus motions in limine.

14           **MR. ARNZEN:**  Oh.

15           **THE COURT:**  It's 22 pages long.

16           **MR. ARNZEN:**  Thank you, Your Honor.  It was hiding

17   over there.  I found it.

18           **THE COURT:**  Have we covered Number 1?

19           **MR. ARNZEN:**  I believe we have, Your Honor.

20           **THE COURT:**  So 1 is granted as ordered in part and

21   deferred in part.

22       2, we previously covered.

23           **MR. ARNZEN:**  We did, Your Honor.

24           **THE COURT:**  So I denied the admissibility of several

25   parts of the expert that you have offered.  But things change,

```
 1    and you are free to ask Judge Sabraw to --
 2         (Court reporter requests clarification for the record.)
 3              THE COURT:  But things change, and you can ask Judge
 4    Sabraw to reconsider at any time during the trial.  For
 5    example, after opening statements, it may be more of an issue.
 6              MR. ARNZEN:  Yes, Your Honor.
 7              THE COURT:  All right.  What is Number 3?
 8              MR. ARNZEN:  Number 3 is a motion we made, Your Honor,
 9    because there are several people that are in the industry.
10    What I mean by that is in the stock industry, and there are
11    lots of terms of art used in the stock industry.
12         And so there are at least three -- there are three
13    witnesses that we expect to testify about what they do in their
14    jobs, one of whom is named Kara Kennedy.  She works for a
15    transfer agent.  It's part of her job to analyze submissions by
16    people so that she can determine whether to issue stock on
17    behalf of ASNT and whether the stock should be restricted or
18    free trading.  This is an example.
19         So what she does in her job is rather esoteric.  It is its
20    own space in the securities industry, and we don't expect a lot
21    of jurors to understand why submissions to her by the likes of
22    Ms. Budhu and Mr. Hackett are important.
23         They made submissions to Ms. Kennedy in order to make
24    their restricted stock free trading; in other words, so they
25    have all the stock and so that they can sell it into the
```

securities markets.  And she has some control over that process
as a representative of ASNT's transfer agent.

So she makes decisions.  She takes in information, makes
decisions based on various criteria, and then that decision
translates into free trading stock in this case.  And so we
expect her to come in and testify about her process, what
information she takes in, why it's important, how she makes her
decision, and the impact of that decision.

We don't think that's expert testimony, Your Honor.  We
think that's just lay witness testimony from somebody in a
professional space, somebody as part of a -- that takes part in
the securities industry in a way that not a lot of people in
the public see or understand because they're just not exposed
to it.  And so that's one example.

Another -- the other examples really concern the people
that are in this penny stocks base.  Those include
Mr. Gillespie, who's a defendant in the case, Mr. Sidhu,
Kuldeep Sidhu, and Mr. Forster.  So all of them will talk about
their jobs in -- in the securities industry and in the penny
stock industry.

But, again, we don't think that's -- that should be
considered expert testimony under 703 -- 702, 703.

**MR. JONES:**  Your Honor, we'd agree that to a large
extent, these witnesses testifying to what they do and what
they understood with regard to the underlying facts of this

1    case would not be problematic.

2        However, I -- in the Government's filing, they

3    specifically say that Mr. Forster would testify about the

4    meaning of terms or issues that are commonly understood in the

5    penny stock fraud world.

6        So, again, we have this somewhat recurring issue where

7    there's a concern that especially these cooperating Government

8    witnesses are going to be offering evidence, testimony, or

9    opinions about what constitutes the penny stock fraud world.

10        So if they're just going to testify generally about penny

11    stock transactions, how they understand them to work, and how

12    that works with their day-to-day job, I think that's probably

13    fine.  It's certainly not something that the Court would be

14    able to rule on absent the exact context of the testimony.

15        But to the extent that they're going to be testifying

16    there is this world of penny stock fraud and people that are in

17    it understand these certain common terms for how fraud works, I

18    think that would be an improper opinion, and I think it would

19    also be 403.

20            **THE COURT:**  Do you mean 404(b)?

21            **MR. JONES:**  It would also be 404(b), but I think

22    there's also a 403 problem.

23            **THE COURT:**  I don't see a problem with what Mr. Arnzen

24    suggested he is going to do, but there is a problem with the

25    use of the words "penny stock fraud" or -- in other words,

suggesting that there is a special word for fraud or
misrepresentation.

So I will defer this to the trial, but I don't think that
there is a problem with what Mr. Arnzen suggested he would do.
If they are just defining terms in the industry, they are not
giving their opinion, and Rule 702 would not apply.

