Pages 1 - 45

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Barry Ted Moskowitz, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
   VS.                          )        NO. 18-CR-03072-DMS
                                )
ANDREW HACKETT AND ANNETTA      )
BUDHU,                          )
                                )
            Defendants.         )
_____ )

San Diego, California
Wednesday, November 20, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        ROBERT S. BREWER, JR.
                        United States Attorney
                        880 Front Street, Suite 6293
                        San Diego, California 92101
                BY:  **AARON ARNZEN, ESQ.**
                     **ANDREW J. GALVIN, ESQ.**
                     **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Andrew Hackett:
                        LAW OFFICE OF MARC S. NURIK
                        1551 Manning Avenue, Suite 302
                        Los Angeles, California 90024
                BY:  **MARC STEVEN NURIK, ESQ.**
                     **ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
               Official Court Reporter

1   **APPEARANCES**:  **(CONTINUED)**

2   For Defendant Annetta Budhu:

                      FEDERAL DEFENDERS OF SAN DIEGO, INC.

3                      225 Broadway, Suite 900

                      San Diego, California 92101

4               **BY:**  **JOSHUA J. JONES, ESQ.**

                      **MICHELLE CYNTHIA ANGELES, ESQ.**

5                      **ATTORNEYS AT LAW**

| | |
|---|---|
| 1 | <u>Wednesday - November 20, 2019</u>                    <u>10:50 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---000--- |
| 4 | **THE COURT:**  Good morning. |
| 5 | Please have a seat.  I'll be right with you. |
| 6 | (Pause in proceedings.) |
| 7 | **THE CLERK:**  Calling Calendar Matter No. 1, 18-CR-3072, |
| 8 | United States of America versus Andrew Hackett and Annetta |
| 9 | Budhu. |
| 10 | **MR. ARNZEN:**  Good morning, Your Honor.  Aaron Arnzen |
| 11 | for the United States. |
| 12 | **MR. NURIK:**  Good morning, Your Honor.  Marc Nurik for |
| 13 | Andrew Hackett, who is present. |
| 14 | **MR. JONES:**  Good morning, Your Honor.  Joshua Jones |
| 15 | and Michelle Angeles, Federal Defenders, on behalf of |
| 16 | Ms. Budhu, who's present via videoconference. |
| 17 | **DEFENDANT BUDHU:**  Good morning, Your Honor.  Annetta |
| 18 | Budhu. |
| 19 | **THE COURT:**  All right.  Good morning. |
| 20 | All right.  We just have to deal with the 404(b) issue as |
| 21 | to the seven other investments. |
| 22 | (Court reporter requests clarification for the record.) |
| 23 | **THE COURT:**  Seven other investments; correct? |
| 24 | **MR. ARNZEN:**  Yes, Your Honor.  That's our |
| 25 | understanding. |

1          **THE COURT:**  All right.

2          **MR. NURIK:**  Yes, Your Honor.

3          **THE COURT:**  So let's get started.

4      Why don't you start with the overall proffer as to what

5  the boiler room broker and operator intend to testify to.

6          **MR. ARNZEN:**  Thank you, Your Honor.

7      I think it's important to understand at the outset what

8  their testimony would be with respect to the charged scheme.

9  It's relatively straightforward.

10     The boiler room broker will testify that Mr. Hackett

11  called the broker or texted the broker, one or the other or

12  both, to communicate that Mr. Hackett wanted the HVST or ASNT

13  stock -- it's the same.  They just changed the ticker symbol

14  over time -- to be promoted through the boiler room.

15     They negotiated briefly about the payment that the boiler

16  room broker would receive.  It was to be 50 percent of the --

17  of the payments made by victims identified through the call

18  room operator.

19     Mr. -- I'm sorry.  The call room broker will testify that

20  they reached an agreement, and the broker then reached out to

21  the operator and communicated that the operator should use the

22  boiler room that he ran in order to identify victims that would

23  buy ASNT stock based on misrepresentations and omissions.

24     The boiler room broker and the boiler room operator will

25  also testify that when a victim was identified, the operator

1    and the agents that worked in the operator's call room would

2    guide the victim through the purchase process online so that

3    they could put in a price, a volume, and at a specified time a

4    trade such that when communicated through the call room broker,

5    the boiler room broker, Mr. Hackett would be on the other side

6    of that trade.

7         And Mr. Hackett would -- this had two purposes, one, so

8    that Mr. Hackett could capture the trade.  In other words,

9    Mr. Hackett's whole goal was to sell stock that he had.  He

10   didn't want to pay 50 percent for somebody to buy the stock

11   from somebody else.  He wanted to pay 50 percent so that he

12   could sell the stock to the identified victim.

13        Just this aspect of the scheme violates Section 10(b) of

14   the Securities Exchange Act.  That's the general antifraud

15   provision.  It also violates Section 9(a)(1) of the Securities

16   Exchange Act.  That's the anti-manipulative trading provision.

17        Mr. Hackett also had another purpose.  He wanted to either

18   use that trade to indicate to the rest of the market that there

19   was either an upward trajectory in the price of ASNT stock or

20   at least mitigate downward pressure on the stock that a lot of

21   selling would have on the market for the stock.

22        So time, price, and volume were all subjects that, the

23   boiler room broker and the boiler room operator will testify,

24   were discussed in a rapid-fire text exchange between

25   Mr. Hackett, the call room or boiler room broker, and in turn

1    the boiler room operator.

2        Mr. Hackett, as I previewed just a minute ago, paid for

3    the service.  The boiler room broker received 50 percent of

4    the -- of the amount paid into the stock market to purchase

5    these shares that the victim paid.  So Mr. Hackett sold his

6    shares -- or hopefully his shares.  Perhaps it was somebody

7    else.

8        But -- but whatever -- whatever was bought by the victim,

9    the amount of that purchase would be multiplied by 50 percent.

10   Mr. Hackett would pay that or agree to pay that to the boiler

11   room broker.  The boiler room broker in turn agreed to pay

12   35 percent of that original amount to the boiler room operator.

13   Her cut was 15 percent.

14       This happened, Your Honor, in 2017 and 2018.  I just want

15   to check my dates to make sure I've got this right, Your Honor.

16   Their testimony will be that the ASNT pump -- yes -- was in

17   2017 and 2018.

18       These two witnesses will testify that that same

19   methodology, that same mode of operation with respect to the

20   boiler room operator and the boiler room broker, was exactly

21   the same as it was for ASNT as for what we call the

22   uncharged -- uncharged stocks in our brief.  Those are the

23   seven stocks that are set forth in here.

24       Everything about it is the same as I just described, the

25   communication from Mr. Hackett to the broker and in turn to the

operator, making clear that Mr. Hackett had a stock that he
wanted to sell through this -- this fraudulent tool, an
agreement on the price or percentages that would be paid, the
manipulative trading that happened when a victim for purposes
of one of these uncharged stocks was identified.

And -- and in all material respects, ASNT was no different
than these other ones for -- for purposes of the aspects that
I've just described.

