RANDY S. GROSSMAN
United States Attorney
Aaron P. Arnzen (Cal Bar No. 218272)
Andrew J. Galvin (Cal Bar No. 261925)
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel.: (619) 546-8384 (Arnzen)/ 619-546-9721 (Galvin)
Email: aaron.arnzen@usdoj.gov / andrew.galvin@usdoj.gov
Attorneys for the United States

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW HACKETT (1),<br><br>Defendant. | Case No. 18CR3072-TWR<br>Date:   February 9, 2022<br>Time:   2:30 p.m.<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

The UNITED STATES OF AMERICA, by and through its counsel, Randy S. Grossman, United States Attorney, and Aaron P. Arnzen and Andrew J. Galvin, Assistant U.S. Attorneys, hereby files this Sentencing Memorandum regarding Defendant Andrew Hackett.

## I
## INTRODUCTION

Defendant Andrew Hackett conspired to defraud investors in a classic pump-and-dump scheme. He and his conspirators gained control over the free trading shares of ASNT stock, pumped up the price through penny stock newsletters, a phone room that used high pressure sales tactics, and (they hoped) an internet stock promotion website called TheMoneyStreet.com. They also had plans to dump the stock at inflated prices on innocent investors. The scheme was uncovered, and evidence of the scheme was captured, because Michael Forster, who served as the conspirators' connection with TheMoneyStreet.com,

was cooperating with the Government, recording his conversations with the conspirators, and forwarding their text messages and emails to the FBI. Hackett was the scheme's quarterback – he brought the conspirators together, held much of the stock to be used in the scheme, engaged in manipulative trading, arranged for phone rooms and penny stock newsletters to pump up the price of the stock, decided what price to sell the stock after its price was artificially inflated, and managed to sell significant share blocks before the scheme unraveled. During trial, he also made threatening gestures at cooperating witness Michael Forster.

For Hackett's participation in this securities fraud scheme, and his obstructive conduct, this Court should impose a sentence of 72 months' custody and three years of supervised release.

## II

## BACKGROUND

### A. PRIOR PROCEEDINGS

On June 29, 2018, a federal grand jury in the Southern District of California returned an indictment charging defendants Andrew Hackett, Annetta Budhu, Vikram Khanna, Kuldeep Sidhu, and Kevin Gillespie with conspiracy in violation of 18 USC § 371, and securities fraud in violation of 15 USC §§ 78j(b) and 78ff and 17 CFR § 240.10b-5. Defendant contested the charges and after a week-long trial the jury convicted him on both counts alleged in the indictment. (ECF 301.)

Prior to trial, three of Hackett's co-defendants, Kuldeep Sidhu, Annetta Budhu, and Kevin Gillespie, pleaded guilty. The final co-defendant, Vikram Khanna, passed away not long after the indictment was unsealed.

### B. STATEMENT OF FACTS

#### 1. The Company and an Overview of the Scheme

First Harvest was a Florida-based company in the cannabis industry. The company developed a game called Hemp Inc. (which is similar to Sim City, but the characters try to create their own marijuana empire) and worked on an application that would allow people

to have medical marijuana delivered to their doorstep.

As co-conspirator Kevin Gillespie testified at trial, First Harvest was in financial trouble and he needed money to fund the company. Gillespie turned to Annetta Budhu – an outside consultant who had helped Gillespie turn First Harvest into a public company. For her efforts, Gillespie had given Budhu several hundred thousand shares of First Harvest stock. With First Harvest in need of someone to invest money in the company, Budhu called Andrew Hackett, with whom she had worked before. Hackett quickly recognized that investing in First Harvest presented an opportunity to run a pump-and-dump scheme given that (1) First Harvest was a small, publicly traded company, and (2) Budhu had inside access to the company through Gillespie – the CEO of the company. That access would allow Hackett to gain control over the company's stock and artificially pump up the price, before ultimately dumping the inflated stock into the market.

Hackett's pump-and-dump scheme involved three steps. First, Hackett and his co-conspirators would gain control over the stock of First Harvest. Second, they would artificially pump up the price of the company's stock. And last, they would dump the overpriced stock into the market and onto investors.