**MR. ARNZEN:**  Thank you, Your Honor.

I wonder if I can address two specific points, which is we
expect Mr. Forster and Mr. Sidhu, for example, to testify about
various aspects of the scheme, especially Mr. Sidhu.
Mr. Sidhu, for example, was one of the people that would
supposedly hold the stock on behalf of the group and sell the
stock after the promotions, cost, and increase in the stock
price.

So we hope to ask Mr. Sidhu how that is an important role
in a scheme like this because it's not a common thing that
happens outside the fraud world, that you choose a nominee with
an offshore brokerage account to hold the stock and sell it at
an advantageous time.

So we do -- we do think that they should be allowed to not
only define terms but to tell the jury why they're doing what
they're doing and playing the role that they're playing within
the context of the scheme.

**THE COURT:**  I understand that.  I don't think there is
necessarily a problem --

1      (Court reporter requests clarification for the record.)

2           **THE COURT:**  I understand that.  I don't think that

3      there is necessarily a problem, but it must be very specific,

4      and I don't have the actual words that they are going to use.

5           So I cannot rule in general on that in advance of the

6      trial.  If the defendants are concerned, they can make a

7      further motion in limine on that during the -- when you are

8      going to bring that out.  I'm going to defer your Motion No. 3

9      to the trial.

10          Number 4.  I think we discussed this.  It has to do with

11     Mr. Hackett's prior proffer statements, and this will depend on

12     the scope of the agreement and whether the foundation is

13     established for the use of the --

14          (Court reporter requests clarification for the record.)

15          **THE COURT:**  Foundation is established for the use of

16     the statements, and then we have a *Bruton* issue that Judge

17     Sabraw can deal with.

18          So I'm ruling that before you use any statements by

19     Mr. Hackett in his proffer, that you first must alert the

20     defense counsel and the trial judge of your intent to do so so

21     the trial judge can make a ruling.

22          **MR. ARNZEN:**  Certainly, Your Honor.  We will.

23          **THE COURT:**  All right.  5.  I think the defendants

24     have no objection if there -- if there is a foundation for the

25     business records.

1          **MR. NURIK:**  That is correct, Your Honor.

2          **MR. JONES:**  Yes, Your Honor.

3          **THE COURT:**  So that is deferred to trial.

4      6.   The same thing.  The defense has no objection to

5   summaries if they are a proper form under the rules of

6   evidence.  I think there should be a deadline for you

7   submitting to the defense all the summaries that you intend to

8   use.

9          Since the trial has been put off, how about three weeks

10  before the beginning of the trial, you will make all the

11  summaries that you intend to use available for their copying

12  and inspection?

13         **MR. ARNZEN:**  Yes, Your Honor.

14         **THE COURT:**  Does the defense agree?

15         **MR. JONES:**  Yes, Your Honor.

16         **MR. NURIK:**  Yes, Your Honor.

17         **THE COURT:**  All right.  Number 7, to preclude the

18  advice-of-counsel defense.

19         **MR. ARNZEN:**  Your Honor, I think we visited this issue

20  a little bit because we had a discussion about the discovery

21  that the defense might make in connection with this.

22         Your Honor indicated that it was -- the Court was

23  disinclined to force the production of what may be

24  attorney/client communications or other privileged materials

25  unless -- unless and until something akin to the defense was

1    presented at trial; in other words, that the defendants were

2    attacking evidence of Ms. Budhu's state of mind by pointing to

3    the existence of the presence of counsel or even advice of

4    counsel, at which point the United States could -- could

5    examine what was underneath the privilege and even, for

6    example, call the attorneys at issue.

7        But I think that's probably a decision that's best made as

8    it happens.  In other words, if there are arguments or if

9    there's evidence presented concerning Ms. Budhu's or

10   Mr. Hackett's reliance on counsel or advice of counsel or the

11   presence of counsel, then we can tackle that as it comes up at

12   trial.

13       We understand Your Honor's ruling with respect to the

14   discovery, and we're not seeking to revisit that at this time,

15   but I think it's kind of a game-time decision that can only be

16   made in the context of the trial.

17          **MR. JONES:**  I think that's true, Your Honor, with

18   regard to the specific pieces of evidence.

19       I mean, as the Government's motion is currently captioned,

20   I think it should be denied in the sense that I don't think

21   there's any appropriate basis to preclude that defense at this

22   juncture, and it would be a determination as to whether

23   particular evidence was relevant or whether there was an

24   appropriate jury instruction.

25       But I do think the specific issues indicated by Mr. Arnzen

 1    would be best addressed in the context of the trial.