I think those are the general outlines of it, Your Honor.
I'm happy to answer any questions.

THE COURT:  The boiler room operator and broker will
testify that the other seven investments were conducted the
same way?

MR. ARNZEN:  They absolutely will, Your Honor.

THE COURT:  And that there were misrepresentations
made in each of them to the prospective investors?

MR. ARNZEN:  That's exactly right, Your Honor.  And I
want to make sure I include omissions, material omissions,
within the term "misrepresentations."

THE COURT:  Yes.

Now, what do you think that shows under Rule 404(b)?

MR. ARNZEN:  In brief, Your Honor, it shows that
Mr. Hackett knew that the boiler room operator misled investors
and that he knew the boiler room operator manipulated the
markets along with Mr. Hackett and the boiler room broker.

1   Given -- so -- and Mr. Hackett knew that with respect to the

2   ASNT promotion.

3        He knew that because he had had experience with it.  He

4   had used it on prior occasions, including these seven prior --

5   specific prior occasions.  He knew the manipulated -- the

6   market for ASNT was manipulated by the boiler room broker and

7   boiler room operator.

8        So in brief, it shows his knowledge that the boiler room

9   operator and the boiler room broker were engaged in fraud with

10  respect to ASNT, the charged scheme.

11       THE COURT:  Did the other seven investments also have

12  circumstances where Mr. Hackett was controlling the sales so

13  the purchaser would buy what he was selling at the same time he

14  sold it?

15       MR. ARNZEN:  That will be our evidence, and that will

16  be the testimony of the boiler room broker and the boiler room

17  operator.  Yes, Your Honor.

18       THE COURT:  All right.  What other evidence do you

19  have as to the seven investments besides the testimony of the

20  broker and operator?

21       MR. ARNZEN:  Your Honor, it comes in two forms, but

22  primarily the evidence comes from -- it's documentary evidence

23  and evidence of communications that we obtained from the boiler

24  room operator and the boiler room broker.

25       So, for example, we imaged the phone of the boiler room

1    broker and have attached a number of exhibits to our briefing.

2    They are Exhibits 21 through 39 attached to Document 1 --

3    Dock- -- Docket 190.  And so they consist of communications

4    where -- the key aspects of what I just described.

5              **THE COURT:**  Well, walk me through them.  Do you have

6    them?  I have my copy here, and I was trying to walk through

7    them based on the briefing last night, and I was not completely

8    successful.

9         So let's walk through them.

10             **MR. ARNZEN:**  Yes, Your Honor.

11        If we could start with Exhibit 21, I want to make clear

12   that 21 is not what we think is 404(b) evidence.  This is just

13   an example of the communications had with respect to the ASNT

14   or HVST scheme.  So this is -- this is just background for

15   purposes of analyzing whether 404(b) admission is appropriate.

16        This discusses ASNT.  It's a -- it's a text exchange

17   between Mr. Hackett on the one hand.  His text messages line up

18   on the left margin, and his text messages are with Liana

19   Millhouse, who's the boiler room broker.  Her text messages

20   line up on the right-hand side.

21        In this one, Mr. Hackett is communicating to the boiler

22   room broker that he has a stock, HVST.  He indicates the price

23   per share of the stock and asks -- and wonders if the broker

24   can engage people -- can engage call or boiler room operators

25   to sell the stock.

1    That's all in the first box at the very top of the page in

2    Exhibit 21, Your Honor.

3         **THE COURT:**  Well, I don't see it.  Why don't you point

4    it out.

5         **MR. ARNZEN:**  Yes, Your Honor.

6    Exhibit 21 -- if one looks at the text exchange at the

7    very top, the first text message is from Mr. Hackett, and it

8    says, "HVST.  It's at 2" -- "2.00."  The testimony will be that

9    that means $2.  "I can get the whole deal.  They have lots of

10   good news.  You think your New York guys will do it?"

11        This is Mr. Hackett touching base with the broker to see

12   if she's got the means to promote HVST stock through the call

13   rooms.

14        **THE COURT:**  All right.

15        **MR. ARNZEN:**  The broker responds in a series of

16   messages.  This is at the right-hand side of the page.  "Yes.

17   I will tell them.  Total," question mark.  "Deposit total."

18        The boiler room broker here, the testimony will be, is

19   trying to figure out what this deal is about, how big it is,

20   how many shares they have to sell, and committing to trying to

21   get a boiler room in New York to pump this stock.

22        Then Mr. Hackett comes back at the bottom of the page and

23   basically says, "I'll get the information to you."

24        So, again, this is -- and I get it, Your Honor.  These

25   are -- these are kind of deep in the weeds, and it doesn't jump

1    out off the page that this is -- in context, it's hard to

2    figure out what's going on, and that's why the testimony will

3    be somewhat important to kind of contextualize these.

4             **THE COURT:**  Let's keep going.

5             **MR. ARNZEN:**  Yes, Your Honor.

6        21A is the next exhibit.  We put this in because there are

7    two things going on.  It's in part to corroborate testimony by

8    the boiler room operator that she had communications with

9    Mr. Hackett about two stocks, one of which is ASNT.

10       So the first page of 21A shows an exercise to figure out

11   what price to put the trades in.  These are those text messages

12   that I was describing so that the -- the boiler room operator

13   and broker could organize with Mr. Hackett to determine the

14   price, volume, and time with which to make a trade such as

15   to -- to make sure -- or increase the chances that Mr. Hackett

16   will capture the trade and, again, to affect the price.

17       So on the right-hand side, again, that is the text message

18   from the boiler room broker.  "Hello.  Price.  AM" -- "ASNT.

19   Price."  The testimony will be she did this all day long when

20   she was engaged with Mr. Hackett to -- to pump these stocks

21   through the call rooms.  They're online all the time, and she's

22   asking, "What" -- "I have a buyer.  What price shall I put it

23   in at?"

24       Mr. Hackett -- in about the middle of the page, he says,

25   "1.75."  The testimony will be that means a price per share,

1   $1.75 per share of ASNT stock.

2       Then the broker says, "Okay."  She has -- she will testify

3   she has trouble from time to time communicating with

4   Mr. Hackett.  Sometimes he's nonresponsive, sometimes she's

5   nonresponsive, and she wants to determine if there's a price

6   that she can use for the entire day, and that's at the bottom

7   of the first page of this text message.  "If you don't answer,

8   is that price all day?"

9       Mr. Hackett doesn't like that idea.  He says, "If I don't

10  answer, please call just in case.  Put messages through here."

11      The broker comes back -- this is on 190-1, Page 5 of 63.

12          **THE COURT:**  I understand this one.  This is about

13  the --

14          **MR. ARNZEN:**  Okay.

15          **THE COURT:**  -- charged stock; right?

16      (Court reporter requests clarification for the record.)

17          **THE COURT:**  This is about the c-h-a-r-g-e-d stock?

18          **MR. ARNZEN:**  Charged stock, Your Honor?

19          **THE COURT:**  Right.