**2. Control**

The conspirators wanted to control the shares of First Harvest stock because once they began pumping up the company's stock price, they worried that other shareholders would start selling their shares, which would bring the stock price back down again. Before they could really pump the price high, they had to know that no other shareholders were capable of undercutting them in the market. Armed with a non-public shareholder list that provided detailed information about all the outstanding shares of First Harvest stock, and most critically, stock that was not yet trading in the public market, Hackett and his co-conspirators were able to identify whether they could get enough control over the stock of First Harvest to be able to successfully pump up the price.



*Email from Budhu to Khanna attaching ASNT shareholder list, Octo 31, 2017 (Trial Ex. 121).*

Budhu had 200,000 shares of First Harvest stock that she received from Gillespie for her work as a consultant for First Harvest. Budhu sold those shares to Hackett for just $5,000 so that the group would have shares to sell into the market once the pump began. There was a catch with Budhu's shares, however. Budhu's shares were stamped as restricted and could not be sold directly to the public.

*(Trial Ex. 204.)*

Before Hackett could deposit the shares into his brokerage account and sell them to the public, he had to have a transfer agent remove that stamp saying that the shares were

restricted. Otherwise he would not be able to sell the shares directly to the public. Hackett repeatedly lied to the transfer agent in order to remove the restrictive legend from the shares, making false statements about (1) his affiliated status with the company, (2) his access to insider information, (3) whether he was involved in soliciting investors, (4) whether he made payments to others to sell shares, and (5) his plan to dispose of shares.

*Seller's Representation Letter to ClearTrust Transfer Agent, Aug. 31, 2017 (Trial Ex. 213).*

### 3. The Pump

**a. *Phone Rooms*** - Before deciding to participate in the deal, Hackett first wanted to make sure he could engage phone rooms to pump the stock. Hackett would take the ASNT deal if, and only if, the phone rooms for which Liana Millhouse brokered the

arrangements could promote the stock.

> 14167292071@s.whatsapp.net Andrew
>
> Hvst it's at 2.00 I can get the whole deal they have lots of good news you think your New York guys will do it?
>
> Status: Read
> Platform: Mobile
>
> 8/3/2017 20:11(UTC+0)

*Text from Hackett to Millhouse, Aug. 3, 2017 (Trial Ex. 107).*

Millhouse, of course, said yes. David Wolfson, who operated the phone rooms, testified at trial that his rooms promoted ASNT/HVST (HVST was the company's prior ticker symbol) from at least October 2017 through January 2018. This testimony dovetails with Trial Exhibits 305-315, which are invoices that Wolfson sent to Millhouse for stock sales during this time period. Hackett's own recorded statement on December 9, 2017 is also consistent with using the phone rooms to further the scheme. Forster asked: "Where has uh this low hum of daily volume been coming from?" Hackett's reply: "Just Leona and just like I'm just balancing out positions. I have been supporrting it some days and then when it goes higher, I sell what I've been supporting." (Trial Ex. 32A at p.21.)

The phone rooms were especially pernicious because they combined misleading statements and omissions to unwiting investors with manipulative trading, *i.e.*, trades made at prearranged volumes, prices, and times, all of which were designed to artificially increase the price of ASNT stock. Text messages between Millhouse and Hackett were full of examples of the two agreeing on transactional details, instead of letting prevailing market forces dictate the transactions, as the law requires. (Manipulative trading is illegal under Section 9(a)(1) of the Securities Exchange Act of 1934.)



*Hackett/Millhouse Text Message Arranging Manipulative Trade.*

**b. *Fernando's List*** – Hackett told Forster that, in addition to Millhouse's phone rooms, he had used "Nando's List" to pump the stock.  As Forster testifed, he was familiar with Nando's List from his long history in the stock fraud world, and knew that Nando helped run promotions through penny stock newsletters, such as BeatPennyStocks.



*BeatPennyStocks Newsletter, Sept. 12, 2017 (Trial Ex. 252).*

Hackett stated on recorded calls that on one of the occasions that he used Nando's List, ASNT's price spiked dramatically and he sold the stock. Hackett: "[I]t got to the point where it was around five dollars, and then I did a, in that, this was before I got any of my shares I just did a campaign, to just kinda' test things out to see how this thing trades, and the stock you'll see shot up to around nine, nine fifty around there." Hackett then confirmed that this took place on September 13 and 14, 2017. (Trial Ex. 15 at p.3.) The recorded calls make clear that Hackett hid the first round of these newsletters from his co-conspirators. *See* Transcript at Trial Ex. 32 (Hackett, when asked if he knew who arranged the penny stock newsletters: "[The] only thing I've had since my shares have been freed was the call room with Leona").