 2          **MR. NURIK:**  I agree with Mr. Jones.

 3          **THE COURT:**  If you all agree that the motion should be

 4    denied, it will be denied.  It is premature.

 5          So just a few words.  If there is reliance on advice --

 6          (Court reporter requests clarification for the record.)

 7          **THE COURT:**  Just a few words.  If there is reliance on

 8    advice of counsel, then it may open the door to consideration

 9    and questioning as to what was told to --

10          (Court reporter requests clarification for the record.)

11          **THE COURT:**  And testimony as to what was told to

12    counsel for obtaining the advice.

13          I believe that it may constitute a waiver, but if the

14    waiver of the privilege is argued, it would be for the trial

15    judge to decide whether the privilege was waived and, if so, to

16    what extent.  So I'm going to deny the motion because there is

17    no grounds to exclude the argument.

18          I think the same should be said for Number 8, to exclude

19    an entrapment defense.  I think that would come up when you are

20    seeking an instruction to the jury from the Court.  If the

21    defense asks for an entrapment instruction, then the trial

22    judge will rule on it.

23          But are either of you going to raise entrapment in your

24    opening statements?  I said:  Are either of you going to raise

25    entrapment in your opening statements?

1      **MR. JONES:**  On behalf of Ms. Budhu, we don't presently

2  anticipate opening on entrapment.

3      **MR. NURIK:**  The same is for Mr. Hackett.

4      **THE COURT:**  I'm going to deny the Motion in Limine No.

5  8 but granting it in a small part.  That is, the defense must

6  notify the trial judge and the Government attorney before

7  raising entrapment before the jury so that can be properly

8  addressed by the Court.  All right?

9      **MR. ARNZEN:**  Yes, Your Honor.

10     **THE COURT:**  Number 9?

11     **MR. ARNZEN:**  This is the United States's argument --

12 or motion to preclude the defendants from arguing that they

13 were unaware that their conduct was unlawful.

14     The reason that we make this argument, Your Honor, is that

15 we're wary of confusing the -- the legal instructions that the

16 Court will provide to the jury.  In other words, Your Honor --

17 or Judge Sabraw will instruct the jury about the mens rea

18 requirements, the elements concerning the state of mind of the

19 defendants.

20     If the defendants start arguing that they did not know

21 that their conduct was unlawful, that risks confusion with the

22 jury because the jury might consider that an element to a

23 requirement that the Government is -- has to prove, and this

24 motion is meant to address that concern.

25     **MR. JONES:**  Your Honor, we agree that it would be

1    inappropriate for us to argue that the lack of knowledge that

2    their conduct was unlawful makes them not guilty of this

3    offense.  That would be inconsistent with the jury instructions

4    for these types of offenses.

5        However, the fact that they were unaware that specific

6    activities were unlawful is certainly relevant and probative on

7    the issue of whether or not they have the appropriate criminal

8    intent, and certainly introducing that evidence would be

9    appropriate for the jury to consider.

10       So while we have no objection to a ruling saying that we

11   can't argue that it's an element that -- that would make them

12   not guilty because they didn't know that their conduct was

13   unlawful, in a situation like this, particularly where the

14   Government is going to be introducing expert testimony with

15   regards to regulations -- rules and regulations of the SEC, we

16   certainly should be allowed to introduce evidence that either

17   Ms. Budhu or Mr. Hackett were unaware that a particular action

18   or activity was unlawful -- was unaware that the activity was

19   unlawful because that would be probative on whether or not they

20   had fraudulent intent in this scheme overall.

21       **THE COURT:**  I think fraudulent intent is a different

22   issue, but I am deferring Motion in Limine No. 9 to the trial

23   judge, and you must raise the issue first with Judge Sabraw or

24   any other trial judge before you elicit testimony about unaware

25   of the illegality of the specific action.

1          In other words, if you are going to ask the defendant did

2     they know that taking a certain course of conduct was illegal

3     under a certain regulation or statute or otherwise, you must

4     first raise that with the trial judge so he or she can make a

5     ruling on it.

6          It would be very fact-specific.  You may be right about

7     the contravention of SEC regulations.

8               **MR. JONES:**  I'm sorry.  Was that a question to me?

9               **THE COURT:**  No.  I'm saying that there is a difference

10    between not knowing that a fraudulent scheme is in violation of

11    the law and not knowing that a certain action contravenes a

12    specific regulation.

13              **MR. JONES:**  I understand, Your Honor.  And if we

14    intend to introduce any evidence of that nature, we'll bring it

15    up with Judge Sabraw first.