20          **MR. ARNZEN:**  It is about the charged stock.

21      I should point out, though, that on Page 5 of 67, the

22  second entry from the bottom mentions another ticker symbol --

23  I'm sorry.  The third entry from the bottom mentions another

24  ticker symbol.  That's DAVC, and that's not one of the --

25  that's not one of our uncharged stocks that we're offering for

1    404(b) purposes.

2        We would redact the DAVC portion of that because it's

3    another deal that arguably is 404(b) evidence that --

4            **THE COURT:**  All right.  Let's move on.

5            **MR. ARNZEN:**  Yes, Your Honor.

6        Exhibit 22 is not 404(b) in our view.  This is, again --

7    this is another background to try to demonstrate the nature of

8    the scheme through the call rooms.

9        So this is about the charged stock, and in short, it shows

10   on Page 9 of 67 that Ms. -- that the call room broker is

11   communicating to Mr. Hackett that she herself has rooms working

12   on the deals for Mr. Hackett.  So, again, that's background in

13   our view.  It's not 404(b) evidence, but we want to kind of

14   contextualize.

15       Exhibit 23 is also background.  It's HVST.  You'll see at

16   the top of the page, there's a date, 10/17, HVST.  This is an

17   invoice that was sent from the boiler room operator to the

18   boiler room broker to get paid for identifying victims that

19   could -- that could buy ASNT stock on October 17th, 2017.

20       Exhibit 24 is the same type of invoice drafted up by the

21   boiler room operator under the same circumstances seeking to be

22   paid for victims that bought another stock, one of the

23   uncharged 404(b) stocks, ticker symbol BMXI.

24       Number 25, Your Honor, is also about BMXI.  It's between

25   the boiler room broker and Mr. Hackett.  This one is

1  actually -- this does a couple of things, one of which is to

2  demonstrate and corroborate the testimony about the purpose of

3  matching the trades.

4      The third entry down, Mr. Hackett says, "Everyone I wrote

5  BMXI filled your orders came in, but sometimes I was saying

6  .047."  That means my -- my -- my trade that I put into my

7  system in the market was at .047 or 4.7 cents a share.  "But I

8  had my order in at .046 just to make sure I capture everything

9  you bring."

10     This demonstrates in our view that -- the purpose that I

11  described, that Mr. -- one of the reasons for matching trades

12  was so that Mr. Hackett could make sure he captured the trades.

13  So that's the size and scope of Number 25.  That one, again, is

14  about BMXI.

15     Exhibit 26 is also about BMXI.  It's between the boiler

16  room broker and the boiler room operator, and this one is about

17  matching trades.  They go through various dollar amounts and

18  asking for the price at which the victims should put into the

19  system, a trade order.  The discussion goes on and on.  I think

20  the testimony will be that this concerns several trades in

21  BMXI.

22     At the end of Page 23 of 67, we intend to redact the last

23  three entries because it looks to be about -- two or three

24  entries that looks to be about another ticker that we're not

25  trying to admit as 404(b).

1          Exhibit 27, another one, BMXI.  This is between the

2     broker -- boiler room broker and Mr. Hackett.  It is about

3     match trades, coordinating volumes and prices for the -- for

4     the trade in BMXI as well.  It meets the same -- or it

5     demonstrates the exact same thing that I've been talking about

6     with respect to manipulating the market.

7          That's the first -- BMXI, I think, is the first of the --

8     the uncharged stocks, the 404(b) stocks that -- that I

9     discussed and that we set forth here.

10          The remainder of these exhibits, Your Honor, 28 through

11     39, fall into the same categories.  They are text messages

12     either between the broker and Mr. Hackett or the broker and the

13     operator about arrangements for payments from Hackett to the

14     broker and in turn to the operator and setting out prices and

15     volume such as to manipulate the shares.

16          I can go -- I can go through those, if you'd like, in

17     detail.

18               **THE COURT:**  Please.

19          **MR. ARNZEN:**  Yes, sir.

20               **THE COURT:**  Just as you were -- just as you have done

21     with Exhibits 21 through 27.

22          **MR. ARNZEN:**  Yes, sir, I will.  Thank you.

23          Exhibit 28, Your Honor, is a -- an invoice from the

24     operator to the broker with respect to another ticker.  It's

25     another one of our 404(b) stocks.  This one's -- CHZP is the

1  ticker.  It is seeking payment for the operator's efforts to --

2  and successful efforts to find victims to buy this stock.

3      The testimony will be from the -- from the boiler room

4  broker that this is one of the stocks that Mr. -- Mr. Hackett

5  engaged her to pump through the call rooms.  This is seeking

6  compensation for -- for trades that were made by victims on

7  May 27th, 2016.

8      Exhibit 29 is also about -- about CHZP.  This is a text

9  exchange between Mr. Hackett and the boiler room broker, and

10  this one is about payment for trades by victims that had been

11  identified, and there's going to be testimony that the boiler

12  room broker had to make sometimes extraordinary efforts to get

13  paid for Mr. Hackett.  But it all corroborates the fact that

14  she was due money for these trades.  She was due 50 percent of

15  the proceeds.

16      So this particular one is about trying to get paid for

17  selling CHZP.

18          **THE COURT:**  Where is the message you are referring to?

19  The message, m-e-s-s-a-g-e.

20          **MR. ARNZEN:**  What part of the message am I referring

21  to, Your Honor?

22          **THE COURT:**  Yes.

23          **MR. ARNZEN:**  Very well.

24      The third block down on Page 29 of 67 -- let's start with

25  the first.  The broker reaches out to Mr. Hackett in the first

block shown here and says, "How much are you sending?"

Mr. Hackett says, "Hold.  Let me get price and amount going out."  So she's raising the subject of payments.  He says, "Hold on.  Let me gather information."

She comes back and says, "19K for CHZP."  That means $19,000 is what the boiler room broker is asserting that she is due based on victims' purchases of this stock, CHZP.  So the 19K for CHZP.

Then she indicates that there's more due.  "Plus this week trades."  In other words, she has amounts that are -- that should be forthcoming from Mr. Hackett for trades done during that very week.  She seeks confirmation from Mr. Hackett.

And he comes back and says, "I'm sending 10K for CHZP.  More is going to hit today," and then he goes on.  There was a -- there was a steady discussion between Mr. Hackett and the boiler room broker about the amounts due to the broker.

I will go on to the next one, if that's okay.

THE COURT:  All right.

MR. ARNZEN:  Exhibit -- Exhibit 30, Your Honor, is about another of the 404(b) stocks.  This one has a ticker symbol -- symbol GVCL, and it's the same type of invoice; in other words, an invoice from the boiler room operator sent to the boiler room broker seeking compensation for amounts paid for the stock of GVCL by victims identified by the operator or his sales agents.  Those are -- those are seeking compensation

1    for trades made on or about August 17th and 18th, 2017.

2         Exhibit 31 is also about GVCL.  This is between

3    Mr. Hackett and the boiler room broker.  It's about -- it's

4    about matching trades, manipulating the market in GVCL stock.