      **c. _TheMoneyStreet.com_** – Of course, Hackett and his co-conspirators also recruited Michael Forster to pump ASNT stock through TheMoneyStreet.com. They were not content to just run ads on TheMoneyStreet.com, though. Instead, they used their inside access to the company through Gillespie to determine the timing of corporate press releases. Gillespie promised the other members of the scheme that he would give them notice before any press release went out to the public. And they also received advance copies of the press

8

releases so that they could use that information to create ads for TheMoneyStreet.com. None of this insider information was available to the average investor.



*Attachement to Gillespie email re Press Release Previews, Nov. 1, 2017 (Trial Ex. 123)*

### 4. The Dump

**_a. Intended Loss_** - The scheme to manipulate First Harvest's stock price would only be successful if the group was able to get to the third step in the scheme – dumping the overpriced shares into the market.  But first they had to decide how high they wanted to pump up the company's share price.  During a call with Hackett, Sidhu, Budhu, and Forster in December 2017, the group agreed to begin dumping their stock once the price reached $4.50 (or more) per share after promotion through TheMoneyStreet.com.

> CHS: Okay, so we've also kind of, on Andrew's uh direction uh kind of a participation starting point is at $5 bucks. So all agree?
>
> KS: Yea.
>
> AH: Yea, let's say between 4 and 5—

> CHS: Okay.
>
> AH: —or 4.50. The highest-let's just try to take it up as high as possible.
>
> CHS: Yea, that-that that works both ways. Between—
>
> AH: Yea you're right too.
>
> CHS: Between 5 and 9, this thing'll be fine.
>
> AH: Well—
>
> CHS: After 9—
>
> AH: Let's see-yea it'll get a lot of resistance.

*Transcript of Dec. 9, 2017 Recorded Call (Trial Ex. 32A at p.21).*

At the time, Hackett had already obtained his 200,000 shares from Budhu, and anticipated getting significantly more stock, with estimates ranging from 700,000 to 850,000 additional shares.



*Hackett/Forster Text Message Regarding 850,000 More ASNT Shares. (Trial Ex. 127.)*

**b.** **_Actual Loss_** - Hackett hid his transactions in nominee and/or offshore accounts. The evidence of Hackett's success in dumping his shares is therefore incomplete. Bits and pieces are nevertheless availabe.

Nando's List/Seton Securities - Hackett's offshore brokeage account statement shows that he sold all of the HVST stock he owned on September 13, 2017 (he acquired many more shares later), which coincides with the pump through Nando's List that Hackett described on a recorded call with Forster.



*Hackett's Seton Securities International Ltd. Statement  (Trial Ex. 119.)*

Call Rooms - It is clear that Hackett sold at least 126,715 shares for at least $332,428.24 through Wolfson's call rooms. This evidence comes from the invoices Wolfson sent to Millhouse, as summarized below.

| Dates | Shares Sold | Proceeds | Trial Ex. |
|---|---|---|---|
| 10/17/17 | 1,864 | $9,895.10 | 305 |
| 10/23/17 – 10/26/17 | 2,282 | $11,964.08 | 306 |
| 11/9/17 | 3,798 | $18,728.55 | 307 |
| 11/10/17 | 4,943 | $24,402.15 | 308 |
| 11/27/17 – 11/30/17 | 4,323 | $13,536.24 | 309 |
| 12/5/17 – 12/7/17 | 4,745 | $14,823.75 | 310 |
| 10/31/17- 11/2/17 | 16,246 | $81,575.72 | 311 |
| 1/11/28 | 14,202 | $25,073.70 | 312 |
| 1/16/18 – 1/18/18 | 13,250 | $24,974.46 | 313 |
| 1/19/18 – 1/25/18 | 57,396 | $100,987.68 | 314 |
| 1/26/18 | 3,666 | $6,466.81 | 315 |
| **Total** | **126,715** | **$332,428.24** | |