16              **THE COURT:**  All right.  And Number 10 was already

17    ruled on.

18              **MR. JONES:**  That's correct, Your Honor.

19              **THE COURT:**  So we'll go next to Mr. Jones's motions in

20    limine.  That is as to the motion to sever, which I denied.

21              **MR. JONES:**  That's correct, Your Honor.

22         And the second motion, as I indicated, I think, overlapped

23    with a portion of Government Motion 1, which the Court deferred

24    to trial.

25              **THE COURT:**  All right.  So I have ruled on your

1   motions in limine --

2           MR. JONES:  Yes, Your Honor.

3           THE COURT:  -- is that correct?

4           MR. JONES:  That's correct.

5           THE COURT:  Mr. Nurik, do you have any motions that

6   you want me to rule on?

7           MR. NURIK:  Not at this time, Your Honor.  Thank you.

8           THE COURT:  Mr. Jones, is there any other part of your

9   motions in limine that you need or want a ruling on?

10          MR. JONES:  No, Your Honor.

11          THE COURT:  All right.  This leaves only one motion

12  left.  That is the issue of the reference to other uses of

13  boiler rooms or sales rooms.

14      (Court reporter requests clarification for the record.)

15          THE COURT:  Sales rooms, s-a-l-e-s.

16      All right.  Mr. Arnzen, do you want to argue that?  This

17  is your supplemental submission.

18          MR. ARNZEN:  It is our supplemental submission,

19  Your Honor.  I would like to argue it briefly.

20      It's Docket No. 190, and we started the discussion, I

21  think, last time, Your Honor.  There's pretty clear evidence

22  that Mr. Hackett used the boiler room broker, and I can

23  eliminate "boiler room" if it offends somebody for purposes of

24  this hearing.  A call room; right?  So he used a call room

25  broker, who he engaged to sell ASNT stock.

1    The evidence is also extremely clear that he paid her

2  50 percent of every dollar that an ultimate victim that was

3  identified by the call room paid for the stock.  The typical

4  commission in the securities industry for an open market equity

5  trade like this is 5 percent.  So this is ten times as much.

6    There's also pretty clear evidence, Your Honor, that when

7  a trade was made -- in other words, the call room identified a

8  victim -- that Mr. Hackett wanted to be the person to sell his

9  stock to that victim.

10    So what they did -- Mr. Hackett, the call room operator,

11  the call room broker, and the victim -- they're all in

12  communication at exactly the same time either by text message

13  or on the phone, and they're organizing, they're prearranging,

14  they're coordinating the price and the volume and the time at

15  which the ASNT transaction will take place.

16    **THE COURT:**  Why was this important to sell the stock

17  to specific identifiable people?

18    **MR. ARNZEN:**  It was important that the -- the specific

19  identifiable person simply gave Mr. Hackett somebody to sell

20  the stock to.  He didn't need to hire the call room broker or

21  the call room operator to simply sell his stock.  He wanted to

22  identify more people to buy the stock, and then if he could

23  transact specifically with that person in the open market, he

24  could do one of two things.

25    He could make sure that this person who wants to buy ASNT

 1   stock bought directly from him.  If he can't sell that stock,

 2   he doesn't make a dime.  He's got to be the person that sells

 3   the stock to the person who -- that's the victim, who now wants

 4   to buy it.  So it allows him an avenue to dispose of the stock.

 5   That's Number 1.

 6       Number 2 is coordinate the trading in the way that I just

 7   described is illegal.  It's market manipulation.  The law is

 8   very clear under Section 9(a)(1) of the Securities Exchange Act

 9   that you may not prearrange a transaction like this on the open

10   market.  If you want to trade stock or sell and buy stock to

11   someone specific, you can certainly do that.  You just go

12   personally to them, and you write a share purchase agreement.

13       Ms. Budhu and Mr. Hackett engaged in the share purchase

14   agreement when he bought shares directly from Ms. Budhu.  This

15   is different.  The purpose of it -- you're not allowed to do

16   this in the open market because it affects everybody else in

17   the market.

18       Other shareholders that are either considering buying or

19   selling ASNT stock see this latest transaction, they see an

20   uptick in volume, and they see the prearranged price that

21   Mr. Hackett and his coconspirators get to pick, that this stock

22   is now trading that.  That's why it's illegal.  It's market

23   manipulation.  It's alleged as one of the manner and means of

24   the conspiracy in this case.

25       And so that's the evidence that we have with respect to

1  ASNT.  Now, what Mr. Nurik has in his favor and Mr. Hackett has

2  is the fact that Mr. Hackett, as far as we can tell, never

3  talked to the person who got the people on the line to buy the

4  ASNT stock.  There was a go-between.  That was the call room

5  broker.