5    It talks about -- it talks about Mr. Hackett having GVCL

6    available and that he can do -- he can do a trade at a certain

7    price.

8         And then the boiler room operator comes back and says,

9    "Okay.  Unlimited."  I'm not sure exactly what "unlimited"

10   means here, Your Honor.  I don't know what the testimony would

11   be.  And then she confirms the ticker symbol.

12        The next page, it indicates that the boiler room operator

13   has notified the broker that there is a trade available for

14   $2500, and Mr. Hackett on Page 36 of 67 identifies the price

15   that the victims should put in such that he can capture the

16   trade.  That's -- .025 is the price for GVCL.  That type of

17   correspondence goes on throughout this exhibit, Your Honor.

18   It's about match trades and manipulating the market.

19        Exhibit 32 is another one about GVCL.  The last one was

20   correspondence between the broker and Mr. Hackett.  This one is

21   text correspondence between the boiler room broker and the

22   boiler room operator.

23        And this, in effect, shows correspondence wherein the

24   broker tells the call room operator that there's a deal that

25   they can do, GVCL, and it's available.  So it shows the

1    correspondence kind of arranging the operator to get himself

2    and his agents started, selling GVCL to victims.

3         Exhibit 33 is about yet another 404(b) stock.  This one

4    has a ticker ITMC, and the correspondence in Exhibit 33 is a

5    text message between Mr. Hackett and the boiler room broker,

6    and it's about matching trades.

7         It talks about what stock; in other words, ITMC.  It talks

8    about the number of shares, 20,000 shares, at the very bottom

9    of the first page, .097.  The testimony will be that that's a

10   price per share that the victim has or will put in for the

11   stock.

12        Exhibit 34, Your Honor, is the same type of invoice from

13   the operator to the broker.  This ticker is another one.  It's

14   LBTD, and it's seeking compensation for sales through the

15   boiler room on August 16th, 2017, of LBTD stock.

16        Exhibit 35 is correspondence, text messages, about the

17   same stock, LBTD.  This one is between the call room broker and

18   the call room operator, and it discusses a match trade,

19   manipulating the market.

20        It sets forth the price per share of stock that both sides

21   will put in.  That's 17 cents a share, and it sets forth the

22   number of shares and the dollar value that the -- the victim

23   investor is willing to put into his stock.

24        So this demonstrates, again, the -- the -- the broker's

25   side -- I'm sorry -- the operator's side of making sure that

1    his victim arranges the right price, volume, and time through

2    the -- through the boiler room broker with Mr. Hackett.

3         There is a pretty lengthy exchange in Exhibit 30 -- 35.

4    Some of these are -- and the testimony will be that some of the

5    exchanges just normally were very short and quick.  Other ones

6    were extended.  Sometimes they were about many trades that

7    happened one after another after another, and so this

8    demonstrates that.

9         Exhibit 36 is another set of correspondence about LBTD.

10   This correspondence is -- the last one was between the broker

11   and the operator.  This one is between the broker and

12   Mr. Hackett.  It, too, concerns a match trade, manipulating the

13   market, setting forth price, volume, dollar amounts.

14        And so, again, this is somewhat lengthy correspond --

15   correspondence.  It matches up with the approximate length of

16   the prior exhibit, where the broker and the operator were

17   discussing the same stock.

18        Exhibit 36 -- I'm sorry.  Did I just discuss 36,

19   Your Honor?

20             **THE COURT:**  Yes.

21        **MR. ARNZEN:**  I apologize.

22   Exhibit 37 --

23             **THE COURT:**  Well, hold on.

24        **MR. ARNZEN:**  Yes, sir.

25             **THE COURT:**  36 is about LBTD?

1    **MR. ARNZEN:**  It is about LPD -- LBTD, Your Honor.  It

2    is the same stock that I talked about with respect to

3    Exhibit 35.

4    **THE COURT:**  All right.  Go on.

5    **MR. ARNZEN:**  Yes, Your Honor.

6    Exhibit 37 is correspondence between -- and all of the

7    correspondence that I've shown here that are attached as

8    exhibits -- just to make clear, all of these are text messages

9    that were captured from an image of the boiler room broker's

10   phone.

11   The invoices were captured from a couple of spots.  They

12   match up.  We got evidence from the broker, and we got evidence

13   from the operator.  The testimony is consistent with respect

14   to -- from both of those witnesses with respect to these

15   invoices.

16   So Exhibit 38 is another text message.  This one is about

17   another of the 404(b) stocks.  It's about QBIO.  They often

18   refer to this as QBIO, and it's about a match trade.  It's

19   correspondence between Mr. Hackett on the one hand and the

20   boiler room broker on the other.

21   You can see in the first -- on the very first page, they

22   flip from a discussion of CHZP.  That's the first text on the

23   upper right-hand corner of Page 65 to 67, and they transition

24   to a discussion -- another one of the 404(b) stocks that we've

25   discussed.  Then they switch to a discussion of QBIO stock in

1    the very next.

2        So on the left-hand side is Mr. Hackett's -- are

3    Mr. Hackett's text messages.  His first one says, "Yes, I know

4    I had to pay for TLNUF shares.  It cost me 30K."

5        (Court reporter requests clarification for the record.)

6            **MR. ARNZEN:**  I apologize.  Yes, sir.

7        "Yes, I know I had to pay for TLNUF shares.  It cost me

8    30K.  I have more funds coming in.  I am clearing 40K QBIO.

9    The stock is at $10.  I'll have more funds hit."

10       And then a boiler room broker reaches out and asks for a

11   price.  I believe this is with respect to CHZP, and it says,

12   "4," meaning $4, Your Honor.  The reference to TLNUF and 38 I

13   don't think is problematic in terms of just being there because

14   it is also one of the 404(b) stocks.

15       Exhibit 39, in fact, is a text exchange about TLNUF.  It

16   is between Mr. Hackett and the broker.  It is about a match

17   trade, manipulating the market in TLNUF.  And it also indicates

18   the -- the boiler -- the boiler room broker asking, "Are you

19   moving it up?"  That's the second text message from the top on

20   Page 67 of 67.

21       This corresponds and corroborates with expected testimony

22   that one of the purposes of manipulating the market was not

23   just so that Hackett could capture the trade but also -- also

24   to support the price of the stock.

25       So those are Exhibits 21 through 39, Your Honor.

1          **THE COURT:**  All right.  The defense position?

2          **MR. NURIK:**  Your Honor, if you recall from the

3    beginning of this process, when the Government first discussed

4    with you their theory of admissibility of these other what we

5    call -- we'll call tickers for purposes of discussion, the

6    seven others, the Government claimed that there would be

7    evidence by the -- what they call boiler room broker and boiler

8    room operator of misrepresentations either by commission or

9    omission to the investors.