*Summary of Sales Amounts, per David Wolfson Invoices*

**1.16. ASNT**

| Date | Buyers Name | Shares | Price Per | Total Sale | Gross Comm |
|---|---|---|---|---|---|
| 1.16.18 | Sean Miller | 1,438 | $ 1.93 | $ 2,775.34 | $ 1,248.90 |
| 1.17.18 | Bill White | 1,500 | $ 1.75 | $ 2,625.00 | $ 1,181.25 |
| 1.17.18 | Bill White | 572 | $ 1.90 | $ 1,086.80 | $ 489.06 |
| 1.18.18 | | 880 | $ 1.93 | $ 1,698.40 | $ 764.28 |
| 1.18.18 | Charlie Lon | 569 | $ 1.93 | $ 1,098.17 | $ 494.18 |
| 1.18.18 | | 7,772 | $ 1.89 | $ 14,689.08 | $ 6,610.09 |
| 1.18.18 | Elden Knbauf | 519 | $ 1.93 | $ 1,001.67 | $ 450.75 |
| | | | | $ - | $ - |
| | | | | $ - | $ - |
| | | 13,250 | | $ - 24,974.46 | $ - 8,741.06 |

*Example of David Wolfson Invoice (Trial Ex. 313)*

Robert Farrill – Gillespie testifed that Hackett used Robert Farrill's name while negotiating to obtain ASNT shares, and Hackett described in recorded calls a partner that meets Farrill's description. Stock trading records show that Farrill did, indeed, receive ASNT shares, and sold at least 234,766 shares for $97,585.32 in March and April 2018. (Trial Ex. 609.1.)

**5. Obstruction of Justice – Hackett's Threats Toward Michael Forster**

More than 30 days after trial, Forster reported to the FBI that Hackett had made two threatening gestures toward him during the course of the trial. On both occasions, Forster

was in the hallway outside the courtroom, Hackett caught Forster's eye, and Hackett drew a finger across his own throat.  The details conveyed by Forster appear in an FBI report, which is attached hereto as Exhibit 1.

Forster stated that he did not alert the Government to this conduct right away because he was instructed to refrain from contact with agents and prosecutors until he was off the witness stand (except to address scheduling issues).  Forster does not believe there were witnesses to Hackett's conduct.  Given the circumstances, there is the possiblity that one or more jurors observed the events, but the Government decided against contacting jurors after they were dismissed.  The Government sought courthouse hallway camera footage from the United States Marshals Service, but was advised that the media is commonly recyled after 30 days and was not available.

Forster took Hackett's actions as a real threat.  The longer Forster thought about it, the more he started to fear that Hackett may have connections or associates that might make good on the threat. Once those fears were sufficiently heightened, he reported the incident to the FBI.

## III

## UNITED STATES' SENTENCING RECOMMENDATION

Based on the facts underlying Defendant's crime, the United States recommends the following Base Offense Level, Specific Offense Characteristics, Adjustments, and Departures:

| | |
|---|---|
| Base Offense Level [§ 2B1.1(a)] | 7 |
| Gain > $3.5 million [§ 2B1.1(b)(1)(J)] | +18 |
| More than 10 victims [§ 2B1.1(b)(2)(A)(i)] | +2 |
| Fraud Outside the U.S. [§ 2B1.1(b)(10)(B)] | +2 |
| Organizer/Leader [USSG §3B1.1(a)] | +4 |
| Obstruction of Justice [3C1.1] | +2 |
| Adjusted Offense Level | 35 |

Each of these items is discussed below.  The corresponding range is 168-210 months.

A.  GUIDELINES CALCULATION

   1.   Base Offense Level and Specific Characteristics

**Base Offense Level: 7.**  The Base Offense Level for engaging in fraud that violates a statute with a statutory maximum sentence of 20 years, such as securities fraud, is 7.  *See* USSG § 2B1.1(a).

**Loss over $3.5 million: +18**.  Actual loss in this case is difficult to measure, thanks in large part to Hackett's concealment of his transactions through nominees (*e.g.*, Robert Farrill) and offshore brokerage Seton Securities.  The United States therefore advocates for the following calculation of <u>intended</u> loss (the specific components of this calculation are discussed below).

| Item | Shares | Price | Total Value |
|---|---|---|---|
| Shares from Budhu | 200,000 | $ 4.50 | $     900,000 |
| Additional Shares | 700,000 | $ 4.50 | $  3,150,000 |
| Total Proceeds from Victims | | | $  4,050,000 |
| Less: Residual Value of Stock | 900,000 | $ 0.32 | - $     288,000 |
| **Total Intended Loss** | | | **$  3,762,000** |

Because the intended loss amount is above $3.5 million, a +18 enhancement in appropriate under USSG § 2B1.1(b)(1)(J).