6      And I think he's going to argue -- at least he did in

7  his -- his papers -- that there's nothing to connect

8  Mr. Hackett's knowledge of what was actually going on with --

9  as far as the victim facing part of the fraud, he has no

10  knowledge of it, that was outside of his knowledge, we

11  couldn't -- we shouldn't be able to blame him for that.  And he

12  will probably tell the jury, "The call room operator never even

13  met Mr. Hackett, didn't even know Mr. Hackett's name.  How can

14  Mr. Hackett be held responsible for this?"

15      So the evidence that we'd like to put in to refute that is

16  evidence on seven other deals.  It was not -- we've taken two

17  of those away.  So it's seven other deals that carry exactly

18  the same characteristics that we just described, and I'll get

19  into those characteristics in a moment.

20      But what those show, Your Honor, is that Mr. Hackett

21  engaged directly in fraud with the call room broker, who he

22  knew was in touch with the call room operator and ultimately

23  the victim, so that they could prearrange the price.

24      This can't be a blind part of the system at least as the

25  market -- as to the market manipulation part of it.  It has to

be an open communication, an open line of communication, that
we have a victim on the line.  They're willing to sell X number
of shares -- or I'm sorry -- buy X number of shares for X price
right now or in five minutes or at the prearranged time.

Also, the call rooms were successful.  We put in evidence
of invoices sent in by the call room operator that were sent to
the call room broker.  These unambiguously and irrefutably
establish that the call room operator sold the subject stocks
to the call room broker's client, and the call room broker will
say the client was Mr. Hackett.

And so the similarities here are overwhelming, and they
all point to the same thing, that Mr. Hackett knows what's
going on with the call room operator and when the call room
operator gets on the line with the victim.  So it's all to
refute this line of argument that Mr. Nurik would make that
would say that Mr. Hackett has no knowledge of what's going on
with the call room operator or in the call room period.

So all of the -- all of the evidence that we've put in,
Your Honor, are either -- they fall into just two categories,
text messages and the invoices themselves.

And these prove that Mr. Hackett and the call room
operator and the call room broker were talking about and
communicating about these subject seven stocks, that they were
communicating not only in general but about the manipulated
prices and volumes that they would sell at and the payment that

1    was due, the 50-percent payment that was due to the call room

2    broker and the 35 percent that was due to the call room

3    operator.

4         So all of these show Mr. Hackett's knowledge of what's

5    going on out in the call rooms.  That's the only point we're

6    trying to make.

7         **MR. NURIK:**  Initially, the Government's point was that

8    they wanted to introduce testimony from Ms. Millhouse, who was

9    the broker, and Mr. Wolf, who was the operator, that they had

10   made deceptive, false statements to the investors who they were

11   pitching the stock to.

12        And so that the Court understands, they weren't -- the

13   call rooms were not selling the stock.  I think the Government

14   would agree.  They were not licensed brokers.  They were

15   pitching the stock.  They were trying to get people then to go

16   and buy the stock through a licensed broker.

17        The commission that Mr. Arnzen talks about, of 5 percent

18   being a normal commission -- I believe and would proffer that

19   the evidence at trial would be that that doesn't apply to call

20   rooms.  Call room commissions are much higher.  So just looking

21   at the commission structure would not indicate any kind of

22   illegality.

23        And as Mr. Arnzen has pointed out, there is going to be no

24   evidence adduced at trial that Mr. Hackett was specifically

25   aware of any misrepresentation made over the phone or in any

1    other manner.  In fact, both Ms. Millhouse and Mr. Wolf will

2    both say they never had any conversation with Mr. Hackett

3    concerning how they were selling the stock.

4        So what has happened now is the Government has now tried

5    to bring in a new theory of connectivity between these other

6    deals, as we would call them, and the one charged in the

7    indictment.

8        Now, it is without question that the Government will be

9    able to bring in evidence that Mr. Hackett employed

10   Ms. Millhouse, the broker, for the purpose of pitching these

11   other deals.  It is also without question, as I mentioned, that

12   there will be no evidence that he was aware of the manner in

13   which they were sold.

14       What the Government is suggesting is the connectivity is

15   that there was market manipulation not only in the charged

16   offense but in these other deals.  And the market manipulation,

17   they claim, is what they call coordinating trades -- or another

18   term that you will hear at trial is matched trades -- that

19   Mr. Hackett was having Ms. Millhouse pitch to a prospective

20   buyer, an investor, to buy at a price and a certain volume on a

21   particular day, time, and that Mr. Hackett would then sell his

22   shares, the same amounts -- substantially same amounts at

23   substantially the same price -- and by the way, that's the

24   language of the statutes, substantially same price,

25   substantially same time, substantially same amount -- into the

1    marketplace.  And it would be a matched trade.