10         The Government has conceded, I believe -- and I invite

11   Mr. Arnzen to at any point interrupt me and correct me if I

12   make a mistake of what their evidence will be or what he

13   proffers their evidence will be.  The Government has conceded

14   that at no point was there any discussion with Mr. Hackett by

15   either the operator or the broker of what was being said, that

16   there was no revelation of any scripts, any pitches, any

17   documents to indicate what was being said.

18         And indeed, the Government also concedes that the

19   operator, in fact, was not known to Mr. Hackett, had never

20   spoke with Mr. Hackett.  Mr. Hackett did not know his identity.

21   All Mr. Hackett knew was that the broker had rooms, and the

22   fact of using phone rooms to promote stocks is not per se

23   illegal.

24         So what the Government has done here is trying to bring in

25   that evidence that these other sales were done through

1    misrepresentations and omissions by attempting to show a

2    linkage between these other tickers and the ASNT.  And the

3    basic thrust of their argument is the gravamen of the offense

4    is both match trades -- and they've used that term repeatedly

5    during their proffer just now -- and misrepresentations.

6        What's interesting is so far in the year-plus that we've

7    been giving -- given a voluminous amount of discovery, we have

8    not received one piece of physical evidence in which the

9    Government has shown that there was indeed a match trade.

10        Now, the Government has access to the records of the

11    investors and their trades.  They clearly have that.  They have

12    shown part of that here.  They also have access to the records

13    of any trades that Mr. Hackett may have made.  Curiously, there

14    is no evidence of any match trades.

15        They are attempting to interpret the language of these

16    text messages to suggest there are match trades whereas the

17    best evidence of it, which is the documentary evidence of match

18    trades, does not exist.

19        **THE COURT:**  Well, my understanding is that the broker

20    and operator will testify that there were match trades.

21        Is that correct, Mr. Arnzen?

22        **MR. ARNZEN:**  Yes, Your Honor.  There were -- there

23    were significant efforts to match the trades.  They don't --

24    because it's a public open market, they don't know who they're

25    trading with.  They just make an order for a trade, and it

1   happens.

2        They will -- they will say, though, that they -- they made

3   all the efforts that I just referred to in order to match the

4   trades, and then the trades took place.

5             MR. NURIK:  Well, of course, they're going to be able

6   to testify to that, I assume.  However, it will be clearly

7   shown through cross-examination that there were no match

8   trades.

9        I mean, it's not hard to determine that there's a match

10  trade.  You have the trade of Mr. Hackett, which shows the

11  amount, the time, the volume, and then you have the trade of

12  the investor that it was supposed to be matched with, which

13  shows the time, the amount, and the volume.  And you can

14  compare the two.

15       And the Government curiously, even as recently as about a

16  month or two ago, was asking their agents to search to see if,

17  in fact -- and that was turned over to us in discovery -- to

18  see if, in fact, they could find any evidence of match trades.

19       Now, it may be even Ms. -- Ms. Millhouse and Mr. Wolf, who

20  both naturally have a reason to testify for the Government

21  because they are both working off cases that they have -- and

22  the Court will give the appropriate instruction to the jury

23  regarding due care and caution to give to their testimony.

24  They both are -- may say that, but there's no independent

25  evidence.

 1          The importance of that is to allow this kind of evidence

 2     about all these other tickers to come in on what is not even

 3     supportable testimony and corroborated testimony is very

 4     dangerous in this case.  And interestingly, if you look -- and

 5     I'd like to take you through some of these exhibits that the

 6     Government is relying upon because this is what they are

 7     suggesting.

 8          First of all, Exhibit 21.  As they indicate, this -- this

 9     only refers to the charged offense, and interestingly, it talks

10     about a New York room.  Well, that's not Mr. Wolf, who is the

11     operator.

12          Exhibit 21A.  There's no discussion at all about capturing

13     trade.  Mentioning of price is not per se illegal.  In fact, if

14     you notice -- if you look at these, the broker, who is Liana

15     Millhouse, is asking what the price is, and Mr. Hackett is

16     telling her what it's being traded at in the marketplace.

17          Exhibit 22, again, is only the charged stock.  So that

18     doesn't help us.  That has nothing to do with any 404(b) or any

19     of the other seven.

20          Exhibit No. 23 is an invoice that was sent from the

21     operator to the broker.  I'm sure the Government will concede

22     this was never sent to Mr. Hackett.  Mr. Hackett never saw

23     this.  This is not part of any evidence that could be linked

24     directly to Mr. Hackett.

25          Exhibit No. 24, again, not sent to Mr. Hackett.  This is

1   simply between the operator and the broker.

2       Exhibit 25.  I will concede, Your Honor, that on Page 19

3   of -- of 67, there is a discussion by Mr. Hackett that appears

4   on its face to suggest the possibility of a matched trade, and

5   that is the third item down.  It's on the left-hand column, the

6   second item on the left-hand column.  However, what you will

7   see is there is no evidence of, in fact, there being a match

8   trade.

9       Exhibit 26.  The Government continues to talk about these

10  conversations as being exhibits of matched trades, yet Exhibit

11  No. 26 again has no reference to that.  Exhibit No. 26 is

12  simply discussing price.

13      Now, if the Government is going to come forward and tell

14  the jury that merely discussing price with the sales room that

15  is promoting the stock is per se a violation of any of the

16  securities laws, I'm anxious to hear that because I don't

17  believe they will.

18      Exhibit No. 27.  Similarly, no discussion of any match

19  trade, merely discussion of price.

20      Exhibit No. 28.  Again, invoices that were never seen or

21  produced or given to Mr. Hackett, merely documentation between

22  the operator and the broker.

23      Exhibit No. 29.  Well, this is curious because the

24  Government's own evidence will not reveal that Mr. Hackett

25  owned any shares in this particular stock, CHZP, at the time of

1    these transactions, again, no discussion of any match trades.

2        And by the way, to the extent there's discussion about

3    money by Mr. Hackett, the testimony will be that Ms. Millhouse

4    is constantly asking Mr. Hackett for the money that he owes for

5    the commissions that he's paying the sales room, and he's

6    constantly telling her about that.

7        That runs all through -- that's the thread that runs all

8    through these particular sets of messages, and he's talking

9    about where he's getting the money from but not from match

10   trades.

11       Exhibit No. 30, GVCL.  These are invoices, again, not sent

12   to Mr. Hackett, not shown to Mr. Hackett.  Mr. Hackett's not

13   aware of them, merely between the operator and the broker.

14   This involves a ticker called GVCL.  Mr. Hackett never had any

15   shares in this particular stock.

16       Number 31.  No evidence of any match trades from any of

17   these discussions.  And, again, this is a ticker.  These are --

18   this is the stock, GVCL, Mr. Hackett did not have shares in,

19   merely discussing what it is trading at.