<u>Shares from Budhu</u> – These are the 200,000 shares that Hackett purchased from Budhu, and were subject to extensive discussion in Hackett's recorded calls with Forster.  They represent a portion of the shares that Hackett sought to sell at $4.50/share.

<u>Additional Shares</u> – Hackett and his co-conspirators made several statements about obtaining additional shares.  These shares also represent a portion of the shares that Hackett sought to sell at $4.50/share.  The volumes under discussion ranged from 700,000 shares to 850,000 shares.  *Compare* Trial Ex. 11 (Khanna's reference on recorded call to 700,000 shares) to Trial Ex. 127 (Hackett's text message referencing "850k more," as excerpted above).  The United States recommends that the more conservative metric – 700,000, which favors Hackett – be used to calculate loss here.

<u>Residual Value of Stock</u> – The stock sold to investors arguably had some actual value. Hackett manipulated the market for ASNT stock from approximately August 2017 through January 2018. Although the artificial price of ASNT fluctuated dramatically during this period – *e.g.*, the share price went from less than $3, to more than $9, and back to around $3 in the ten days surrounding Hackett's use of Nando's List – the stock settled at well less than $0.50/share after the effects of the call rooms and newsletters wore off. As shown in Trial Exhibits 607 and 607.1, investors watched the price drop to pennies from February 2018 through April 2018. The average price during this period comes out to $.32 per share. The United States recommends that this value - $.32/per share - be subtracted from the amount of loss caused by Hackett's fraud (*i.e.*, the loss suffered by victims is arguably reduced because victims ended up owning stock that had some residual value after the manipulative impact of the scheme subsided). This is a very conservative estimate that favors Hackett, given that the price on the last day of April 2018 was $.03/share.

**More than 10 Victims: +2.** Where there are 10 or more victims of a fraudulent scheme, the Guidelines provide for a 2-level upward adjustment. *See* USSG § 2B1.1(b)(2)(A)(i). There were far more than 10 victims listed in the David Wolfson's call room invoices (Trial Ex. 305-315), without having to count the larger number of victims who bought ASNT stock as a result of the penny stock newsletters that Hackett arranged through Nando's List.

**Substantial Portion of Fraud Committed Outside the United States: +2.** Hackett lived in, and committed the scheme from, his home in Canada. Hi co-conspirator Sidhu also resided in, and engaged in the scheme, from Canada. Hackett also used his Seton Securities Ltd account to hold and trade ASNT stock, which was useful for concealment purposes precisely because it was located offshore. Because a substantial part of the fraudulent scheme was committed from outside the U.S., a two-level increase is appropriate under USSG §2B1.1(b)(10)(B).

**Organizer/Leader: +4.** Hackett was, without doubt, the quarterback of the ASNT scheme. He brought a company that needed money and its CEO into a full fledged pump

and dump scheme. Hackett loaned ASNT money; lied to ClearTrust about the resulting shares in order to remove the restrictive legend; held shares offshore in his Seton Securities account; made decisions about whether, how much, and when to trade ASNT shares; arranged for promotions through Wolfson's call rooms and Nando's penny stock newsletters; engaged in manipulative trades when Wolfson's call rooms located an investor; lied to co-conspirators about aspects of his promotional activities; and was on the phone far more frequently and discussed far more aspects of the pump and dump scheme with Forster than any other co-schemers. Because Hackett was an organizer or leader of a criminal activity that involved five or more participants (including Hackett, Sidhu, Khanna, Gillespie, Budhu, Wolfson, Millhouse, and whoever runs Nando's List), his offense level should be increased by four levels pursuant to USSG §3B1.1(a).

**Obstruction of Justice: +2.** As described above, Hackett threatened Forster during Forster's testimony. This is reprehensible conduct. Two points should be added pursuant to USSG §3C1.1, because Hackett willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice.

* * *

Based on the foregoing, Defendant's adjusted offense level is, by the government's calculation, equal to 35.

### 3.   Criminal History

Defendant has no scoring criminal convictions of which the United States in aware. Accordingly, Defendant falls into Criminal History Category I.