2        However, this case is now -- we are before this Court in

3    October 2019.  This case was indicted sometime in 2018.

4    Presumably, the Government had investigated this case to the

5    grand jury through -- for some period of time beforehand, and

6    yet surprisingly the Government has not brought into court one

7    piece of evidence to show that there was, in fact, a match

8    trade between Mr. Hackett and any of these investors.

9        Interestingly also, just last week, we received discovery

10   which -- there is a letter between the agent in this case and

11   the Government's expert asking the expert to review what we

12   call the blue sheets to see if there are, in fact, any match

13   trades between Mr. Hackett and any of the investors.

14       The fact is they have not shown the Court in any of their

15   exhibits that they have provided you the existence of actual

16   match trading or coordinated trading.  What they simply have

17   are discussions between Ms. Millhouse and Mr. Hackett in text

18   messages about suggested prices and volumes, which, standing

19   alone in and of itself, is not illegal under the statute.

20       So I would suggest to the Court that at this point in

21   time, the Government does not have sufficient evidence to

22   establish my client's participation in these other acts, which

23   are 404(b) acts, as proffered by the Government, which is a

24   prerequisite for admissibility.

25       And I would further suggest that given the number of these

1    acts, seven of them, that to allow this evidence -- to allow

2    this -- this testimony or these exhibits into evidence would

3    simply be in violation of Rule 403 as well.

4         And I want to point out that clearly, if we were to get

5    into this, we would literally have trials within trials because

6    we would have to literally analyze each of these trades in all

7    of these other securities, these seven other matters, and

8    literally have a fight over them in the same manner in which we

9    would be having a fight over ASNT.

10        So I would suggest most respectfully that the Court deny

11   the Government's motion.

12             **THE COURT:**  Do you want to add anything, Mr. Jones?

13             **MR. JONES:**  No, Your Honor.

14             **THE COURT:**  All right.  Let's start from the part that

15   I need to understand exactly what evidence the Government

16   wants --

17        (Court reporter requests clarification for the record.)

18             **THE COURT:**  Let's start from the part that I need to

19   understand exactly what evidence the Government wants to offer.

20   We may have to break it down into seven transactions.

21        I understand that you are proffering that you will prove

22   that Mr. Hackett did business with the call room broker in the

23   seven other transactions; is that correct?

24             **MR. ARNZEN:**  It is, Your Honor.

25             **THE COURT:**  So you are saying that because he did

1 these seven other transactions with the same call broker, he

2 expected them to go the same way for ASE -- ASNT, and that

3 would prove it is fraudulent intent?

4        **MR. ARNZEN:**  I think that's basically true,

5 Your Honor.  We would expect -- our argument is this:

6     He used the call rooms so many times on these seven

7 different occasions, and there are many others.  We've

8 restricted it to these seven.  He used the call room on these

9 seven occasions, and he pays them 50 percent.

10     There's no way he doesn't know what they're doing.  He has

11 plenty of reason and plenty of knowledge and background and

12 history sufficient to know what they're doing on the ASNT deal.

13        **THE COURT:**  I understand your theory, and it's a good

14 one, but I need to get into the weeds, w-e-e-d-s, of the

15 evidence as to each one of the seven.

16        **MR. ARNZEN:**  Understood, Your Honor.

17        **THE COURT:**  How are you going to do that?  What do you

18 suggest?

19     It would seem to me that you would have a legitimate

20 argument under Rule 404(b) that there was just one transaction

21 he did prior with the same result, and you have six more.  That

22 makes the evidence stronger.

23     But I need to see whether there is anything that would

24 indeed show his intent or plan or modus operandi -- not really

25 modus operandi, his plan and intent.  And for intent, the

 1    transactions must be similar.

 2            **MR. ARNZEN:**  Very well, Your Honor.

 3        I can walk through one deal at a time, if that's helpful.

 4    I can describe how all the -- which -- which of the deals have

 5    certain aspects in common at the Court's preference.

 6            **THE COURT:**  I think you need to show how you are going

 7    to prove this, what witnesses you are going to call, what

 8    exhibits you are going to use, and show us one by one how it

 9    all ties together.

10        So we'll take a short break for the court reporters, and

11    we are going to conclude at 4:30 today, and I doubt we'll have

12    this done.