20       And when he says "fill," that's Mr. Hackett confirming

21   that, in fact, those shares were bought on the market by the

22   investors because the commission is paid -- and Ms. Millhouse

23   will testify to this -- not merely because she gets somebody

24   who agreed to buy.  Remember, these people can't purchase stock

25   through the sales room.  They have to go through a licensed

```
 1   security dealer.

 2        And as such, until there is a confirmation that the order

 3   was, in fact, filled, Mr. Hackett does not owe the money to

 4   Ms. Millhouse.

 5        So there's constant reference in these particular messages

 6   about orders being filled; that is, confirmation by Mr. Hackett

 7   that he has seen on the various sites that reveal this

 8   publically, that, in fact, those many shares at that price were

 9   actually purchased.  Therefore, he owes the money to

10   Ms. Millhouse.

11        Again, Exhibit 32.  These are, as there are a number of

12   here, just merely conversations between the operator and the

13   broker.  Mr. Hackett is not a party to these conversations, but

14   yet the Government is using this to somehow suggest that this

15   is evidence -- 404(b) evidence to support 404(b) evidence.

16        Number 33, ITMC.  No evidence of match trades, no

17   discussion of match trades.

18        Item 34, invoice for LBTD.  These, again, are invoices

19   between the broker and the operator, never seen by Mr. Hackett.

20   And, in fact, the evidence will reveal that LBTD was not owned

21   by Mr. Hackett at the time of these transactions.

22        Exhibit 35.  Again, communications solely between the

23   broker and the operator, not Mr. Hackett, no evidence that

24   Mr. Hackett saw any of these communications.

25        Exhibit 37.  Again, invoices that Mr. Hackett did not
```

1  receive or see.

2       Exhibit 38.  Again, nothing in this that talks about a

3  match trade.

4       Exhibit 39, similarly.

5       In sum, Your Honor, the Government has put before you

6  evidence, but it is not evidence linking Mr. Hackett to illegal

7  conduct in any of these other deals.

8       Now, one of the key elements for admissibility under Rule

9  404(b), as interpreted by a legion of case law, is that there

10 must be substantial evidence indicating the defendant's

11 participation in the other illegal bad acts.  And I would

12 submit respectfully the Government has failed to show that and

13 has failed to show the illegality of these other acts.

14      The only illegality that they propose to present before

15 the jury is that both Ms. Millhouse and Mr. Wolf will testify

16 that their rooms made misrepresentations, but there is no

17 linkage between Mr. Hackett's knowledge or intent and what

18 those misrepresentations were.

19      And both witnesses will testify, again -- I don't want to

20 beat a dead horse, but they will testify that there is no

21 knowledge on Mr. Hackett's part.

22      The Government's sole connection or attempt to connect or

23 create intent there or knowledge, as it were, is to suggest

24 that because there was a 50-percent commission paid, that that

25 would be evidence that Mr. Hackett should have known.  They

1    suggest to the Court that that -- they will have evidence that

2    that is not a commercially reasonable commission.

3         However, what they're not telling the Court is that that

4    evidence will come from someone who will testify about what is

5    a commercially reasonable commission in other facets of the

6    securities industry, not with respect to sales rooms that

7    promote these types of stocks.

8         And we would submit under the circumstances, given what we

9    will wind up having, which is an extensive amount of

10   cross-examination and probably extrinsic testimony that will

11   have to be brought in because I will have to demonstrate, since

12   they're not going to have any -- I'll point out that there's

13   absolutely no evidence of match trades -- that this will unduly

14   lengthen the trial.

15        It will prejudice the defendant, and there is knowledge --

16   no sufficient evidence that the defendant participated in these

17   illegal acts, if they were, in fact, illegal acts.

18        So I would submit that the Court should exclude these

19   seven other matters.

20        **THE COURT:**  Thank you.

21        **MR. JONES:**  Your Honor, just briefly.

22        My understanding from speaking with Mr. Arnzen is that

23   with regard to these other ticker symbols related to the

24   alleged activity of Mr. Hackett -- that that evidence is not

25   going to be offered against Ms. Budhu and that the jury would

 1   be so instructed.

 2        So our only arguments on these points would be, one, that

 3   to the extent that the Government -- that the Court is going to

 4   admit substantial 404(b) evidence against Mr. Hackett, that

 5   would increase the possibility of spillover prejudice, which is

 6   relevant to our severance motion, which we understand the Court

 7   denied.  But we do anticipate renewing it at an appropriate

 8   time.

 9        In addition, with regard to Exhibits 37 and 38 --

10        **THE COURT:**  Well, actually, it might help your client

11   by the absence of her involvement in these --

12        (Court reporter requests clarification for the record.)

13        **THE COURT:**  Actually, it might help your client

14   because of the absence of her participation in the seven other

15   investments, and that would actually distinguish her from

16   Mr. Hackett.

17        **MR. JONES:**  I think that's certainly true and one

18   argument that could be made, Your Honor, which does lead me to

19   the other point that I wanted to raise, which is Exhibits 37

20   and 38 deal with the ticker symbol QBIO.

21        This is the same ticker symbol that came up when the Court

22   was discussing 404(b) with reference to things that came up in

23   the transcripts, and there are references in the transcripts to

24   QBIO in relation to describing the current ASNT negotiations.

25        And when the Court admitted that, the Government's

1    position was they're not going to have testimony that that was

2    a fraudulent deal, that that was a pump-and-dump scheme.  It's

3    just going to be a reference to another deal.

4         But now we're going to have separate, independent evidence

5    introduced specifically with the Government arguing and the

6    defense presumably contesting that QBIO was, in fact, a

7    fraudulent deal, that it was a pump-and-dump, that there were

8    false representations made to investors in that scheme.

9         So I think particularly with regard to Exhibits 37 and 38

10   and the QBIO deal, especially given the fact that the

11   Government -- if the Court is inclined to allow this

12   information in, the Government has substantial evidence of

13   these other deals.

14        That one specific deal really does not add much to the

15   narrative, especially considering their argument seems to just

16   be that there is this high commission that he's received on

17   numerous occasions.  At some point, it gets cumulative because

18   we're talking about hundreds and hundreds of thousands of

19   losses to investors on other deals to prove essentially

20   knowledge in a much, much smaller investment.

21        So I think that, if anything, the QBIO should be removed

22   because of the fact that it raises a specter of 404(b) with

23   regard to the references in the transcript.

24        **MR. NURIK:**  Excuse me, Your Honor.  May I just add one

25   more thing?  I apologize.

1    I don't believe that the Government is going to contend

2    that my client actually participated in the QBIO deal, and if

3    I'm wrong, I'd like them to tell me that now.  I think that

4    they are aware that -- or they're going to contend that my

5    client was aware that there was this QBIO deal, and as you

6    recall, it's referenced in some of the other matters as part of

7    the inextricably intertwined testimony.

8        But to introduce evidence about the QBIO deal when my

9    client was not a player in that deal -- unless the Government's

10   going to tell me -- or tell us that they do have evidence that

11   he was, which I would submit would be in error, but it's up to

12   them to proffer.

13       **MR. ARNZEN:**  Respond, Your Honor?  Thank you.

14       Your Honor, a couple points that I think I should

15   concentrate on.  One is Mr. Nurik's assertion that these do

16   not -- these Exhibits 21 through 39 don't have any evidence of

17   match trades.