## IV

## SECTION 3553(a) SENTENCING ANALYSIS

The Sentencing Guidelines are an important factor that must be calculated and considered by the Court in fashioning an appropriate sentence, but they are only one of the factors set out in 18 U.S.C. §3553(a) that ultimately guide a district court in the exercise of its discretion. *See United States v. Sylvester Norman Knows His Gun, III*, 438 F.3d 913, 918 (9th Cir. 2006).

A.  **NEED FOR SENTENCE TO REFLECT SERIOUSNESS OF THE OFFENSE**

Engaging in a pump and dump scheme is undoubtedly a serious offense. Hackett and his co-con-conspirators collectively deceived First Harvest's shareholders, the SEC, First Harvest's transfer agent, and brokerage firms, to create the appearance that First Harvest stock had significant trading volume and an upward price trajectory. In truth, they were really intent on buying low, forcing up the price of First Harvest stock, and selling their shares at inflated prices to an unsuspecting public, all through a classic pump and dump scheme.

The sentence imposed here should promote respect for the law in general, and for the securities laws and regulations governing fraud and capital formation through securities offerings in particular. Capital formation is absolutely vital to the local and national economies. But to work well, the system must be based on integrity and the public's trust. "In looking at the Commission's role in facilitating capital formation for small businesses, it is important to note that the Commission's mission is to do so in a manner consistent with the protection of investors and maintaining the integrity of the capital markets." *See* 2014 SEC Government-Business Forum on Small Business Capital Formation, *Remarks of Commissioner Luis Gallagher* (available at http://www.sec.gov/info/smallbus/gbfor33.pdf).

Defendant's conduct here did substantial harm to investors and undermined the integrity of the capital markets. Defendant's sentence should reflect the seriousness of his crime and the harm he has caused.

B.  **NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES**

Hackett will doubtless point out that his co-conspirators received less severe sentences than the one he is facing. Sidhu was sentenced to roughly one year (342 days), and Gillespie and Budhu both received 6 months home confinement. While Hackett's recommended sentence is certainly not the same as that of his co-defendants, much of the disparity is warranted. This comes down to (1) the co-conspirators' guilty pleas and acceptance of responsibility, (2) their cooperation/substantial assistance, and (3) Hackett's far more central role in the scheme. All living co-defendants named in the indictment –

Gillespie, Sidhu, and Budhu – pleaded guilty. Gillespie and Sidhu put themselves in position to testify at trial, and Gillespie was called to the witness stand.

To be clear, though, the primary factor leading to a more serious sentence for Hackett is his aggravated role, as discussed above, and his failure to accept responsibility for his crime. This is also borne out in the recommended § 2B1.1 loss calculation in addition to the recommended leader/organizer role. The Government's recommended loss figure is significantly higher than it was for Hackett's co-conspirators, because Hackett made near unilateral decisions about promoting ASNT, and exercised total control over selling his overvalued stock to unwitting investors. A telling example is described above: Hackett outright lied to his co-conspriators about the scope and extent of his fraud by telling them that he had nothing to do with the first Nando's List promotions in September 2017, when the evidence is perfectly clear that he was fully responsible for newsletters.

All that said, the Government seeks a sentence that varies significantly from the Guidelines range, and recommends that the Court reduce Hackett's sentence to 72 months under § 3553(a) based on the need to avoid unwarranted sentencing disparities.

C. **KINDS OF SENTENCES AVAILABLE**

**Probation** - If the recommendation of the United States is accepted, Defendant's adjusted offense level of 35 falls within Zone D of the Guidelines Sentencing Table; taking into account his Criminal History Category I, the Guidelines range is 168-210 months. Given the serious nature of the offense, the Guidelines do not contemplate a probationary sentence. U.S.S.G. § 5B1.1, comment (n.2).

**Restitution** - The government seeks restitution from Defendant. It requests, however, that a restitution hearing be calendared for approximately 45 days after the initial sentencing hearing, given the nuanced analysis necessary to properly calculate victim-by-victim losses here.

# V
# CONCLUSION

The Court should sentence Defendant to 72 months' custody, and order him to pay restitution to victims of his crime in an amount to be determined at a future hearing. Once he has completed his custodial sentence, Defendant should be placed on a period of supervised release for three years.

DATED: February 21, 2022	Respectfully submitted,

	RANDY S. GROSSMAN
	United States Attorney

	/s/Aaron P. Arnzen
	AARON P. ARNZEN
	ANDREW J. GALVIN
	Assistant United States Attorneys