13            **MR. ARNZEN:**  Very well today.

14            **THE COURT:**  All right.  We'll take a break for the

15    court reporters and then try to begin the analysis.

16                    (Recess taken at 4:09 p.m.)

17                    (Proceedings resumed at 4:17 p.m.)

18            **THE COURT:**  Are we ready?

19            **MR. ARNZEN:**  Yes, Your Honor.

20            **THE COURT:**  All right.  What do you suggest as to the

21    best way to proceed?

22            **MR. ARNZEN:**  Your Honor, I think I can start at least

23    with -- the first question proposed by the Court is who's going

24    to testify about this, and then I think I can -- I can tell you

25    how they're going to testify and what evidence will come in or

1    at least we would seek to introduce on which deals.

2         Shall I start with the witnesses?  Very well.

3         The two most important witnesses who are probably going to

4    do 90 percent of the talking on this issue are the call room

5    operator and the call room broker.  The broker will testify

6    that as to ASNT, as described, Mr. Hackett engaged the broker

7    to sell ASNT stock through call rooms.

8         The call room broker will testify that the agreement was

9    that Mr. Hackett would pay 50 percent of the proceeds -- I'm

10   sorry -- not of the proceeds -- 50 percent of the money spent

11   by a victim identified through the call rooms, would pay

12   that -- he would pay that amount to the broker.

13        The broker will also testify that on ASNT -- that there --

14   she was a go-between for these rapid-fire text messages and

15   sometimes phone calls in which Mr. Hackett on the one side

16   coordinated the volume, the price, and the time of trades in

17   ASNT; and on the other side, she was coordinating the same

18   thing with the call room operator.

19        The call room operator ran a room with callers.  The

20   caller had someone on the line who they were communicating with

21   at the same time and telling them how to log into their online

22   trading account such as to coordinate the trade at the same

23   time, place, and volume, as I described.

24        I will then ask the call room broker if she used that

25   on -- if all those facts are true with respect not just to ASNT

1    but also with respect to other stocks.  I expect she'll say,

2    "Yes."  I'll ask her, "What other stocks?"  And she'll name

3    them.  I can go through the documents.

4        So that's the size and scope of her testimony, Your Honor.

5    If -- if I use documents that I submitted as Exhibits 21

6    through 39, it is simply to corroborate that testimony.

7        The call room operator in turn will testify, I expect,

8    that he was engaged by the call room broker.  The call room

9    broker said, "I have someone that's hired me to sell ASNT

10   stock, and I want you to sell it through your call room."

11       The call room operator will also say that the arrangement

12   was that the call room operator got 35 percent of what was

13   spent by his or her victims on ASNT stock from the broker,

14   inferring, of course, that the broker then has a

15   10-to-15-percent spread; right?  So the call room operator gets

16   35 percent of the proceeds that are -- or the payments for ASNT

17   stock that were made for purchases hopefully by Mr. Hackett.

18       The operator will also testify that he was part of this

19   rapid-fire communication such as to organize and coordinate the

20   trades at the time, quantity, and price that was agreed upon by

21   Mr. Hackett.  The call room operator will also say that there

22   were misleading omissions and statements made in calls with

23   investors.

24       For example, a very significant omission was the fact that

25   the call room operator and the -- that machinery was paid such

1    a huge commission.  So if I'm an investor and I'm spending a

2    hundred dollars on ASNT stock, I should know that 35 percent of

3    those dollars are going back to the call room operator.  And

4    indeed, 50 percent are going to the broker.

5         I would then ask the same questions of the call room

6    operator about whether there were other stocks that met the

7    same description that the call room broker engaged him or her

8    to sell through his call room.  I expect the answer to be

9    "Yes."

10        And then I would say -- I would present the seven stocks

11   in question, and the call room operator would say, "Yes, those

12   are" -- "those are stocks that I" -- "that" -- "that I had my

13   call room sell because the call room broker hired me to do so."

14        And if I put in documents, again, it would be for the same

15   purpose, simply to corroborate that testimony.  So that

16   testimony was supported not with -- not just with respect to

17   ASNT but with respect to each of the seven other sales.

18        And so Exhibits 20 through 39, which were attached to the

19   second supplemental briefing, go through exactly that,

20   Your Honor.  I can describe exhibit by exhibit, if that's the

21   Court's preference, starting with ASNT and moving on to the

22   other stocks.

23             THE COURT:  No.  We're not going to get this done

24   today.  So I would like to have it at one time and place, not

25   broken up.  So we need another day to go through this.

1    **MR. ARNZEN:**  Yes, Your Honor.