18       I wonder if I can turn the Court's attention to Page 35 of

19   67 in the exhibits, Document -- Docket No. 190-1, Page 35 of

20   67.  The third entry down is about GVCL.  Mr. Hackett tells the

21   broker, "We can do the trade at .024."  This is a more extended

22   version of virtually every exchange about match trades in these

23   text messages.

24       Mr. Hackett and the broker and the operator -- they're not

25   talking about the published market price of a stock,

1    Your Honor.  Anybody in the courtroom right now can pick up

2    their phone and find out the market price for ASNT stock in

3    less than three seconds.  You just Google up the ticker and

4    say, "ASNT stock," and you come up with the stock price

5    instantaneously.

6        And these are professionals.  The broker and the operator

7    have ready and constant access to the then-current market

8    price.  All of these text messages are about a desired price.

9    The whole point to capture the trade really is furthered by

10   separating a specific trade price from the market price because

11   if two people are trying to hit each other in a price that's

12   different than the market, they're more likely to hit.

13       Everybody else is trading down here at the market price.

14   This is about a desired price, not the market price,

15   Your Honor.  We do not have forensic evidence about trades and

16   match trades with respect to -- and we haven't sought it,

17   Your Honor, with respect to all of these tickers, all of these

18   404(b) tickers.

19       We're relying on the direct evidence of intent to match

20   trades in these ticker symbols, in these 404(b) tickers.  We do

21   have evidence of match trades --

22           **THE COURT:**  All right.

23       **MR. ARNZEN:**  Thank you, Your Honor.

24       We do have evidence of match trades in the charged stock,

25   ASNT.

1      So Mr. Nurik's right.  He hasn't seen a bunch of forensic

2  analysis of trade data showing that these other -- these 404(b)

3  tickers are match trades.  We just think that would overly

4  extend the presentation, and the presentation is about a finite

5  point of only one of a number of manner and means of the

6  conspiracy.  It's about Mr. Hackett's knowledge of the boiler

7  room operator's misrepresentations and omissions to -- to

8  investors.

9      With respect to misrepresentations and omissions, Mr.

10  Nurik is right that we -- we don't have evidence that Mr. Nurik

11  saw scripts used by the operator.

12          **MR. NURIK:**  Excuse me.  You mean Mr. Hackett.

13          **MR. ARNZEN:**  I apologize.

14      Mr. Nurik -- Mr. Nurik stated that we don't have evidence

15  that Mr. Hackett saw scripts that were used by the operator,

16  and he's right.  We don't.  What we do have is perfect

17  knowledge by Mr. Hackett or a very, very strong inference that

18  Mr. Hackett knew two things, that the boiler room operator was

19  misrepresenting to investors the natural market price of the

20  stock.

21      The operator was representing to these victims that they

22  could get -- they could get this stock at the market price,

23  which was X.  And the whole point of their exercise was to get

24  a price that was not the market price; in other words, a price

25  as determined by a normally functioning market in the penny

1    stock world.  So that's the misrepresentation.

2         The omission that he almost certainly had knowledge of is

3    that the victim investors were not told that 50 percent of the

4    amounts that they paid for a stock would be paid to the

5    operators, the boiler room operator and agents who were trying

6    to sell them the stock.

7         And it's extremely clear and there's abundant case law

8    that that's -- that that is absolutely material to the

9    investor, to know how much or what stake is owned or -- or --

10   or they have an interest in the person that's trying to sell

11   them that stock.  So those are the -- that's the

12   misrepresentation and omission.

13        Mr. Nurik referred to stocks that Mr. Hackett did not own

14   at the time the correspondence about those stocks was going on.

15   We have evidence that he does.  The evidence primarily comes

16   from the boiler room operator and the boiler room broker and

17   the text messages here.

18        If he cares to put on contrary evidence, that's absolutely

19   his right.  He can do so now.  He can do so at trial.  But if

20   it's a contested issue, we certainly have overcome the burden

21   of being able to present it by virtue of the testimony that we

22   proffer as well as these exhibits.

23        As for QBIO, Your Honor, we do have evidence that

24   Mr. Hackett participated in QBIO.  He did not participate in

25   the Q -- the version of a QBIO scheme that everybody was

1  looking at and frankly admiring from afar.  That QBIO scheme

2  was principally carried out by several actors, including Mr.

3  Forster himself, our cooperator, back before he started

4  cooperating.

5       And Mr. Hackett was not involved with that version of the

6  scheme.  He was trying to -- or had in-depth knowledge of

7  attempts to manipulate the market for QBIO stock before our

8  cooperator, Michael Forster, got involved.  And he states on

9  calls -- and we have transcripts of it -- that there were two

10 ways in which he was involved.  One was through Liana

11 Millhouse.

12      Ms. Millhouse was one of the people that Mr. Hackett hired

13 to try to sell the stock.  Ms. Millhouse is the boiler room

14 broker.  So he hired the broker to get rid of the QBIO stock

15 through the call rooms.

16      He also said on tape that there was an Internet -- an

17 e-mail promotion tool called Nando's List that he -- that he

18 also used to try to dispose of -- I was confused.  Sorry --

19 that he used to try to dispose of QBIO stock.

20      So Mr. Nurik is in part right that he was not involved

21 with the version that everybody watched, but he was an

22 investor.  He had stock in QBIO when the very successful

23 version went on.  So he profited from it, he observed it as a

24 nonparticipant, and he was a participant prior to that point in

25 time.  That's the full story with respect to QBIO.

1    Are there any questions that I can answer for Your Honor

2    beyond that?

3        **THE COURT:**  No.

4    If I were going to try the case, I would probably allow

5    the evidence in under Rule 404(b) and Rule 403, but I would

6    first do -- how I would like to do that is take the testimony

7    of the --

8    (Court reporter requests clarification for the record.)

9        **THE COURT:**  But what I would do is take the testimony

10   of the broker and operator first outside the presence of the

11   jury.  And since this would be likely mentioned in the -- the

12   Government's opening statement, I would do that before the

13   trial.

14   So I would want to make sure that the witnesses actually

15   testify to what Mr. Arnzen said they would.  I trust Mr. Arnzen

16   100 percent.  But at trials, sometimes things turn out

17   differently than the best attorney anticipates, and this would

18   be significant evidence, and I would like to determine that

19   beforehand.

20   So my -- if it turns out as Mr. Arnzen says, I would

21   probably admit it and rule accordingly.  It would be on a

22   material point (Inaudible).

23   (Court reporter requests clarification for the record.)

24       **THE COURT:**  It would be on a material point; that is,

25   the knowledge and intent of Mr. Hackett.

1  The timing of when the other seven transactions took

2  place -- I believe within two years of the charged transaction;

3  is that correct?

4          **MR. ARNZEN:**  It is, Your Honor.

5          **THE COURT:**  And so it would have been not remote in

6  time.  The evidence, if it turns out as Mr. Arnzen proffers, is

7  sufficient to clearly establish that Mr. Hackett had knowledge

8  of what they were doing.  It would support a strong inference

9  of that.  And the other transactions are very similar to the

10  one charged, and so it would be admissible on knowledge and

11  intent.