2       **THE COURT:**  I was thinking about later in November.

3       **THE CLERK:**  Your Honor, based on your Thursday

4    calendars, I was looking at Wednesday the 13th.  The 14th

5    calendar is lighter than the other two preparation-wise.  So I

6    would suggest November 13th.

7       **THE COURT:**  I think I'm sitting on another court that

8    day.

9       **THE CLERK:**  One moment, Your Honor.

10      That is why it was so light.  You are.

11      **THE COURT:**  What about the following Wednesday?

12      **THE CLERK:**  The following Wednesday, you have a

13   4:00 o'clock civil final pretrial conference.  The following

14   Thursday -- that could work.

15   **MR. NURIK:**  I have a deposition on the 21st that I had

16   to move Heaven and Earth to arrange.

17      **THE CLERK:**  This will be on the 20th.

18   **MR. NURIK:**  On the 20th?  Oh.  Wednesday the 20th?

19   That would work.

20      **THE COURT:**  Well, you are from out of town; right?

21   **MR. NURIK:**  I'm in Los Angeles, Your Honor.  I'm

22   just -- just a three- or four- or five-hour drive away.

23                      (Laughter)

24      **THE COURT:**  Well, I don't want to make your life

25   difficult.  Is the 20th okay, given your deposition on the

1  21st?

2  **MR. NURIK:**  Yes.  The 20th would be fine, Your Honor.

3  Thank you.

4  **THE COURT:**  All right.  The calendar on the 21st does

5  not require a lot of reading, Rick?

6  **THE CLERK:**  I don't believe so.  There are a number of

7  motion hearing/trial settings, but this far out, a lot of them

8  may go away.  There is one revocation, one sentence with

9  criminal history report -- or excuse me -- two revocations.

10  So I would say there is not a great deal of reading

11  involved.

12  **THE COURT:**  All right.  So why don't we try for

13  10:30 on the 20th.

14  **MR. NURIK:**  Thank you.

15  **MR. ARNZEN:**  Yes, Your Honor.

16  **THE COURT:**  So I think you have made your arguments in

17  your submission, but if there is anything else in your proffer

18  that you can disclose, that would be helpful.

19  **MR. ARNZEN:**  Yes, Your Honor.

20  **THE COURT:**  All right.  Anything else we can do today?

21  **MR. NURIK:**  No, Your Honor.  Thank you.

22  **MR. ARNZEN:**  I don't think so, Your Honor.

23  **THE COURT:**  Are you eliminating any of the exhibits

24  you filed on Friday?

25  **MR. ARNZEN:**  Eliminating any of them, Your Honor?

1       **THE COURT:**  In other words, there are two --

2       **MR. ARNZEN:**  Oh.

3       **THE COURT:**  -- sets that you are no longer arguing.

4       **MR. ARNZEN:**  You're right, Your Honor.  Only seven are

5  reflected in our filing as of Friday.  So we already extracted

6  the two.

7       **THE COURT:**  Thank you.

8    Mr. Nurik and Mr. Jones, anything else we can accomplish

9  today?

10      **MR. JONES:**  I think that's it.

11      **MR. NURIK:**  No.  Thank you, Your Honor.

12      **THE COURT:**  Thank you all.

13    And, Ms. Budhu, can you appear the same way, although you

14  are entitled to be --

15      **DEFENDANT BUDHU:**  Yes, Your Honor.  Yes, Your Honor.

16  Thank you.

17      **THE COURT:**  You are entitled to be present, but it

18  seems to be working out pretty well.

19      **DEFENDANT BUDHU:**  Yes, it is, Your Honor.  Thank you.

20      **THE COURT:**  All right.  So I'll leave it up to you and

21  Mr. Jones as to whether you want to be here in person or by the

22  videoconference.

23      **MR. JONES:**  Thank you, Your Honor.

24    We're all done, Ms. Budhu.  Thank you.

25      **DEFENDANT BUDHU:**  Oh.  Thank you.

1      Okay.  Bye.

2           **THE COURT:**  Safe travels.

3           **MR. JONES:**  Thank you, Your Honor.

4           **MR. NURIK:**  Thank you, Your Honor.

5           **THE COURT:**  Safe travels.

6           **MR. ARNZEN:**  Thank you, Your Honor.

7           **THE CLERK:**  "Safe travels."

8           **MR. NURIK:**  Thank you.

9           **MR. ARNZEN:**  Thank you.

10               (Proceedings adjourned at 4:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Monday, December 16, 2019

8

9

10

11                    _____/S/ James C. Pence-Aviles_____

12            James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                           U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25