12  As to Rule 404(b), I've indicated my tentative ruling.  As

13  to Rule 403 as to Ms. Budhu, I think a limiting instruction

14  would take care of any prejudice.  It may actually inure to her

15  favor and help her distinguish her knowledge from the knowledge

16  of Mr. Hackett.

17  And as to Mr. Hackett, I don't think the time would be

18  substantial in presenting that or confuse the jury, and any

19  prejudicial factors would not outweigh the strong probative

20  value; that is, the engagement in seven other similar

21  transactions supports the inference that he had knowledge and

22  intent to defraud.

23  So it comes down to being careful; that is, making sure we

24  have what is anticipated before it is displayed to the jury.

25  (Inaudible) whether Judge Sabraw would like to conduct the

1   hearing or have me do so.

2       (Court reporter requests clarification for the record.)

3       **THE COURT:**  That comes down to whether Judge Sabraw

4   would like to conduct an outside-the-presence-of-the-jury

5   hearing or have me do so.  I'm willing to bet that he would

6   defer it to me before the case is transferred.

7       Any ruling I would make would be without prejudice because

8   the defendants would have the opportunity during the hiatus

9   before the trial to investigate this and offer any new evidence

10  that would change the Rule 403 balance and the Rule 404(b)

11  analysis.

12      All right.  So if I'm going to do it, when?

13      **MR. ARNZEN:**  I'm sorry.  What are you going to do and

14  when?  Is that the question?

15      **THE COURT:**  No.  If, i-f, I'm going to do it, the

16  question becomes when (Inaudible) to hear the testimony.

17      (Court reporter requests clarification for the record.)

18      **THE COURT:**  If I am going to conduct the hearing

19  outside the presence of the jury, the question is when.

20      **MR. ARNZEN:**  Understood.

21      From the Government's position, Your Honor, I -- so if I'm

22  remembering correctly, Judge Sabraw set the trial date for

23  February 18th.  I think if we did it in January, that would

24  be -- would be plenty of time in advance.  I'm trying to think

25  through the logistical issues.

1          Both the boiler room operator and boiler room broker live

2     in Southern California.  Their attorneys do as well.  I

3     would -- I would prefer to have time from the Government's

4     perspective to prepare kind of a trial-ready set of documents

5     as well as testimony.

6          If -- if I have a tendency, it would be to try to -- to

7     make sure that I have a broader scope that would be admissible

8     and then work within those confines more easily.  So I may

9     narrow down the scope of the 404(b) evidence that actually is

10    presented at trial.  I would then want to have a chance to

11    analyze that and go through it with the witnesses.

12         So I think mid-January might be preferrable, Your Honor,

13    from our perspective.

14         **MR. NURIK:**  I would respectfully request an earlier

15    date for the very reason the Court suggests.

16         In the event that you do allow this testimony to come

17    in -- and that has been mentioned earlier today -- the

18    Government seems to feel it would be incumbent upon me to

19    present evidence that I have a lack of match trades, and that's

20    something that's going to require subpoenaing records.

21         And I don't believe that January -- a January hearing date

22    on this will allow me sufficient time between then and a

23    February 18th trial date to get the materials I need.  So I

24    would -- I would recommend a date in the latter part of

25    December.

1        The other question I have, Your Honor, is while I am more

2   than content to have Your Honor handle this matter, since

3   everything is going to be without prejudice with respect to

4   having Judge Sabraw, who will be the trial judge, review it,

5   I'm just questioning out loud whether or not it is at this

6   point appropriate to have Judge Sabraw get into the guts of

7   this case now versus having Your Honor continue.

8        That I leave to everybody to ponder, but I am prepared to

9   go forward with Your Honor on this matter since you already

10  have a firm understanding of the issues and have already had

11  evidence presented.

12       But I'm only concerned that if we have to retool this in

13  front of Judge Sabraw at the time of trial, I don't know what

14  kind of record he will be familiar with because, as you know,

15  you know, no matter what we do pretrial and even if we take

16  this testimony in advance of trial, we still have the

17  possibility that there are other things that come up during

18  trial that change the nature.

19       A case always lives two lives that it lives before trial

20  and that it has on trial, and we sometimes have to make

21  on-the-spot decisions during trial that weren't anticipated or

22  were seen in a different light prior.  So --

23            THE COURT:  I understand, but I will leave that up to

24  Judge Sabraw.  I will let him know my tentative ruling, and you

25  have a tentative ruling that I would likely allow the testimony

1   if it turns out as represented.  So you need to engage in your

2   research and subpoenaing and other preparation forthwith.

3   Don't wait until January.

4       If I do it, I will try to do it within the first week of

5   January, but you have my tentative ruling that I would admit

6   it.  And also, there would have to be limiting instructions as

7   to the jury's consideration of the evidence being limited to

8   knowledge and intent by Mr. Hackett.

9       So I will let you know through the clerk.

10          **MR. NURIK:**  Your Honor, then I will act forthwith and

11  begin my investigation.

12      And with respect to scheduling a hearing, then, before

13  Your Honor in the beginning of January, I would ask leave to

14  get back to your clerk tomorrow.  I have some depositions, I

15  believe, that are being scheduled through letters rogatory in

16  Canada the first week of January, and I need to double-check.

17          **THE COURT:**  The first week is a weird week.  I think

18  January 1st is on a Wednesday.

19          **MR. JONES:**  That's correct, Your Honor.

20          **THE COURT:**  So it's probably not the first week.  I

21  was thinking the following week.

22      Rick, do we have time?

23          **THE CLERK:**  Your Honor, we could do either the 6th or

24  the 8th.

25          **THE COURT:**  All right.  So those are ideas for you,

```
1    but I would make it convenient for you.  So if you have

2    something else, I wouldn't worry about it.  I'm flexible.

3         First, let me do something if Judge Sabraw wants to do

4    this himself.  This is the way I would proceed.  I'm pretty

5    careful in taking testimony first outside of the presence of

6    the jury to make sure what we have.

7              MR. NURIK:  All right.  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you.  We'll see you

9    perhaps again.

10        I think this takes care of all the motions in limine, does

11   it not?

12             MR. ARNZEN:  According to my notes, we've tackled them

13   all, Your Honor.

14             THE COURT:  All right.

15             MR. NURIK:  Yes, Your Honor.

16             MR. ARNZEN:  Thank you, Your Honor.

17             THE COURT:  Bye, Ms. Budhu.

18        Rick.

19             DEFENDANT BUDHU:  Thank you, Your Honor.  Bye.

20                  (Proceedings adjourned at 12:20 p.m.)

21

22

23

24

25
```

1

2

3                          <u>**CERTIFICATE OF REPORTER**</u>

4           I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Monday, December 16, 2019

8

9

10

11                    _____/S/ James C. Pence-Aviles_____

12            James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                            U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25